IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

               Plaintiff,

    vs.

NATHAN CONNER,

             Defendant.

Case No. 3:20-cr-00002-JMK

**ORDER**

Before the Court at Docket 38 is Defendant Nathan Conner's *Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment* (the "Motion to Suppress"). The Government filed a response in opposition at Docket 46. The Court held an evidentiary hearing from November 9–10, 2021, at the conclusion of which the Court requested supplemental briefing from the parties.[1] Subsequently, Mr. Conner filed *Supplemental Briefing in Support of Dismissal with Prejudice, Suppression of Evidence, And/Or Exclusion of Alaska State Trooper K9 Evidence and Witnesses* at Docket 77. The Government filed a response in opposition at Docket 78. For the following reasons, the Court **GRANTS** Mr. Conner's Motion to Suppress. It further **GRANTS** Mr. Conner's

---

[1] *See* Dockets 73, 74.

request to exclude the testimony and statements of Alaska State Trooper Woodruff and related K-9 evidence.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On June 14, 2019, around 8 p.m., Kenai Police Department Officer Trevor Miller was driving westbound on the Kenai Spur Highway and observed Mr. Conner enter the highway from Swires Road in a 1997 Chevrolet pickup truck.[2]  Officer Miller testified that Mr. Conner failed to signal two turns:  first, after Mr. Conner left his residence at 1803 Brannigan Circle and turned onto the Kenai Spur Highway ("the highway"), and, second, as Mr. Conner changed lanes on the highway.[3]  As Mr. Conner signaled a right turn off of the highway, Officer Miller activated his overhead lights, dash cam, and body cameras.[4]  Mr. Conner maintains that he properly signaled his turn onto the highway, while making the lane change, and in turning off the highway.[5]

Dash cam footage shows that Officer Miller slowly followed Mr. Conner through a residential neighborhood for approximately 50 seconds, until Mr. Conner pulled into a driveway at 714 Linwood Lane.[6]  Officer Miller approached Mr. Conner's driver's side door with his firearm drawn and asked Mr. Conner if he had any weapons.[7]  Mr. Conner stated that he had a BB gun in the driver's door pocket and, in response to further questioning, confirmed he did not have a valid Alaska driver's license.[8]

---

[2] Docket 38 at 2.
[3] Docket 46 at 3.
[4] Docket 38-1 at 2.
[5] Docket 38 at 2.
[6] *Id.* at 3.
[7] Docket 46 at 3.
[8] Docket 38 at 4.

Officer Miller ordered Mr. Conner out of the vehicle and conducted a pat-down search for weapons.[9]  Officer Miller found $113 of rolled up cash on Mr. Conner, but no weapons, and arrested him for driving while his license was revoked, failing to stop at the direction of a police officer, and for violating conditions of release imposed for a pending state criminal case.[10]  Officer Miller placed him in the back of a patrol vehicle belonging to another officer that arrived on the scene.[11]

Officer Miller testified that several houses near where Mr. Conner had stopped were known to law enforcement as places of reported drug activity.[12]  While processing the scene, Officer Miller stated he observed a cell phone in Mr. Conner's truck display two text messages which stated, "Also have 20 perks they're not mine 8 a piece," and "Like to see you if can help."[13]  Those text messages were received from different numbers.[14]  Based on these observations, he requested Alaska State Trooper Jason Woodruff and K-9 Donna perform a drug detection sniff of the vehicle.[15]  During the subsequent drug detection sniff, K-9 Donna "alerted" to the passenger side bed approaching the cab of the truck and to the upper portion of the toolbox towards the passenger side seam of the cab for the presence of the odor of drugs.[16]

---

[9] *Id.*
[10] *Id.*
[11] *Id.*; Docket 46 at 4.
[12] Docket 38 at 5.
[13] Docket 46 at 4.
[14] Evidentiary Hearing Exhibit D–16.
[15] Docket 38 at 5.
[16] *Id.* at 4.

Mr. Conner's vehicle was impounded and Officer Miller applied for a search warrant, alleging there was probable cause to believe that the pickup contained evidence of the Alaska state crimes of Misconduct Involving Weapons and Misconduct Involving Controlled Substances.[17] In an affidavit attached to the search warrant, Trooper Woodruff stated he observed tinfoil pieces, a butane torch, and a lockbox in the vehicle prior to conducting the K-9 sniff.[18] The search warrant was granted, and Officer Miller discovered in the vehicle: (1) $700 in cash rolled up in a rubber band, located on the floorboard near the driver's seat; (2) various quantities of alleged heroin, methamphetamine, marijuana, and pills inside a closed and locked container near the center console; (3) alleged marijuana and a "drug ledger" inside a closed and locked backpack in the back seat; (4) a Colt 1911 .45 pistol and ammunition inside a separate closed backpack on the back seat; and (5) two cell phones.[19]

On August 31, 2020, through counsel, Mr. Conner requested from the Government "AST Woodruff and K-9 Donna's handler's log, training records and score sheets, certification records, and training standards and manuals pertaining to K-9 Donna."[20] It appears from the record before the Court that the Government attempted to obtain the records from the state law enforcement agency but ultimately was unsuccessful.

On April 7, 2021, Mr. Conner requested, and the Court granted, a subpoena pursuant to Federal Rule of Criminal Procedure 17(c) requesting the "handler's log as well

---

[17] *Id.* at 6.
[18] Docket 38-8 at 3.
[19] Docket 38 at 7.
[20] Docket 77-1 at 2.

as all training records and score sheets, certification records, and training standards and manuals pertaining to Alaska State Trooper [] Jason Woodruff and K-9 Donna."[21] The subpoena contained an April 30, 2021 deadline for production.[22] In response, Mr. Conner received log sheets, score sheets, and certification records dating from May 19, 2019 to June 14, 2019.[23] Because Trooper Woodruff indicated in his affidavit accompanying the search warrant request that K-9 Donna had been certified since June 14, 2018, counsel for Mr. Conner emailed the Government asking why the remaining certifications were not produced.[24] On August 5, 2021, Alaska State Trooper Sergeant D. Andrey Cooper responded to the Government, who forwarded the response to Mr. Conner, as follows:

> Without seeing the original order my response might not cover what it needs to. After *Florida v. Harris*, AST only held records for dogs through the certification year. In this case it appears that Donna was certified for two months and thus two months of records were provided. Prior to Harris we would list and count every training search on the K9 affidavit through the dogs [sic] career. Again, we stopped doing this as a program and only hold records now from certification to certification.[25]

When the records still were not turned over to Mr. Conner, this Court issued two additional orders, on July 20, 2021, and September 3, 2021, demanding compliance with the subpoena.[26]

---

[21] Docket 40 (quotation marks omitted).
[22] Docket 77-6 at 2.
[23] Docket 77 at 6.
[24] Docket 77-10 at 3–4.
[25] *Id.* at 7.
[26] *See* Dockets 59, 63.

At the evidentiary hearing held from November 9–10, 2021, the Government called Trooper Woodruff, Officer Miller, and Lead Canine Instructor Sergeant Brian Zeisel to testify. The Court reviewed footage from the body cam and dash cam that documented a portion of the encounter between Officer Miller and Mr. Conner. Among other exhibits, Defendant introduced Trooper Woodruff's K-9 Handler's log, photos from the vehicle search, and an unopened cigarette box.[27]

In response to questioning by Mr. Conner's defense counsel, Sergeant Zeisel testified that the Alaska State Troopers *are* in possession of K-9 Donna's complete training records and that the Alaska State Trooper K-9 Training Program has a written curriculum and written standards for certification beyond what was provided in discovery to Mr. Conner. After learning that the records existed and were withheld in violation of the Rule 17(c) subpoena, Mr. Conner made an oral motion to dismiss his indictment with prejudice, citing a violation of his due process rights. This Court declined to dismiss the indictment entirely, but agreed that excluding all evidence related to K-9 Donna's drug detection sniff was proper.

After the hearing, Mr. Conner filed supplemental briefing alleging that the Alaska State Troopers' refusal to provide the records relating to K-9 Donna's certification and training in defiance of a federal subpoena resulted in a miscarriage of justice.[28] To remedy a myriad of constitutional violations, Mr. Conner requests that this Court exercise

---

[27] Docket 75.
[28] Docket 77 at 13.

its supervisory power to issue an Order dismissing the indictment with prejudice.[29]  In the alternative, Mr. Conner requests that the Court exclude Trooper Woodruff's testimony and all evidence related to K-9 Donna.

## II. DISCUSSION

Mr. Conner first moves this Court to suppress all evidence obtained from the search of his 1997 Chevrolet truck, including the alleged drugs, gun, and associated ammunition.[30]  He alleges two violations of his Fourth Amendment rights, specifically that: (1) Officer Miller conducted an unreasonable seizure of his vehicle unsupported by reasonable suspicion that Mr. Conner had committed any criminal offense or traffic violation; and (2) the vehicle search was unreasonable because it was based on an unreliable dog sniff and a warrant otherwise unsupported by probable cause to believe that evidence of any criminal offense would be found inside.[31]  The Court finds that the investigatory stop was an unreasonable seizure and Mr. Conner's Motion to Suppress should be granted.

Mr. Conner's oral motion and supplemental briefing moves the Court to dismiss his indictment entirely based on several other constitutional violations stemming from the Alaska State Troopers' failure to comply with a federal subpoena for K-9 records.[32]  The Court declines to dismiss Mr. Conner's indictment, but finds that suppressing Trooper Woodruff's testimony is an appropriate remedy for the Alaska State

---

[29] *Id.* at 14.
[30] Docket 38 at 1.
[31] *Id.* at 1–2.
[32] Docket 77 at 13.

Troopers' failure to comply with the Court's subpoena and subsequent Orders and is justified by the Court's inherent supervisory powers.

## A.    Motion to Suppress

The first issue before the Court is whether Officer Miller had reasonable suspicion to conduct an investigatory stop.    The Fourth Amendment prohibits "unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."[33]   A police officer may conduct a traffic stop if they have "reasonable suspicion" to believe that a motorist has committed a traffic violation or is otherwise engaged in criminal activity.[34] To have reasonable suspicion, "the police officer must be able to point to specific, articulable facts which, together with rational inferences from those facts, reasonably warrant [the] intrusion."[35]   A police officer may rely on training and experience in drawing inferences from the facts they observe, but only if the inferences are "grounded in objective facts and . . . capable of rational explanation."[36]  The Court must look to the "totality of the circumstances" to determine whether the officer has such "particularized and objective basis for suspecting legal wrongdoing."[37]

Here, the Government argues the traffic stop was supported by reasonable suspicion because Mr. Conner committed several traffic violations:  first by failing to signal

---

[33] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

[34] *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (discussing *Whren v. United States*, 517 U.S. 806 (1996)).

[35] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

[36] *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996).

[37] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

two turns, and later by failing to stop after Officer Miller activated his lights. Mr. Conner alleges in his declaration that he signaled both turns and pulled over as soon as was practicable, and therefore violated no traffic laws warranting an investigatory stop.[38]

The dash cam footage recorded by Officer Miller does not begin recording until after the first two alleged traffic violations had already occurred and his lights were activated, so it provides no conclusive evidence as to whether Mr. Conner failed to signal. However, the dash cam does record Officer Miller's pursuit of Mr. Conner after Mr. Conner signals his exit off the Kenai Highway. The footage shows Officer Miller slowly following Mr. Conner on a single lane road with no shoulder. In the incident report, Officer Miller alleges that Mr. Conner sharply turned before stopping, forcing him to slam on his brakes to avoid colliding with the truck.[39] In the search warrant affidavit for the truck, Officer Miller stated that Mr. Conner was arrested for "felony Failure to Stop at the Direction of a Police Officer," which necessarily requires a motorist also commit the offense of reckless driving by "creating a substantial and unjustifiable risk of harm to a person or property. . . ."[40] It does not appear from the dash cam footage that Mr. Conner drove in a reckless manner, and he certainly did not create a substantial risk of harm to a person or property. The footage shows Mr. Conner driving what appears to be less than ten miles per hour to a clearing and then pulling over into a parking space outside of a residence; the entire pursuit lasts less than one minute from when Officer Miller alleges

---

[38] Docket 38-2 at 1.
[39] Docket 38-1 at 2.
[40] Alaska Stat. § 28.35.182(a)(1); Alaska Stat. § 28.35.400.

*United States v. Conner*
Order

Case No. 3:20-cr-00002-JMK
Page 9

Case 3:20-cr-00002-JMK-MMS   Document 81   Filed 01/18/22   Page 9 of 22

activating his overhead lights. From the audio, Mr. Conner is heard calmly explaining to Officer Miller that he did not stop immediately because there was no place to do so without blocking traffic. These actions were reasonable given the narrow, residential back road. When Officer Miller asks Mr. Conner why he did not pull over on the highway, Mr. Conner responds he was not aware the overhead lights were activated. Mr. Connor's explanation appears reasonable, given the significant distance between Officer Miller's and Mr. Conner's vehicles, and Officer Miller's sworn statement that he did not activate his overhead lights until Mr. Conner was already executing the turn off from the highway. Although Mr. Conner perhaps could have stopped a few seconds sooner, Officer Miller's description of an excessive pursuit and Mr. Conner's erratic driving appears grossly exaggerated in comparison to what is visible in the dash cam footage.

The Court finds that Officer Miller's testimony is discredited by the dash and body cam footage because the footage conflicts with his statements made in the search warrant application and incident report, and with his testimony at the evidentiary hearing. The drastic disparity between Officer Miller's description of the "pursuit" and what is clearly evident in the dash cam footage calls into question the veracity of Officer Miller's testimony associated with any alleged traffic violations preceding the stop. The Court therefore finds that, based on the record before it, the Government has not carried its burden of showing that law enforcement had reasonable suspicion to conduct the stop. Absent reasonable suspicion, Mr. Conner's Fourth Amendment rights were violated. The evidence

discovered in Mr. Conner's truck is the fruit of an unlawful search and seizure and must be suppressed.[41]

### B.     Oral Motion to Dismiss Indictment

In addition to granting his Motion to Suppress, Mr. Conner also moves this Court to dismiss his indictment with prejudice pursuant to its supervisory powers under the Article III of the U.S. Constitution.[42]  He argues that the Alaska State Troopers' failure to comply with a subpoena issued by this Court violates the following constitutional rights: (1) Fourth Amendment right to be free of unreasonable searches and seizures; (2) Fifth Amendment right to due process of law; (3) Sixth Amendment right to present a defense; (4) Sixth Amendment right to compulsory process; (5) Sixth Amendment right to confrontation; and (6) Sixth Amendment right to a speedy trial.[43]  Mr. Conner's supplemental briefing summarily asserts these various rights have been violated, but does not cite to case law supporting his assertions.

The Government's opposition does not respond to Mr. Conner's supervisory power arguments, but instead asserts that Federal Rule of Criminal Procedure 48(b) governs the Court's authority to dismiss the indictment.[44]  The Government then argues that Rule 48 does not apply here because Mr. Conner has not shown prosecutorial misconduct or prejudice.[45]  The Government asserts that dismissal and suppression are inappropriate sanctions, but concedes that the Alaska State Troopers have engaged in some

---

[41] *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).
[42] Docket 77 at 13.
[43] *Id.*
[44] Docket 78 at 2–3.
[45] *Id.*

misconduct, whether negligent or intentional, and suggests ordering "a show cause hearing to determine what happened with the Troopers' response to the defendant's unopposed R 17(c) subpoena" or "impos[ing] the defense expert's cost upon the Troopers."[46]

"'[G]uided by considerations of justice,' and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or Congress."[47]  However,

> [t]he Supreme Court has recognized only three legitimate bases for the exercise of the supervisory power: to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.[48]

The Ninth Circuit also has approved of a district court's invocation of its supervisory power to remedy violations of specific discovery orders and other "recognized rights," and has found that the supervisory powers of the federal courts are not necessarily limited to those three distinct arenas.[49]  But such powers are not without parameters.  For example, courts "may not impose an exclusionary rule in the name of exercising their supervisory power to remedy a nonconstitutional violation in seizing evidence to the extent the Supreme Court limits that remedy to fourth amendment violations."[50]  Supervisory powers are exercised

---

[46] *Id.* at 4–5.

[47] *United States v. Hastings*, 461 U.S. 499, 505 (1983) (citing to *McNabb v. United States*, 318 U.S. 332, 341 (1943)).

[48] *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991) (*abrogated by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008)).

[49] *See, e.g., United States v. Talbot*, 51 F.3d 183, 187 (9th Cir. 1995) ("a district court can exclude otherwise admissible government evidence only when a violation of 'any constitutional provision, federal statute, specific discovery order, or any other recognized right' has been shown.") (citing to *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985)); *W.R. Grace*, 526 F.3d at 511 n.9 (collecting cases).

[50] *Gatto*, 763 F.2d at 1046.

with extreme caution, as the Court does not encroach upon its sister branches unless the administration of an effective criminal justice system hangs in the balance.[51]  As such, a "court may not exercise any supervisory power absent 'a clear basis in fact and law for doing so.'"[52]  Under appropriate circumstances, this caution must be balanced by courts' inherent need to "manage their cases and courtrooms effectively and to ensure obedience to their orders."[53]

As a threshold matter, the Court agrees with the Government that Rule 48 is inapplicable in this case.  Dismissal of an indictment by the court is proper under Rule 48 where unnecessary delay occurs in "bringing a defendant to trial."[54]  A district court may only impose this sanction when it satisfies the requirements of "caution" and "forewarning."[55]  "The caution requirement is satisfied where the reason for dismissal is 'prosecutorial misconduct and demonstrable prejudice or substantial [threat] thereof.'"[56]  Although misconduct on the part of the Alaska State Troopers has been established, as discussed *infra*, neither party suggests that prosecutorial misconduct has been

---

[51] *Gonsalves*, 691 F.2d, 1310 1319 (9th Cir. 1982) ("The judiciary therefore should use its supervisory power to maintain its own institutional integrity, including the ability to administer an effective criminal justice system, as well as to maintain the institutional power of all three branches of government. The courts must not abdicate their responsibility to check the governmental excesses of the executive and the legislature; the invocation of supervisory power may occasionally provide the necessary restraint of these excesses.") (internal citations omitted) (judgment vacated).

[52] *Gatto*, 763 F.2d at 1046 (citing to *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977)).

[53] *W.R. Grace*, 526 F.3d at 509 (citing to *Aloe Vera of Am., Inc. v. United States*, 376 F.3d 960, 964–65 (9th Cir. 2004) (per curiam) (internal quotations omitted)).

[54] Fed. R. Crim. P. 48(b)(3).

[55] *United States v. Sears, Roebuck and Co., Inc.*, 877 F.2d 734, 738 (9th Cir. 1989).

[56] *Id.* (internal citations and quotations omitted).

demonstrated in this case.[57] Further, the Court certainly has not forewarned the Government of the possibility of a Rule 48(b) dismissal, nor could it have done so, as the Court did not know of the Alaska State Troopers' noncompliance with the federal subpoena until the conclusion of the evidentiary hearing.

The inapplicably of Rule 48, however, does not preclude the Court's consideration of exercising its supervisory powers to fashion an appropriate remedy where there has been a violation of a court order and Constitutional safeguards. At the evidentiary hearing, it was conclusively established that the Alaska State Troopers were in possession of numerous additional responsive documents—so voluminous, in fact, that they could not be electronically transferred[58]—requested in Mr. Conner's Rule 17(c) subpoena regarding K-9 Donna's training records and certifications, as well as Trooper Woodruff's handler records. In an email exchange between the Alaska State Trooper Sergeant Cooper and Mr. Conner's defense counsel in August 2021, Sergeant Cooper represented that the Troopers "no longer held" complete K-9 training records pursuant to a 2013 Supreme Court decision.[59] It appears from the record that no effort was made to contact Sergeant Zeisel—

---

[57] In fact, the Court explicitly acknowledges that the prosecutor in this matter admirably endeavored to mollify these discovery issues. Nevertheless, despite those efforts, state law enforcement failed to comply with the Court's Rule 17 subpoena.

[58] Docket 78 at 2. The Government alleges that the documents were scheduled to be physically delivered to the Assistant United States Attorney's Office due to their multiplicity. *Id.*

[59] Sergeant Cooper cited to *Florida v. Harris*, which the Court presumes to refer to *Florida v. Harris*, 568 U.S. 237 (2013). In that case, the Supreme Court found that whether an officer has probable cause pursuant to a drug detection dog sniff depends on the totality of the circumstances, rather than "an inflexible set of evidentiary requirements." It is not clear how this case gives the Alaska State Troopers carte blanche to destroy years of training records and certifications, especially when Trooper Woodruff relied on the fact that K-9 Donna had been certified since 2018 in the search warrant application for Mr. Conner's vehicle.

the individual most likely to be, and indeed in possession of responsive records—despite being called to testify as a witness during the evidentiary hearing.

Sergeant Cooper's August 2021 email response for why additional records were not produced gives rise to more questions. Sergeant Cooper stated that K-9 records are only held by the Alaska State Troopers "through the certification year," and because K-9 Donna was certified for two months in 2019, only the certifications from May 19, 2019–June 14, 2019, were disclosed to defense counsel.[60] The drug detection dog sniff of Mr. Conner's vehicle was conducted on June 14, 2019; however, the subpoena was not issued and answered until April 2021. If the policy articulated by Sergeant Cooper was true, *i.e.*, that the Troopers only retain K-9 records on a yearly basis, the Alaska State Troopers would not have held on to any K-9 records from two years prior, much less exactly one month of certifications leading up to the *precise* date of the search of Mr. Conner's vehicle. It is unclear to the Court whether Sergeant Cooper was untruthful or simply mistaken about the agency's policy, whether the Alaska State Troopers were aware that additional responsive records existed and selectively suppressed or destroyed them, or whether K-9 Donna truly was only certified for less than one month and Trooper Woodruff falsely asserted on his affidavit for the search warrant that she had been certified since 2018. At best, the Alaska State Troopers were grossly negligent in taking steps to properly investigate and respond to the subpoena; at worst, deceptive.[61] Regardless, the

---

[60] Docket 77 at 3.

[61] Based on the testimony heard at the evidentiary hearing, the Court determined that the recordkeeping practices of the Alaska State Troopers with regard to K-9 training and certification are "woefully lacking." The Government itself has admonished the Alaska State Troopers' response to the subpoena as either an "institutional failure or a ministerial malfunction." Docket 78 at 2.

Alaska State Troopers plainly violated *several* unambiguous orders from this Court to comply with the subpoena.

The Court finds that the Alaska State Troopers' willful disobedience in turning over, by definition, relevant evidence pursuant to a Rule 17 subpoena violated Mr. Conner's due process rights. Rule 17(c) is intended to implement the compulsory process obligation of the Sixth Amendment to the U.S. Constitution.[62] The Supreme Court has held that the Sixth Amendment's guarantee to compulsory process is violated when a criminal defendant is arbitrarily deprived of "testimony [that] would have been relevant and material, and . . . vital to the defense."[63] To require production of documents prior to trial, a moving party must necessarily show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."[64]

Magistrate Judge Smith granted the subpoena for all handler's logs, training records, score sheets, certification records, and training standards and manuals pertaining to Trooper Woodruff and K-9 Donna.[65] Mr. Conner's request for subpoena was unopposed by the Government, and a sufficient showing was made justifying the production of K-9 Donna's records prior to trial. By virtue of granting the request for a subpoena of the K-9

---

[62] *See California v. Trombetta*, 467 U.S. 479, 485 (1984).
[63] *Washington v. Texas*, 388 U.S. 14, 16 (1967).
[64] *United States v. Nixon*, 418 U.S. 683, 699–700 (1974).
[65] *See* Dockets 40, 41.

records, Magistrate Judge Smith determined that Mr. Conner cannot properly prepare for trial without their production. The Court sees no reason to disturb this finding, especially absent any objection from the Government. While there also may be an unreasonable delay in trial due to the Alaska State Troopers' failure to identify all responsive records until nearly eight months after the subpoena was issued,[66] the most problematic consequence of the Alaska State Troopers' actions is Mr. Conner's inability to secure all evidence necessary to his defense.

Indeed, an essential element of Mr. Conner's defense appears to be the alleged unreliability of K-9 Donna's alert for the presence of the odor of drugs. Mr. Conner alleges that Officer Miller based his probable cause determination in the search warrant application on K-9 Donna's positive alert for the presence of the odor of drugs, and that until Mr. Conner obtains all the "dog-history discovery to which he is entitled, it is impossible to properly assess the foundation for the alleged reliability of the dog sniff or to determine whether AST Woodruff made false statement or omissions as to the dog's training, certification, or performance in his supporting search warrant affidavit."[67] Where Trooper Woodruff relied on K-9 Donna's certification records dating back to June 2018 in his search warrant affidavit, but could only produce certifications dating from May 2019 to June 2019, the Court must agree with Mr. Conner.[68]

---

[66] The Supreme Court has recognized that one of the fundamental characteristics of a subpoena duces tecum in criminal cases is to "expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698–99 (citing to *Bowman Dairy Co.*, 341 U.S. at 220). However, the Government has articulated other legitimate reasons for the delay in trial, principally the COVID-19 pandemic.

[67] Docket 38 at 13.

[68] *See United States v. Cedano-Arellano*, 332 F.3d 568, 571–72 (9th Cir. 2003).

Further, at the evidentiary hearing, Mr. Conner was able to show to a limited extent, by virtue of possessing limited documentation, that Trooper Woodruff was not entirely diligent in his continued training of K-9 Donna. Trooper Woodruff testified that according to the training logs turned over to Mr. Conner, he did not meet the minimum number of hours and criteria set forth by the Alaska State Troopers' requirements for proper maintenance training. Because the Court has not reviewed the documents withheld by the Alaska State Troopers, it does not know whether they contain exculpatory information. However, only a plausible showing that the evidence would have been material and favorable is required to show a violation of due process.[69] The Court finds that Mr. Conner has made a plausible showing that the suppressed training logs would have revealed information discounting the reliability of K-9 Donna and Trooper Woodruff's statements made in the search warrant affidavit. The Alaska State Troopers' deliberate indifference to three separate orders from this Court demanding production of the K-9 records gives this Court further pause as to the reliability of this particular K-9. Although the Court does not opine on whether the warrant would be rendered deficient absent the dog sniff evidence, it finds that there would at least be a valid question of whether it was supported by probable cause.[70] Thus, the withheld information would have proved material and favorable to Mr. Conner's defense.

---

[69] *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982) (finding criminal defendant must make a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense" in order to sanction the Government for deporting such witnesses, but that such showing may be based upon "legal argument, rather a submission of additional facts.").

[70] Although not specifically relevant to this Court's ruling or rationale, it may be worth noting that other problematic aspects of the search warrant affidavit were exposed during the evidentiary hearing. In addition to the unsubstantiated allegations of the "high-speed pursuit" and K-9 reliability, it became clear

The circumstances of this case are analogous to those in *United States v. Roybal*.[71]  In *Roybal*, the government intentionally failed to turn over witness testimony to the defendant in violation of a discovery order, which the court found prejudiced the defendant's ability to prepare a defense.[72]  The evidence did not come within the orbit of *Brady v. Maryland* or Jencks Act material,[73] and the court therefore relied on its supervisory powers to remedy the unfairness caused by the Government's violation of a "fair procedure."[74]  Specifically, the Ninth Circuit found that it "could not ignore the unfairness and potential prejudice to the defendant" nor the "unfairness and discourtesy to the trial judge who [wa]s suddenly faced with having to decide, on an incomplete record, whether trial should continue[.]"[75]  As a result, the court in *Roybal* reversed the defendant's conviction and remanded the case.[76]  Mr. Conner's ability to prepare his defense is similarly impacted by the Alaska State Troopers' failure to comply with the subpoena,

---

that other items articulated in the search warrant affidavit as evidence of possible drug trafficking were less than reliable when exposed to even a slightly rigorous examination.  For example, the tin foil referenced in the affidavit was clearly a piece of tin foil removed from a nearby pack of cigarettes as opposed to tin foil used in the consumption of controlled substances.

[71] 566 F.2d 1109 (9th Cir. 1977).

[72] *Id.* at 1110.

[73] *Brady v. Maryland*, 373 U.S. 83 (1963), requires that the government turn over all evidence which is exculpatory to the defendant.  The Jencks Act "requires the government to produce any written statements by a government witness that relate to the subject matter of any direct testimony by the witness." *United States v. Wallace*, 848 F.2d 1464, 1470 (9th Cir. 1988).

[74] 566 F.2d at 1111.  Although the Ninth Circuit did not specifically cite to its supervisory powers in the *Roybal* opinion, it cites to *McNabb v. United States*, 318 U.S. 332, 347 (1943), for the proposition that reversal of a defendant's conviction is an appropriate remedy where the government violates a discovery order.  In *McNabb*, the Supreme Court expressly approved of the ability of the federal courts to rely on their supervisory powers to "formulate[] rules of evidence to be applied in federal criminal prosecutions." 318 U.S. at 341.

[75] *Roybal*, 566 F.2d at 1111.

[76] *Id.*

which is a "fair procedure" implemented by this Court to ensure access to all evidence necessary to preparation of his defense.

However, Mr. Conner's case differs from *Roybal* in two critical ways. First, a subpoena issued pursuant to Federal Rule of Criminal Procedure 17(c) "is not a discovery tool but offers compulsory process for securing specific, identifiable evidence for trial."[77] The willful violation of a subpoena in a criminal case by law enforcement is thus more akin to a due process violation than the violation of a discovery order. Second, there is no allegation of federal prosecutorial misconduct here, only misconduct alleged on the part of state law enforcement. The Court recognizes that the Ninth Circuit has been hesitant to attribute the actions of other investigatory agencies to the government.[78] However, "[t]o the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer."[79] Far from simply "disagreeing with the method of law enforcement attempted here," the Court draws a distinction where allowing evidence of the dog sniff to be introduced "would make the federal courts accomplices in the willful disobedience of a Constitution they are sworn to uphold."[80] This difference, therefore, does not affect the outcome of the Court's analysis.

---

[77] *See, e.g., Bowman Diary Co. v. United States*, 341 U.S. 214, 219–20 (1951) ("[Crim.] Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.").

[78] *See United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) (finding that an FBI informant's illegal conduct, because it was not encouraged by the FBI, could not be attributed to the government and therefore the Court could not invoke its supervisory power to deter the government from engaging in future illegal conduct because no past illegal conduct for which the government was responsible had occurred) (*abrogated by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008)).

[79] *Elkins v. United States*, 364 U.S. 206, 215 (9th Cir. 1960).

[80] *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980).

The Court recognizes that supervisory powers cannot give "the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it (does) not approve."[81] And this Court is careful not to prescribe "an inflexible set of evidentiary requirements" for law enforcement to establish the reliability of drug detection dogs.[82] However, the Court is insistent that law enforcement comply with due process under the United States Constitution. Although there is a remedy available under the Federal Rules of Criminal Procedure for the violation of a Rule 17 subpoena, the Court finds that the existing remedy is inadequate in this case.[83] Rule 17 directs that a court "may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district."[84] But holding the Alaska State Troopers in contempt of Court would not remedy the prejudice Mr. Conner faced at the evidentiary hearing and the violation of his due process rights. Barring a witness is well within the wheelhouse of sanctions the

---

[81] *United States v. Russell*, 411 U.S. 423, 435 (1973).

[82] *Florida v. Harris*, 568 U.S. 237, 248 (2013).

[83] The Ninth Circuit has not approved of the District Court exercising its supervisory powers where a remedy is prescribed by Rule. *See Gatto*, 763 F.2d at 1046. However, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)*; see also Cortina*, 630 F.2d at 1214 (finding the "call for the court's supervisory power . . . at its strongest and most defensible" where a law enforcement agent "lied in an affidavit.").

[84] Fed. R. Crim. P. 17(h).

Court may impose in response to "willful disobedience of a court order."[85]  Further, this sanction does not "circumvent or conflict with the Federal Rules of Criminal Procedure."[86]

The Supreme Court observed in *McNabb* that "[t]he history of liberty has largely been the history of observance of procedural safeguards.  And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law."[87]  Mindful of this sentiment, and in accordance with Mr. Conner's constitutional right to due process, the Court exercises its supervisory powers to exclude Trooper Woodruff's testimony and statements.

## III.  CONCLUSION

For the foregoing reasons, the Motion at Docket 38 is **GRANTED**.  Mr. Conner's Oral Motion to Dismiss Indictment is **DENIED**.  The Court **FURTHER ORDERS** all evidence related to Trooper Woodruff and K-9 Donna be excluded.

IT IS SO ORDERED this 18th day of January, 2022, at Anchorage, Alaska.

*/s/ Joshua M. Kindred*
JOSHUA M. KINDRED
United States District Judge

---

[85] *See Aloe Vera of America, Inc.*, 376 F.3d at 964–65 ("All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience with their orders . . . As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and assess fines.") (citing to *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001)); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990) ("A determination that an order was disobeyed is entitled to considerable weigh because a district judge is the best equipped to assess the circumstances of the non-compliance.") (internal quotation marks and citations omitted).
[86] *See W.R. Grace*, 526 F.3d at 511.
[87] *McNabb v. United States*, 318 U.S. 332, 347 (1943).