```
1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
2

3  UNITED STATES OF AMERICA,        )
                                    )
4           Plaintiff,              )
                                    )
5       vs.                         )
                                    )
6  NATHAN CONNER,                   ) No. 3:20-cr-00002-JMK
                                    )
7           Defendant.              )
   _____ )
8
```

9  TRANSCRIPT OF CONTINUED EVIDENTIARY HEARING ON
                 MOTION TO SUPPRESS
10  **BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE**
              Wednesday - November 10, 2021
11                10:30 a.m. - 4:33 p.m.
                  Anchorage, Alaska
12
   **FOR THE GOVERNMENT:**
13    Office of the United States Attorney
      BY: CHRISTINA M. SHERMAN
14    222 West 7th Avenue, RM 253 #9
      Anchorage, Alaska 99513
15    (907) 271-5071

16  **FOR THE DEFENDANT:**
      Office of the Federal Public Defender
17    BY: SAMUEL LEE EILERS
      425 G Street, Suite 800
18    Anchorage, Alaska 99501
      (907)646-3400
19
   Deputy Clerk:  Irma Hernandez
20  _____

21
                  **STACY M. BALDWIN**
22             **Registered Merit Reporter**
             **Federal Official Court Reporter**
23              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
24                  406-945-0589
          Proceedings recorded by machine shorthand
25      Transcript Produced from the Digital Recording

1                    I N D E X

2   WITNESSES CALLED BY THE GOVERNMENT:              PAGE

3    OFFICER TREVOR MILLER
        DIRECT EXAMINATION BY MR. COLLINS              4
4       CROSS-EXAMINATION BY MR. EILERS               45
        RE-DIRECT EXAMINATION BY MR. COLLINS         115
5       RE-CROSS-EXAMINATION BY MR. EILERS           122
     OFFICER BRIAN ZEISEL
6       DIRECT EXAMINATION MR. COLLINS               131
        CROSS-EXAMINATION BY MR. EILERS              177

7

8   FURTHER PROCEEDINGS:                            PAGE
     CERTIFICATE                                     229

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (Call to Order of the Court at 10:32 p.m.)

2              DEPUTY CLERK:  All rise.  His Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session.  The Honorable Joshua M.

5    Kindred presiding.

6              Please be seated.

7              Your Honor, we're on record in case number

8    3:20-cr-00002-JMK, United States of America versus

9    Nathan Conner.

10             Counsel, please identify yourself for record.

11             MR. COLLINS:  Stephan Collins, United States.

12             MR. EILERS:  Sam Eilers, public defenders for

13   Nathan Conner, who's presently in custody, Your Honor.

14             THE COURT:  Good morning, everyone, and thank

15   you, Madam Clerk.  We're here today to resume taking

16   testimony for this motion to suppress.  I believe that

17   the parties had indicated yesterday they thought,

18   hopefully, that we would need about four hours.

19             So the plan for today is, we'll begin now.

20   We'll take a break at noon, come back at 1:15, and then

21   continue until we finish with the testimony.

22             Does that work for both the parties?

23             MR. COLLINS:  Yes, Your Honor.

24             MR. EILERS:  Yes.

25             THE COURT:  All right.  Very well.  Anything we
```

```
 1  need to take up before we call, I think it was Officer
 2  Miller.
 3           MR. COLLINS:  I don't believe so.
 4           THE COURT:  All right.  Very well, please
 5  proceed.
 6           MR. COLLINS:  We call Kenai Police Officer
 7  Trevor Miller, Your Honor.
 8           (Oath administered to the witness)
 9           DEPUTY CLERK:  For the record, please state and
10  spell your full name.
11           THE WITNESS:  Trevor Miller, T-r-e-v-o-r,
12  M-i-l-l-e-r.
13           MR. EILERS:  Did you want him to remove the
14  mask?
15           MR. COLLINS:  What's that?
16           MR. EILERS:  Do you want to remove the mask?
17           MR. COLLINS:  Oh, yeah.  I was going to.
18           Your Honor, he can remove the mask at this
19  time, the witness.  Likewise, me while I'm asking
20  questions, and I will put it on when Mr. Eilers
21  approaches the lectern.
22      OFFICER TREVOR MILLER, GOVERNMENT WITNESS, SWORN
23                    DIRECT EXAMINATION
24  BY MR. COLLINS:
25      Q.  Officer Miller, for how long have you been in law
```

enforcement?

A.   A little over 23 years.

Q.   And with whom have you worked as a law
enforcement officer?

A.   The Kenai Police Department.

Q.   What have been your duties during those last
23 years?

A.   I spent two years in a uniformed investigation
position.  The majority of the work I've done has been
patrol work in that 23 years.

THE COURT:  I apologize for interrupting you.
If you would just pull that microphone a little bit
closer to you, I would appreciate it.

THE WITNESS:  Yes, sir.

BY MR. COLLINS:

Q.   And during those 23 years, what percentage -- I'm
not going to ask you to put an exact number, but maybe
just a general description of how much of that work has
been related to drug-related investigations or cases?

A.   A lot.  I would say -- especially in, maybe, the
last ten years, it's more than 50 percent.  It's
increased dramatically.

Q.   And what area do you patrol?

A.   The City of Kenai.  So there's a -- we have a 35-
to 40-mile radius of city limits that we patrol.

1    Q.  So within the last ten years, what would you say,

2    in your experience, is the most common drug that you've

3    encountered?

4    A.  The two most common are methamphetamine and

5    heroin.

6    Q.  Would you say that, based upon your experience,

7    you're familiar with the identification of

8    methamphetamine or heroin -- and heroin?

9    A.  Yes, sir.

10   Q.  And are you familiar with the way that heroin and

11   methamphetamine are consumed by the ultimate user?

12   A.  Yes, sir.

13   Q.  And in what ways have you experienced or observed

14   that it's been consumed?

15   A.  Anywhere from injecting it intervenously to

16   smoking it, using a tinfoil with heroin.  Those types of

17   things.

18   Q.  What's the -- how does tinfoil play into that?

19   A.  It's put on the tinfoil and heated up and then

20   it's inhaled through a -- what's called a tutor or a

21   pipe.  It's -- sometimes they fashion them out of the

22   stems of ink pens or a glass pipe.

23   Q.  And the user -- do they always have to use a

24   tutor or can they just inhale the vapors?

25   A.  Just inhale the vapors.  I've even seen aluminum

cans used to utilize heroin.  Much like they used, you
know way back way, they used to use a pop can or a soda
can to use marijuana, make a small bong out of it.  I've
seen and found tin cans used in that fashion, too.

Q.  Is it accurate to summarize that common-day items
that people who aren't using heroin, are employed in the
consumption of these controlled substances?

A.  I'm sorry.

Q.  Is it true to say, like tinfoil, that's commonly
available to everybody in the public, correct?

A.  Correct.

Q.  And ink pens, likewise, could be used by -- for
legitimate purposes, correct?

A.  Correct.

Q.  And in case of -- in this case, were you the
affiant for the search warrant for Nathan Conner's
truck?

A.  I was.

Q.  And that was related to the incidents that
occurred on June 14th of 2019, correct?

A.  Correct.

Q.  Prior to that day, were you -- did you know who
Nathan Conner was?

A.  Yes.

Q.  And how did you know who he was prior to that

1   day?

2       A.   Through contacts from -- as a police officer.

3       Q.   So would it be -- is it accurate to say that you

4   would recognize him prior to -- you would have

5   recognized him prior to June 14, 2019?

6       A.   Yes.

7       Q.   Did you participate in any case that resulted in

8   criminal charges being filed against him prior to

9   June 14th, 2019?

10      A.   Yeah.  I believe I arrested him for DUI several

11  years prior.

12      Q.   Prior to June 14th, 2019, were you aware of the

13  status of Mr. Conner's driver's license?

14      A.   Yes.

15      Q.   And what did you know?

16      A.   Mr. Conner's driver's license had been revoked

17  for felony DUI.

18      Q.   Was he under any other conditions related to

19  driver's license prior to that date?

20      A.   I'm sorry.

21      Q.   Did he have any other -- was he under supervision

22  by any court authority prior to June 14th, 2019?

23      A.   Yes, he was under the supervision of Alaska

24  Pretrial Enforcement Division and had conditions of

25  release.

1     Q.   In regards to what?

2     A.   There was a -- I believe, it was a domestic

3  violence-related assault and a felony DUI.

4     Q.   On June 14, 2019, were you on patrol?

5     A.   Yes.

6     Q.   And where were you on patrol?

7     A.   It would have been about mile eight of the Kenai

8  Spur Highway, which intersections there right at Swires

9  (indiscernible.)

10    Q.   And that's within your patrol jurisdiction?

11    A.   Yes.

12    Q.   At about what time -- did you see a pickup truck

13 enter -- or draw your attention that day, that evening?

14    A.   Yes.   It was about 8:00 at night.

15    Q.   And what did you observe?

16    A.   I watched a light-colored Chevy pickup come off

17 of Swires onto the Spur Highway, turn and go the same

18 direction I was going, which would be westbound or

19 inbound to town.   And as it was making its turn and

20 completing its turn, I did not see a left turn signal

21 flashing on the back of the truck.

22         The truck continued in the inside lane there and

23 then it changed lanes over, from the inside lane to the

24 outside lane, and I didn't see a right turn signal

25 illuminate for that lane change.

1    Q.  And seeing that at that moment, did you know who
2    was driving that truck?
3    A.  I did not.
4    Q.  After the second -- your testimony, after your
5    second observation was the failure to signal right, what
6    did you do?
7    A.  I made the decision to stop the Chevy truck for
8    the two signaling violations.
9    Q.  Do you recall the distance between the two
10   observations of the turn onto the highway and then the
11   lane change?
12   A.  I don't.  It's been over two and a half years, I
13   don't recall that.
14   Q.  Do you recall the speed at which you were
15   traveling?
16   A.  I believe we were traveling the speed limit.  I
17   don't remember there being any excess speed or anything
18   of that nature.
19   Q.  And what's the speed limit at that section of the
20   highway?
21   A.  Forty-five miles an hour.
22   Q.  So and it's your recollection, as best that you
23   can, that you were traveling at 45 miles thereabouts?
24   A.  Yes, sir.
25   Q.  As was the pickup truck?

1    A.  Yes.

2    Q.  Once you made your decision to stop the vehicle,

3  what did you do?

4    A.  I activated my emergency overhead lights.  I have

5  a marked police car, so I have red and blue lights on

6  the top of the car.  When I activated the lights, the

7  truck signalled a right turn off of the highway into a

8  neighborhood there that intersects with Lynnwood Lane.

9    Q.  Is there a recording -- is there a recording

10  video -- recording equipment in your vehicle?

11    A.  Yes.

12    Q.  And when did you activate that?

13    A.  At some point when I decided to make the stop.

14  There's two.  I have an in-car, the dash cam that's up

15  in the windshield, and then I had a body-worn camera

16  that I activated.  So sometime in that process -- I

17  don't know exactly when I activated it, but sometime in

18  that process of making that stop, I activated both of

19  them.

20    Q.  So this was after you saw the truck enter the

21  highway, correct?

22    A.  Yes.  From Swires, yes.

23    Q.  You weren't anticipating seeing a pickup truck

24  pull onto the highway prior to that, correct?

25    A.  No.

1    Q.  So you've activated your lights.  And this was on

2  the highway, correct?

3    A.  Yes, sir.

4    Q.  Where -- to where did you end up?

5    A.  We activated -- as we were turning off the

6  highway, the driver, which I recognized as Mr. Conner,

7  looked in the side -- driver's side mirror back at me.

8  We didn't stop.  So I activated my siren.  We continued

9  to move at probably about 10 to 15 miles an hour.  Not a

10  really high speed, but a slow pace.  Kept the siren

11  going.  I could see that the driver's side window was

12  down or open.  And we just continued on until we came to

13  a stop in front of a residence there on Lynnwood Lane.

14    Q.  And I -- you might not be able to recognize those

15  who are masked, but do you see anybody here who

16  resembles Mr. Conner?

17    A.  I believe the gentleman dressed in yellow with

18  the blue face mask is Mr. Conner.

19    Q.  And when you were on the highway, you only had

20  your lights activated, correct?

21    A.  Correct.

22    Q.  When do you recall seeing Mr. Conner look back in

23  the mirror?

24    A.  Prior to us turning off of the highway is what I

25  recall.  And the activation of a siren is generally --

that's one those things where if somebody doesn't yield
to the lights alone, then the siren gets activated to
get someone to stop.

So a siren isn't a common thing for us to
activate during a traffic stop. It's usually when
somebody fails to yield to the emergency lights.

Q. So you're on this side road -- or the road off
the highway?

A. Correct.

Q. And that was which road?

A. Well, I think it -- actually, I think it's
labelled as Hayes, kind of Hayes. But it loops into --
like Lynnwood Lane loops around. There's some houses
that if you go off Lynnwood and loop around, there's
kind of a loop that comes out onto the highway.

Q. So was that portion onto which Mr. Conner turned
Hayes or Lynnwood or you don't know?

A. I think it's commonly referred to -- depending on
who you talk to. Lynnwood Lane is actually marked on
the Spur. We didn't turn down the marked portion of it.
So that whole -- that kind of subdivision right there.
Hayes is the name of the family that owns most of those
houses, or did own most of those houses, and was renting
most of them out.

Q. Is this a road that the state maintains, or is it

1    privately maintained?

2        A.   I don't know.  The city maintains Lynnwood.  I

3    don't know if it maintains it all the way through or

4    around.  I know in the wintertime we can drive through

5    there, and it's plowed.  So it's not like -- it's not

6    like one portion of it's restricted more than the other

7    side.  It always seemed to be cleaned about the same

8    time.  I've never had any issues with driving through

9    there due to snow or anything like that.

10       Q.   Is it true that it is a public road?

11       A.   That --

12       Q.   That Hayes, Lynnwood --

13       A.   I believe so.

14       Q.   It's not a private drive?

15       A.   I don't know.  That's the problem with that area.

16   The way that it's set up, is that, you know, the way it

17   loops around, it's possible that it could be like a

18   private drive, but I've never known it to be that.  It

19   has access to the highway.  It runs through and connects

20   with Lynnwood Lane.  So there are private driveways off

21   of that roadway that goes through there.  But it's, I

22   guess, a thoroughfare that goes right through that.  So

23   I don't know.

24       Q.   And on this day, June 14, 2019, was not the first

25   time you'd ever driven down that road?

1    A.  No, no.

2    Q.  What kind of -- can you give us a general

3  description of its physical characteristics, like is it

4  paved, unpaved?

5    A.  It's unpaved.  It's dirt.  The houses, you know,

6  are pretty close to it.  It's not an overly wide area.

7  I mean, it wouldn't be your standard, like, city street

8  width.  So it's a little more narrower.

9    Q.  And on that day at that time that you turned off,

10  did you know to where Mr. Conner was driving?

11    A.  Say again.

12    Q.  On June 14th, 2019, at that time that he turned

13  off the Spur Road --

14    A.  Correct.

15    Q.  -- do you know to where he was going?

16    A.  I have an idea of where he was going.

17    Q.  But you had no specific particular idea?

18    A.  No.

19    Q.  For how -- what's the distance, if you can

20  recall, from the Spur Highway to where the car, the

21  truck, eventually stopped?

22    A.  I would have to say it's probably maybe a few

23  yards.  It's not very -- it's not a huge distance.  You

24  got to go by -- if your -- where the truck came to a

25  stop, that side of the street has one, two, maybe three

1   houses that you have to drive past to get to where he

2   came to a stop.

3       Q.   And where did he end up stopping?

4       A.   At the residence of 714 Lynnwood Lane.

5       Q.   Do you recall if, at any time after Mr. Conner

6   turned off the highway, the Spur Highway, after you had

7   activated -- after you activated your lights and after

8   he turned off the highway, did you see him apply the

9   brakes?

10      A.   I don't recall that, no.  We traveled at a slow

11  speed.  So at one point when I tried to move to the left

12  of him to get him to stop, I had to hit my brakes to

13  avoid colliding with him.  Because he had actually

14  turned in front of my patrol car.  And if I had not

15  stopped, I would have driven right into the driver's

16  side of his truck.

17      Q.   So you were passing him at that time?

18      A.   Well, I moved -- so, where the -- we first turned

19  off is a little bit more narrow.  But prior to where

20  Mr. Conner finally came to a stop it widens way up.  And

21  so, we weren't stopping.  And I, you know, didn't really

22  understand why.  So I pulled to the side so I could get

23  a view of Mr. Conner.  And then he turned about the same

24  time, and I had to hit my brakes.  And then he pulled up

25  into the driveway of 714 Lynnwood and parked in front of

1    the house.

2        Q.   To be clear, so the point at which you were on

3    his left side; is that correct?

4        A.   Correct.

5        Q.   The road had widened enough so that two cars --

6    there was a two-car width?

7        A.   It was actually, I think, wider in that spot.  It

8    widens way up.  There's a -- in front of the -- you got

9    714 Lynnwood and 712 Lynnwood there, and it widens way

10   up to -- it's a lot more than two-car-lengths (sic)

11   wide.

12       Q.   And on the right-hand side of this area, was

13   there a driveway or was there a lawn?

14       A.   That area there it was just undeveloped.  There's

15   like trees or grass.  There's no houses there.  There's

16   no driveway.  It's just that side of where that portion

17   occurred is undeveloped.  And there isn't another house

18   probably for another 50 yards.  And it's well off the

19   roadway.  And its driveway is well past where Mr. Conner

20   came to a stop.

21       Q.   Were there any obstructions that you recall in

22   the road on the right-hand side of that road, that would

23   have prevented Mr. Conner from parking anywhere along

24   that stretch of road?

25       A.   No.

1    Q.   And to your recollection, how many driveways were
2    there on the right-hand side?
3    A.   On the right, if I recall correctly, when you
4    come off the highway, there's at least one -- there's
5    two houses, I believe, on the right side.  There's three
6    houses prior -- I believe it's two or three on the left,
7    to where he came to a stop.
8    Q.   At what point did you activate your siren?
9    A.   That was just as we turned off the highway.
10   Right in that area.  So literally, I think we got off
11   the pavement -- the turning off, the right there, and I
12   activated the siren.
13   Q.   And this was before he turned into the driveway
14   that he did?
15   A.   Correct.
16   Q.   Did you -- was that the place you said you had a
17   suspicion that you thought he might be going?
18   A.   Yes.
19   Q.   And why is that?
20   A.   Over the previous months, we'd had a lot of
21   police-related activity there, a lot of drug-related
22   activity.  We contacted numerous people.  Complaints
23   from the neighbors going in and out of there.  One of
24   the occupants in one of the homes had been arrested by
25   our agency for drug-related activity.  So it was kind of

1    a hot spot of activity for drug-related crimes.

2      Q.   But at the time you activated your lights,

3    overhead lights, you did not know that he was for

4    certain going to that driveway, correct?

5      A.   No, because he hadn't signalled -- I don't think

6    he had signalled a turn at that point.  I didn't know

7    where he was going at that point.  It wasn't until we

8    turned off, off the highway, and started going that

9    direction that I suspected that's where he was going.

10     Q.   When you stopped eventually, where was

11   Mr. Conner?

12     A.   In the driver's seat of that Chevy pickup truck.

13     Q.   And where was that truck?

14     A.   Parked in front of 714 Lynnwood.

15     Q.   Was that on the street or the driveway?

16     A.   It would have been -- if you drove in there, it

17   would look like the driveway or the parking area for

18   that house.

19     Q.   What did you do after both he and you stopped?

20     A.   I exited.  I got out of my car.  I drew my pistol

21   at the ready, and I ordered him to stop moving and to

22   not touch anything.

23     Q.   By "at the ready," what do you mean?

24     A.   It's basically you present your pistol, but you

25   point it in the a safe direction.  It's pointed at the

1    ground.  It's not pointed at the person.  The muzzle's

2    not covering him.  That's what "at the ready" means, or

3    "guard" is often what it's referred to.

4      Q.  Is that your normal reaction in similar

5    circumstances?

6      A.  Yes.

7      Q.  Why?

8      A.  Because it's not normal for someone -- in the

9    past when I've had that same similar situation where

10   people are not stopping, and there's no other

11   explanation why.  I mean, I got a window down.  I got a

12   guy that I know I've had contact with, that has an

13   actual officer safety in our computer system, for making

14   threats to law enforcement.  You know, there's all sorts

15   of things that occur.  We get into foot pursuits.  We

16   get into physical altercations.  It creates a whole

17   myriad of things.

18      So until I can gain control and get people to

19   stop, and I know that it's safe to do so, to proceed

20   with anything else, that is a normal way of doing

21   things.

22      Q.  Well, in this circumstance, did Mr. Conner have

23   such a notice that you were aware of for officer safety?

24      A.  Yes.

25      Q.  In what regard?

1     A.  It was placed in our system basically -- it

2    stated that Mr. Conner threatens, specifically, I think

3    it was KPD officers, and while they were off duty, as

4    well.

5     Q.  At that point, did you have any communication --

6    prior to you exit -- leaving your marked police vehicle,

7    did you have any communication with Mr. Conner, such as

8    over a loud speaker?

9     A.  No.

10     Q.  Did you have any non-loud speaker communication

11   with him before you got out of the vehicle?

12     A.  Would have been the emergency lights and the

13   siren.

14     Q.  But no verbal?

15     A.  No verbal.

16     Q.  When you did get out and were at the ready and

17   approached, what did you do?

18     A.  I'm sorry?

19     Q.  When you left your vehicle -- and where was it in

20   relation to Mr. Conner's truck?

21     A.  My vehicle?

22     Q.  Yes.

23     A.  The front would have been facing right about mid

24   side of the driver's side of his truck, a few feet back,

25   in the driveway area -- or not the driveway -- the

1    travel -- the driveway road portion of it.

2      Q.   And this was at that residence property, correct?

3      A.   Correct.

4      Q.   So you were on the residential property at this

5    time?

6      A.   I don't know that I was.

7      Q.   But he was?

8      A.   He was.

9      Q.   Did you block the driveway exit?

10      A.   No.

11      Q.   Were you blocking the road in any way?

12      A.   No.

13      Q.   The main road?

14      A.   No.

15      Q.   And were you parked in a way that people could

16    have passed you?

17      A.   Yes.

18      Q.   So going back to when you left your marked police

19    vehicle, were your lights still on?

20      A.   Yes.

21      Q.   Was the siren activated?

22      A.   You know, that I don't remember.  I don't know if

23    I shut it off or if it was still going.

24      Q.   When you approached the truck, who did you see

25    was inside?  Could you see who was inside the truck?

1    A.   Mr. Conner.

2    Q.   Only Mr. Conner?

3    A.   Well, at that point, he's the only person I could

4 visibly see.  And then once I approached him and made

5 sure it was safe, I couldn't see anyone else in the

6 vehicle.

7    Q.   We've been describing this as a truck.  But it is

8 more particularly the type of truck that has, what's

9 either called a king cab or a crew cab?

10   A.   Yeah.  It's an extended cab truck, and the

11 windows in the back are a little bit darker in the back

12 than they are up front, as I recall.

13   Q.   And does that mean that there could be passengers

14 behind the driver and the front passenger seat?

15   A.   Yes.  And it's not uncommon when we have these

16 things that there are people trying to stay out of view

17 when we make these stops.

18   Q.   The driver's side window was open still, correct?

19   A.   Correct.

20   Q.   You had seen it open prior to the stop, correct?

21   A.   Correct.

22   Q.   And the driver was in fact Mr. Conner?

23   A.   Yes.

24   Q.   When you approached it, did you identify yourself

25 in particular?  Did you say, I'm a police officer, so

1    there was no mistake?

2        A.   Well -- no.  But I'm wearing -- dressed like I am

3    today.  So I didn't identify myself as Officer Miller.

4        Q.   Did you identify the driver?

5        A.   Yes.

6        Q.   By name?

7        A.   Yes.

8        Q.   And what did you say to him?

9        A.   I asked him about -- I asked him about why is he

10   driving without a license, or if he even had a license.

11   And he acknowledged that he didn't have a valid license.

12       Q.   Did you ask him any other questions?

13       A.   I asked him if there were any weapons in the

14   vehicle.

15       Q.   And why did you do that?

16       A.   Again, we -- try to make sure that with

17   everything that was going on -- and I wanted to make

18   sure that we weren't -- things weren't going to get

19   worse.  And as a safety precaution that's a question

20   that I asked him.  And he told me he had an air gun or a

21   BB gun in the driver's door.  There's a pocket at the

22   bottom of the door.

23       Q.   What was his demeanor like at this time?

24       A.   Actually, Mr. Conner was very calm.  He wasn't

25   upset.  He wasn't yelling or shouting.  And when I got

1   out of the car then he complied with my requests.

2   Q.  Were you -- did you specifically ask for -- did

3   you specifically use the general terms weapons, or were

4   you more articulate?

5   A.  I believe I asked him if there were any weapons

6   in the vehicle.

7   Q.  And his response was that there was a BB gun or

8   such non-firearm?

9   A.  Correct.  The only one that he told me was the

10  one that he specifically noted, the one that was in the

11  driver pocket door.

12  Q.  Did he remain in the vehicle during this time?

13  A.  Initially, and then I opened the door and had him

14  step out of the truck and had him step to the back of

15  the truck.  And I patted him down to make sure he didn't

16  have any weapons on his person.

17  Q.  Why did do you that?

18  A.  Again, just to -- people don't always tell us the

19  truth.  And I've been doing this for 23 years, and I've

20  asked people if they had any weapons on them.  They've

21  denied it.  I pulled them out, patted them down.  I've

22  found guns.  I've found knives.  I've found ball peen

23  hammers.  I've found a lot of different weapons on

24  people when they told me they hadn't had any weapons.

25  Q.  Now he told you he had a BB gun or -- was it a BB

1  gun or an air soft?

2      A.  It was, I believe, once it ended up being

3  identified later was, I think, a BB gun, an air gun, not

4  an air soft gun.

5      Q.  But what did he tell you?

6      A.  I think he told me it was a BB gun.

7      Q.  Now in your experience is that -- does that

8  always assuage your concerns, officer safety?

9      A.  Yes, because I don't want to get shot with these

10  new air pistols or air rifles.  I don't want to get shot

11  with those.

12      Q.  I'll rephrase the question.  When he told you it

13  was a BB gun, were you satisfied with just his

14  statement, or did you want to secure the --

15      A.  No, I wasn't satisfied with that.

16      Q.  And again, why did you have any concerns about a

17  BB gun or an air soft gun?

18      A.  They can cause serious physical injury, but

19  oftentimes again, people aren't always truthful with us

20  about what something actually is.  And so until I can

21  verify what it is they have to say, I got to take things

22  as, you know, I still got to take precautions.

23      Q.  Now, at this point, you knew that -- prior to the

24  stop you knew he didn't have a valid driver's license?

25      A.  Correct.

1    Q.  And he confirmed that when you asked him?

2    A.  Correct.

3    Q.  So is that a violation of any law?

4    A.  State law, yes.

5    Q.  When did you actually see the handle of the gun?

6    A.  Say again.

7    Q.  When did you see the actual object that he

8  described as a BB gun?

9    A.  When I opened the door to get him to step to the

10  rear.

11    Q.  And was the BB gun within arm's reach?

12    A.  Yes.

13    Q.  What was your intent then by opening the door?

14    A.  I wanted to be able to see what it was he was

15  talking about, or at least, you know, be able to kind of

16  control that a little bit.  And remove him from that --

17  where it was in the pocket and remove him from that.

18  That's why I took him to the -- I had him step out to

19  the back of the truck was to remove him from any

20  possible access to any weapons inside the vehicle.

21    Q.  I mean, is it fair to say that a BB gun -- even

22  though we consider BB guns children's toys, is it fair

23  to say that BB guns are nonetheless possibly used as

24  weapons?

25    A.  Yes.

1    Q.  So once you saw the door was open and you looked

2    down and saw the handle of this object, what did it look

3    like to you at first?

4    A.  It looked like a black pistol of a concealable

5    nature.  I couldn't verify whether, by just looking down

6    at a glance, whether or not it was an actual firearm or

7    an actual air pistol.

8    Q.  Did you secure it at that time?

9    A.  No, I left it right where it was.

10   Q.  What did -- when Mr. Conner -- and again, I just

11   want to be clear, that was the only weapon that he

12   identified when you asked him if he had any weapons,

13   correct?

14   A.  Correct.

15   Q.  Did the -- when he left -- stepped out of the

16   vehicle, what did you observe?

17   A.  He had some cash cupped in the palm of his hand

18   that it looked like he was trying to conceal.  So I had

19   him remove that item and leave it on the driver's seat.

20   Q.  What did you do with that?

21   A.  It stayed on the driver's seat until later.

22   Q.  So how did this encounter progress?

23   A.  I don't --

24   Q.  I mean, what happened after he put the money on

25   the seat?

1    A.   Then we went to the rear of the truck, and I

2   patted him down for weapons.

3    Q.   And did you find anything?

4    A.   No.

5    Q.   Well, what happened next then?

6    A.   Another officer came and stood by with him and

7   then ultimately he was handcuffed and placed in the back

8   seat of my patrol car.

9    Q.   Why did that happen?

10    A.   I requested -- well, obviously, he was under

11   arrest.  And then the issues with -- I wanted to secure

12   him, because I called and requested that Trooper

13   Woodruff respond with his K-9 and other police officers

14   had called -- or had responded.

15    Q.   What did you have probable cause to believe that

16   he committed in your presence?

17         MR. EILERS:   Objection.   Phrasing

18   (indiscernible.)

19   BY MR. COLLINS:

20    Q.   Why did you arrest him?

21    A.   He was arrested for not having a valid driver's

22   license for being revoked; he was arrested for the

23   failure to yield, and then he was arrested for violating

24   his conditions of release.

25    Q.   So why did -- based on that, why did you call

1    Trooper Woodruff?

2        A.    I observed -- there was -- in the truck, I saw

3    what I believed to be drug paraphernalia.  I saw a

4    butane torch, and then I saw a piece of tinfoil.

5        Q.    What -- when you say drug paraphernalia, what are

6    you referring to?

7        A.    So, there was -- I saw zippered pouches and a

8    butane torch.  So the butane torches are often used in

9    the use of meth and heroin.  Tinfoil is a common thing

10   for drug paraphernalia.  And like zippered pouches and

11   those types of things, those are commonly used to

12   transport drug paraphernalia or drugs like meth, heroin,

13   prescription meds, those types of things.

14       Q.    Well, let's be a little bit more specific.  I

15   mean, are we talking about like, what some people might

16   use to carry toiletry items?

17       A.    Yeah.  I mean like shaving kits.  Eyeglass cases

18   is a common one.  If it's a zippered pouch.  Sometimes,

19   you know, boxes with latches on them.  Like pelican

20   cases, those types of things.  You know, oftentimes

21   there will be plastic cases that will have -- they will

22   be decorated with stuff, like art or beads or those

23   types of things.  Or right down to the common zippered

24   shaving kit, or a camera case, or those types of things.

25   Common, everyday cases get used for those purposes for

possession of drugs or drug paraphernalia.

Q.   Now, those sound like -- like you said everyday
things; what distinguishes them from other legitimate
uses?

A.   Just the combination of that, with the butane
torch lighter and the tinfoil itself in conjunction,
leads me to believe, when I run into those, that
potentially that person is in possession of either drugs
or paraphernalia or drugs and paraphernalia.

Q.   You say butane.  I mean, aren't normal cigarette
lighters fueled by butane?

A.   No.

Q.   What are they fueled by?

A.   I don't know.  They're not refillable, and they
don't get as hot as quick.  And you can't hold them on
because you end up burning your fingers.  So the butane
torches have a trigger, and you can keep them lit, and
they'll burn longer, and you can refill them.

     It's not common to see a cigarette smoker use a
butane torch.

Q.   When you say a butane torch, are you talking
about -- can you be a little bit more descriptive?

A.   It's the size -- they're either the size of --
some of them can be the size of the palm of your hand.
Some of them can be the size of roughly a cigarette

1    lighter or a little bigger.  It just depends.

2        Q.  And how are you able to distinguish this butane

3    torch from a regular cigarette lighter?

4        A.  They're shaped different.  They have a trigger,

5    and they have a directional -- I don't know what you

6    call it -- but like a barrel, a directional barrel.

7    Where a regular cigarette lighter is, you know, it has

8    that horseshoe top, and it has the strikers on it that

9    you roll with your thumb.

10       Q.  So is the cigarette lighter more cylindrical

11   shaped; is that correct.

12       A.  Yeah, it's more -- yeah, it's more straight than

13   what a butane torch would be.  A butane torch would be

14   thicker and wider.

15       Q.  And is it an L shape?

16       A.  Yes.

17       Q.  So have you ever -- never mind.

18           Now you saw this torch and you saw the foil.  Now

19   foil, is that in and of itself -- does that mean that if

20   I have a piece of foil on me, I'm using heroin?

21       A.  No.

22       Q.  What about this foil drew your attention to it?

23       A.  It was on the driver's seat, right where -- where

24   Mr. Conner was sitting.  Where the -- basically the

25   bottom of the seat meets the back seat, so where it

hinges. And so -- and the area that we were in, I mean,
there a lot of -- it would be common for me to relate
those items altogether as possible drug paraphernalia.

Q. Do you smoke?

A. No.

Q. Have you ever opened a pack of cigarettes?

A. Yes.

Q. Is there foil in there?

A. There is.

Q. That foil that you recall seeing in the
cigarettes packs, is that similar to the foil that you
saw?

A. You know, I don't recall.

Q. Did it look more like wrapping paper, like -- I
mean, food foil that you use to wrap your sandwich in
perhaps?

A. You know, I don't recall that, either. It's been
so long that I don't recall. I just remember it being a
piece of tinfoil, silver.

Q. Did Trooper Woodruff -- was there anything else
that you observed in the truck? Or you or other
officers who were on the scene prior to --

A. I believe Trooper Woodruff also saw the lighter,
and then he saw a -- he pointed to a lockbox that was
protruding out from the driver's seat. And I believe he

1  saw a couple more pieces of tinfoil.

2     Q.  Were there any cell phones in the vehicle?

3     A.  There were two cell phones in the vehicle.

4     Q.  And where were they?

5     A.  They were right there on the center console,

6  driver's seat area.

7     Q.  Were you or any other officer present able -- or

8  what -- to your recollection, were the cell phones

9  operating that day at that time?

10    A.  Sergeant Casey Hershberger told me that they were

11 operating that day.  As a matter of fact, he was

12 standing there, and he observed a text come across, at

13 least one of the cell phones.  And then he photographed

14 that text message that lit up on the screen of the

15 phone.

16    Q.  Why did that warrant a photograph?

17    A.  The way it was worded it came across -- I believe

18 it referenced having or wanting Percocets or some type

19 of prescription medication for, either to purchase or to

20 sell.  One of the two things.

21    Q.  You just mentioned Percocet.  Is that a substance

22 of which you're familiar?

23    A.  Yes.

24    Q.  And what is it?

25    A.  I'm having a brain fart.  I believe a Percocet is

1  a CNS depressant.

2    Q.  To your knowledge, can you buy those over the

3  counter?

4    A.  No, you cannot.  It is a controlled substance.

5    Q.  To your knowledge, is Mr. Conner a pharmacist?

6    A.  To my knowledge, no.

7    Q.  Has he ever been a pharmacist?

8    A.  Not that I'm aware of.

9    Q.  He's also -- is he licensed to prescribe

10  Percocet?

11    A.  I don't believe he's a doctor of any kind.

12    Q.  Prior to -- Officer Woodruff arrived, correct?

13  Yes.  Trooper Woodruff arrived, correct?

14    A.  Yes.

15    Q.  Was he in the company of Donna, his K-9?

16    A.  Yes.

17    Q.  Did you observe Trooper Woodruff and Donna do

18  their thing?

19    A.  I was there while they were doing their thing,

20  yes.

21    Q.  And what did you see?

22    A.  Actually, I don't recall because I don't know

23  that I was watching the whole -- however Woodruff does

24  his procedure with his dog.  Usually we all stand back

25  and get out of the way so that there's -- you know, we

1  don't want to interfere or cause any problems.

2      Q.   And by we, besides Trooper Woodruff, who else was

3  there, law enforcement?

4      A.   There was Sergeant Hershberger -- Trooper

5  Hershberger.  Officer Megan Swangel was there.  There

6  may have been another trooper there.  I'm not sure.

7      Q.   Were there any civilians standing by?

8      A.   Yeah.  There was a gal by the name of Amanda

9  Keeve (phonetic) had come out of the house while I was

10 talking to Mr. Conner initially.

11     Q.   Did you know who she was prior to that day?

12     A.   Yes.

13     Q.   In what capacity?

14     A.   I've arrested her.

15     Q.   For?

16     A.   For drugs and weapons, concealed weapon.

17     Q.   At some point did you apply for a search warrant

18 for the truck?

19     A.   Yes.

20     Q.   And when did you do that?

21     A.   That was after the search that -- or the --

22 whatever process you call it with K-9 Donna and Trooper

23 Woodruff.  The truck was impounded then and taken to the

24 Kenai Police Department.

25     Q.   Have you ever worked with Trooper Woodruff before

1  June 14th?

2     A.  Yes.

3     Q.  In regards to Donna?

4     A.  Yes.

5     Q.  Have you submitted affidavits in support of

6  search warrants in which Donna's credentials are

7  attached?

8     A.  Yes.

9     Q.  The search warrant in this case, that wasn't the

10 first time you had submitted a search warrant with

11 Donna's credentials attached, correct?

12    A.  No, it was not.

13    Q.  And in your experience how reliable is Donna --

14        MR. EILERS:  Objection.

15        THE COURT:  Overruled.  You can answer.

16        THE WITNESS:  Every time that Trooper Woodruff

17 utilized K-9 Donna on a vehicle I had seized, we had

18 found either, A, drugs or, B, paraphernalia.

19 BY MR. COLLINS:

20    Q.  And do you know how many times you happened to

21 use Donna, or relied upon Donna?

22    A.  No, it's been a lot.  I couldn't give you a

23 number.  I just know that it's quite a bit.

24    Q.  And the judicial authority before whom you

25 submitted this affidavit, was that the first time you

1    had submitted such as application?

2        A.   In general or for this case?

3        Q.   In general.  Sorry.  Was this the first time you

4    had ever submit -- I'm having a hard time reading the

5    name of the -- it's --

6            Well, was the judicial officer before whom you

7    submitted the affidavit, was that the first time you had

8    presented a search warrant application?

9        A.   For that judge?

10       Q.   Yes.

11       A.   I don't know.  I have a hard time reading the

12   names a lot of times on the -- that wasn't the first one

13   that I had submitted through the Anchorage courts,

14   though.

15       Q.   Why was it through the Anchorage courts and not

16   the Kenai court?

17       A.   After hours they switch to -- I can't even

18   remember when they started it, but after hours we get

19   pushed through to the Anchorage courts because Anchorage

20   courts have night court.  And our judges are done

21   usually by 4:30 and 5:00 in the afternoons.  So we don't

22   have anybody available to us.

23       Q.   Did you apply for the warrant on June 14th or

24   June 15th?

25       A.   I believe it was on the 15th, and I submitted it

1    in the early morning hours.

2        Q.   But was this the first time you'd submitted this

3    application to the Anchorage court, I believe it's Judge

4    Dorsey?

5        A.   For Mr. Conner's truck?

6        Q.   Or no, for any other time.

7        A.   Oh, no.   It wouldn't have been the first time I

8    had submitted a request for a search warrant through the

9    Anchorage courts.

10       Q.   Okay.   But you can't recall how many times you

11   have submitted an application with Donna's credentials

12   attached to, it looks like Magistrate Dordy?

13       A.   I wouldn't know how many times.   There's so many

14   different magistrates and judges.   I generally don't

15   keep track of that.

16       Q.   So you did execute the search warrant?

17       A.   We did.

18       Q.   And what inside -- and what did you discover?

19       A.   So inside the truck there was -- one of the

20   small -- during the initial contact with Mr. Conner

21   there was a small zippered bag that had been sitting on

22   the center console.   Inside that bag there were numerous

23   bags.   I want to say it was roughly a total of 23

24   individual bags of what looked like a brown tarry

25   substance, that looked like heroin.

1       Then there was several other -- there were -- I
2   can't remember how many exact bags -- there was more
3   than one bag of a crystalline substance and shards that
4   resembled methamphetamine.  And I believe in that pouch
5   there was also some prescription medication tablets that
6   were identified as like hydrocodone.
7       Q.  That was all within this package or zippered
8   pouch on the consoles, between the front and --
9       A.  Correct.  The front seat has this fold up/down,
10  like, center console armrest-type thing.
11      Q.  Were those the only items that you found during
12  the course of this search?
13      A.  No.
14      Q.  What else --
15      A.  So behind the driver's seat, in the back seat,
16  floor area behind seat there, there were two or three
17  backpacks.  And inside those backpacks, there was -- one
18  of them we found what we recognized as potentially to be
19  a ledger for keeping track of drug sales.  There were
20  names and numbers correlating and associating with those
21  names in that notebook.
22          There was -- I think I found some more where
23  there were a couple of bags of marijuana that were
24  bagged up.  There was a Colt 1911 semiautomatic pistol
25  in a shoulder holster that had three loaded magazines in

one of the backpacks.  And in that same backpack there
was also another air pistol, like -- I believe it was
like -- like a 1911 copy air pistol that resembled the
real pistol that was found in that backpack.

Q.  So the Colt, that's an actual firearm; is that
correct?

A.  Correct.

Q.  And the other BB gun, or the other what looked
like, was not a firearm, correct?

A.  Correct.  It was an air gun.

Q.  But to your recollection was it an operable air
gun?

A.  Was the air gun operable?

Q.  Yes.  Could it shoot the pellets?

A.  I have no idea if that one was operable or not.

Q.  When you first met Mr. Conner and asked him for
weapons, how specific was he about the BB gun in the
driver's side door?

A.  That was the only one that he told me that was in
the vehicle.

Q.  Did he also indicate by gesture the presence of
that weapon?

A.  I believe so.  He either looked down or pointed
down towards that area.

Q.  Did he turn in any way, shape, or form, or

```
1    indicate in any way, shape, or form, the presence of
2    those -- the firearm, the Colt, or the other air soft in
3    the back?
4        A.   No.
5        Q.   Are you aware of Mr. Conner making statements
6    indicating his prior knowledge of any of those items,
7    either of those items?
8        A.   I learned later of that through recorded phone
9    calls from the --
10            MR. EILERS:   Objection.  Relevance.
11            MR. COLLINS:   I'm establishing the connection
12   between the knowledge of that firearm prior to the
13   stop --
14            MR. EILERS:   The answer is no.
15            MR. COLLINS:   The answer is -- well, I will let
16   the witness answer.
17            THE COURT:   Overruled.  Please answer, Officer.
18            THE WITNESS:   Mr. Conner made a phone call
19   where he acknowledged to the receiving party that there
20   had been an actual firearm in the truck, and he placed a
21   value of, I believe it was $2,000 on that firearm.
22            MR. EILERS:   Again, Your Honor, I'm going renew
23   my objection on relevance grounds.  What this motion has
24   to do with is the facts known by the officer at the time
25   of the stop.
```

1          THE COURT:  I agree.  We've heard the answer.
2     I don't know that it's particularly relevant.
3          MR. EILERS:  Move to strike.
4          THE COURT:  Your objection is noted.  I'm not
5     going to grant that.
6          Please proceed, Mr. Collins.
7     BY MR. COLLINS:
8     Q.  Where did the search take place?
9     A.  Where did --
10    Q.  Where did the search of the truck take place?
11    A.  It was in a garage bay at the Kenai Police
12    Department.
13    Q.  And when was the search conducted?
14    A.  I want to say that it was -- well, it was
15    conducted immediately upon receiving the search warrant.
16    And again, as I recall, it was in the early a.m. hours
17    of the next -- like the 15th.
18    Q.  And how were the cell phones secured?
19    A.  I wrapped them in -- I believe in this case I
20    wrapped them in either tinfoil or stuck them in
21    different Faraday bags, depending on what I had
22    available to me at that time.
23    Q.  And do you normally carry tinfoil?
24    A.  No.
25    Q.  Where did you get the tinfoil?

     A.  I think another officer brought it.  I'm not sure
how we ended securing -- that's done just to prevent the
phones from getting a signal and destroying anything
that might be on them.  I don't recall how we came up
with the tinfoil or the Faraday bags specifically, but
the phones were placed in those.

     Q.  Prior to that search, did you secure anything or
seize anything?  Besides seizing the vehicle in
anticipation of the warrant.

     A.  No.  Everything was in the vehicle.

     Q.  And who took the photographs of the search?

     A.  I believe -- I believe that would have been
Officer Lee that took the photographs of the search, or
Officer Heron.  I'm not sure which one.

     Q.  But you participated in the search, correct?

     A.  Yes.

     Q.  And you secured the evidence item -- items of
evidentiary value thereafter, correct?

     A.  Correct.

     MR. COLLINS:  I haven't any other questions at
this time, Your Honor.

          THE COURT:  Thank you, Mr. Conner.

          Mr. Eilers, cross.

                    CROSS-EXAMINATION
1
2   BY MR. EILERS:
3       Q.   Good morning, Officer.
4       A.   Good morning, sir.
5       Q.   You've been a cop for 23 years?
6       A.   Yes, sir.
7       Q.   All right.  Did you begin your law enforcement
8   career in Kenai?
9       A.   I did.
10      Q.   Okay.  Now in order to become an officer with the
11  Kenai Police Department you went through training,
12  right?
13      A.   Correct.
14      Q.   Now I don't know if they were doing this back
15  23 years ago, but did you go to training at the
16  Department of Public Safety before becoming a Kenai
17  officer?
18      A.   Actually I was employed -- I got hired as a Kenai
19  police officer, and I did my -- the majority of my field
20  training prior to attending the Department of Public
21  Safety Academy.  Then I went to the academy, graduated
22  the academy, came back and finished my field training
23  program.
24      Q.   Okay.  Let's talk about the academy a little bit.
25  At the academy you're trained on a number of things

```
 1    relating to your duties as a law enforcement officer,

 2    right?

 3        A.   Correct.

 4        Q.   Okay.   And that is a pretty intensive training,

 5    right?

 6        A.   Yes.

 7        Q.   Okay.   And you consider yourself to be a good

 8    officer, right?

 9        A.   I believe so.

10        Q.   Now, to be a good officer, it's important to

11    receive good training, right?

12        A.   Correct.

13        Q.   And pay attention during that training, right?

14        A.   Correct.

15        Q.   And then employ that training in the field

16    appropriately?

17        A.   Correct.

18        Q.   And throughout the course of your years, you've

19    received additional training, right?

20        A.   Yes.

21        Q.   Okay.   Now one of the things you're trained on at

22    the Department of Public Safety is what the law is,

23    right?

24        A.   Correct.

25        Q.   All right.   As a law enforcement officer your job
```

1   is to enforce the law, right?

2       A.  Correct.

3       Q.  To do that you need to know what the law is?

4       A.  Correct.

5       Q.  Okay.  And you do know what the law is?

6       A.  Well, I'm familiar with the laws, yes.

7       Q.  Okay.  Now in the course of your duties as a law

8   enforcement officer, one of the things you do is conduct

9   traffic stops, right?

10      A.  Correct.

11      Q.  Okay.  And one reason you might do a traffic stop

12  is for a traffic violation, right?

13      A.  Correct.

14      Q.  And it's your job to determine whether that

15  violation has occurred?

16      A.  Correct.

17      Q.  And if it has occurred the person on the

18  receiving end might get a ticket, right, the person who

19  committed it?

20      A.  Correct.

21      Q.  They could get fined?

22      A.  Yes.

23      Q.  They could even have their license suspended

24  depending on the record, right?

25      A.  As a result of the -- depending on the traffic

1  citation, sure.

2     Q.  So for all of those reasons, it's important for

3  you to know what the traffic laws are?

4     A.  Correct.

5     Q.  Okay.  Now in addition to traffic laws, it's

6  important for you to know the criminal laws, correct?

7     A.  Correct.

8     Q.  So as a law enforcement officer you make a

9  determination about whether a crime has occurred, right?

10    A.  Yes.

11    Q.  And to do that you need to know what constitutes

12 a crime?

13    A.  Yes.

14    Q.  And you're trained on that?

15    A.  Yes.

16    Q.  And you know what activities do constitute

17 crimes, right?

18    A.  Correct.

19    Q.  If you make that determination, you might place

20 somebody under arrest?

21    A.  Yes.

22    Q.  That person could go to jail?

23    A.  Yes.

24    Q.  And for all of those reasons, it's important for

25 you to know what the criminal codes are?

 1    A.  Correct.

 2         MR. COLLINS:  I think we've asked and answered

 3    this multiple times.

 4         THE COURT:  I'm not going to sustain the

 5    objection.  I understand where you're going, Mr. Eilers,

 6    but time is of the essence.

 7    BY MR. EILERS:

 8    Q.  One of the other things you're trained on is how

 9    to conduct a criminal investigation, right?

10    A.  Correct.

11    Q.  Okay.  Now when you're conducting a criminal

12    investigation sometimes there's a suspect on the scene,

13    right?

14    A.  Yes.

15    Q.  And that suspect presents -- or represents a

16    potential crime?

17    A.  Yes.

18    Q.  Okay.  And officer safety is a paramount concern

19    when conducting an investigation?

20    A.  Very much so, yes.

21    Q.  Not only your safety but the safety of other

22    officers who might arrive on scene?

23    A.  Yes.

24    Q.  Okay.  Now if there's a firearm on scene, that

25    presents a threat, right?

1    A.  Correct.

2    Q.  Okay.  Particularly if there's an unsecured

3  suspect on the scene?

4    A.  Correct.

5    Q.  Okay.  Now I imagine down in Kenai it's not too

6  uncommon for you to encounter folks who are in

7  possession of firearms, right?

8    A.  Correct.

9    Q.  Okay.  Now there's actually an Alaska state law

10  that imposes an affirmative duty on people to warn an

11  officer if they have a concealed firearm on them when

12  you come in contact with them; is that right?

13    A.  That is correct.

14    Q.  And under that same law they actually have an

15  obligation to allow you to secure that firearm for

16  officer safety during that contact, right?

17    A.  That is correct.

18    Q.  Okay.  When you got a new officer who shows up to

19  support an investigation, even if it's a criminal one,

20  it's important for that supporting officer who shows up

21  to know about potential threats on the scene, right?

22    A.  Yes.

23    Q.  Okay.

24       MR. EILERS:  Just for the record, Your Honor,

25  I'm asking Mr. Johnson to go ahead and pull up Exhibit

D-5.  That's the dash cam from the traffic stop in this
case.

        I'm going ask you to pull that up and then just
pause it.
BY MR. COLLINS:
    Q.  All right.  Now what I'm going to do with you,
Officer Miller, is I'm going to present you with a
couple of hypothetical scenarios and then ask -- I'm
going to ask you some questions about it; do you
understand?
    A.  Yes.
    Q.  Okay.  What we see here is Officer -- or excuse
me -- is Nathan Conner's vehicle, correct?
    A.  Correct.
    Q.  That's his truck?
    A.  That's the truck that I stopped that he was
driving, yes.
    Q.  Okay.  Now let's pretend that this is my trunk
and I'm driving it, and you witness me fail to indicate
a lane change, which would be a traffic violation.  And
I'm not impaired and you go to light me up to pull me
over.  Are you with me?
    A.  I'm following you.
    Q.  Okay.  Now let's assume that I -- when you
indicate with your overhead lights that I stop that

1  truck right where it's at, right in the middle of that

2  lane, would that be unusual?

3      A.  If you stopped in the middle of that lane, yes.

4      Q.  Okay.  You would expect me to pull off to the

5  shoulder, right?

6      A.  I would expect you to yield to the right of where

7  that truck is sitting right there.

8      Q.  To get off the roadway?

9      A.  Yes.

10      Q.  Okay.  Let's assume that I didn't do that.  Is it

11  fair to say that during that traffic stop you'd probably

12  tell me at some point to get off the road?

13      A.  Yes, I would have -- if I determined there was an

14  issue, I would have you move.

15      Q.  Okay.  One way to do that is you can pull up

16  behind me and get on your loud speaker on your patrol

17  car, right?

18      A.  Yeah, but I've never done that.  I usually get

19  out and contact the person prior, and then have verbal

20  contact with them.

21      Q.  And then ask them to get off the road?

22      A.  Yes, if it's an issue.

23      Q.  You wouldn't complete the traffic stop in that

24  lane, right?

25      A.  No.

1    Q.  Okay.  Now to the right of that truck there's a

2    while solid line.  That's the shoulder line, right?

3    A.  Correct.

4    Q.  To left of that line is a lane, right?

5    A.  Yes.

6    Q.  To the right of that is the shoulder?

7    A.  Correct.

8    Q.  And there's pavement off to the right and a safe

9    area for the truck to get off the roadway?

10   A.  Correct.

11   Q.  All right.  Now let's get to the second

12   hypothetical.  Let's assume that there's a guardrail

13   right along that white line, so there's no shoulder.

14   Five hundred feet ahead, there's place that opens up

15   where a vehicle could get safely off the roadway, and

16   the shoulder opens up.  Let's assume that you light me

17   up and rather than stop, I drive 500 feet, instead of

18   stopping immediately, and get past the guardrail off the

19   road.  Is that a crime?

20   A.  No, because I would recognize the obvious

21   guardrail there is probably a potential as to why you

22   weren't immediately stopping.

23   Q.  So failure to yield doesn't require somebody to

24   just stop immediately, no matter what, right?

25   A.  When it's safe to do so.

1    Q.   Right.  And practical, right?

2    A.   Correct.

3    Q.   Okay.  This is when your dash cam starts

4    recording.  What activates it?

5    A.   My finger.  I have to actually push a button.

6    Q.   Okay.  So you turn it off and on yourself?

7    A.   Yes.

8    Q.   Okay.  Now you're aware that regular folks can

9    buy dash cams to put in a civilian vehicle, right?

10   A.   Yes.

11   Q.   Okay.  And you're aware that technology's reached

12   a point where folks can have those dash cams recording

13   at all times, right?

14   A.   Yes.

15   Q.   And it will actually save that memory?

16   A.   To my knowledge, there's a portion of it that

17   will save.  I don't know if it does it 24/7, but there's

18   a portion of it that -- like it records in a loop and is

19   good before it records over itself.

20   Q.   Why would you turn your dash cam off?

21   A.   What do you mean?

22   Q.   Why isn't it on all the time?

23   A.   Because I don't have enough memory -- it has

24   power to it.  So it records in a loop.  So -- but I

25   don't have enough memory to just hit record and drive

1  around for a ten-hour shift and record everything for

2  ten hours.

3      Q.  How much memory does it have?

4      A.  It's less than -- it might be maybe four

5  megabytes.  It's not very big.

6      Q.  How much time does four megabytes hold?

7      A.  I don't know.  I think I might get an hour out of

8  the camera, maybe.

9      Q.  So this only -- your dash cam -- you can only

10  record up to an hour on it?

11      A.  I believe so, before I have to take the card out

12  and then download the video and reformat the card.  It's

13  an old camera.

14      Q.  Okay.  Let's talk a little bit about Mr. Conner

15  and what you knew at the time of this traffic stop,

16  before you conducted it, at this moment in time.

17      A.  Okay.

18      Q.  So you knew who Nathan Conner was, right?

19      A.  Yes, I knew who Nathan Conner was.

20      Q.  And you knew where he lived, right?

21      A.  Yes.

22      Q.  Okay.  You knew what kind of truck he drove,

23  right?

24      A.  Yes.

25      Q.  All right.  Now in your search warrant affidavit,

1    you say that in 2019, the Kenai Police Department had

2    received a number of complaints from neighbors about

3    Mr. Conner?

4        A.   Correct.

5        Q.   Okay.  Were those complaints made directly to

6    you, or were those phone calls?

7        A.   Those would have been phone calls to the

8    department.

9        Q.   Okay.  Which neighbors made those complaints?

10       A.   There were neighbors next door, across the -- at

11   that time Mr. Conner lived in a cul-de-sac.  So there

12   were neighbors throughout the cul-de-sac that were

13   making those reports.

14       Q.   Were you a party to those phone calls?

15       A.   No.

16       Q.   Okay.  So you don't know what steps were taken to

17   verify the identity of those people that made those

18   complaints?

19       A.   It would have been done by the officers or the

20   dispatchers that took those complaints.

21       Q.   Okay.  Have you ever taken those complaints?

22       A.   Yes.

23       Q.   Okay.  And what's policy and procedure to provide

24   information about who's making those complaints?

25       A.   Not always.  Sometimes people want to remain

anonymous.  When somebody generally calls the police
department, there should be a record of that.  Whether
they're anonymous or not, there should be a record of
the date and the time in which they called.

Q.  So as far as you know, when you filled out the
search warrant affidavit these neighbor complaints, that
you called them, were anonymous complaints?

A.  No.  I believe that they were actually identified
as the neighbors.

Q.  How?

A.  Other officers.

Q.  Okay.  Specifically, what were you told and which
neighbors?

A.  I don't remember the neighbors' names.  I don't
have that information with me.

Q.  Okay.  You don't remember because that's a couple
years ago, right?

A.  I would have to go back and research all their
names, so...

Q.  Right.

A.  Right, I don't know their names.

Q.  When you fill out a search warrant affidavit
there's specific instructions you're supposed to follow,
right?

A.  Yes.

1    Q.   There's a cover sheet to your search warrant

2    affidavit that actually tells you how to fill it out?

3    A.   Correct.

4    Q.   And it says to specify exactly who was observed,

5    right?

6    A.   Correct.

7    Q.   When the officer observations took place, right?

8    Correct?

9    A.   I'm not sure.  You want an answer?

10    Q.   Yes.

11    A.   Yes.

12    Q.   Why the observations were made, right?

13    A.   Correct.

14    Q.   And it says, if, for example, the information

15    came from an informant.  It says the informant's reasons

16    for making the observations should be specified and the

17    reasons for relying on the informant's information

18    should be set out, right?

19    A.   Okay.

20    Q.   Would you agree with that?

21    A.   Sure.

22    Q.   Okay.  Now when you filled out this search

23    warrant affidavit you didn't say anything about who

24    these neighbors were, right?

25    A.   As far as identifying them by name, no.

1    Q.  Right.  Or the specific date, other than saying

2    in 2019, these complaints took place, right?

3    A.  No.  There was no specific dates for that.

4    Q.  All right.  Now these complaints -- just to

5    narrow this down -- were these complaints where the

6    people were coming and going from Nathan Conner's

7    residence and staying for short periods of time?

8    A.  There was that.  There were people that were

9    parking at a nearby school, and parking in the parking

10   lot, walking through their yards to get to Mr. Conner's

11   residence.

12   Q.  Okay.  Any of these anonymous tips from these

13   neighbors involve somebody witnessing any kind of

14   hand-to-hand transactions, to your knowledge?

15   A.  To my knowledge, no.

16   Q.  Okay.

17   A.  But officers had made arrests at that -- at his

18   residence with people leaving with controlled

19   substances.

20   Q.  Let's talk about that.  So you bring that up in

21   your search warrant affidavit.  I want to break that

22   down with you.  What you say in your search warrant

23   affidavit is that in 2019, the Kenai Police Department

24   contacted numerous people leaving that residence in

25   possession of drug paraphernalia, right?

1    A.  Correct.

2    Q.  Okay.  You didn't say anything in that search

3    warrant affidavit about people leaving that residence

4    being in contact in possession of controlled substances,

5    right?

6    A.  I would have to see that specific affidavit.  I

7    know that there were people that were arrested leaving

8    there, and that should have been in the affidavit.

9    Q.  And what you wrote in the affidavit is that those

10   people were arrested leaving that residence with drug

11   paraphernalia, right?

12   A.  I would have to see what exactly I wrote.

13   Q.  There's a white binder up there.  Go ahead and

14   turn to Exhibit D-9, and go to page 4 of D-9?

15   A.  D-9 you said?

16   Q.  Yes.

17   A.  Page 4.

18   Q.  Yes.

19   A.  Okay.  I'm on page 4.

20   Q.  Okay.  So we're on page 4.  Let's just go down to

21   that first full paragraph there.  It's about six lines.

22   Do you see that?

23   A.  The after -- where it starts in 2019?

24   Q.  Right, right, right.

25   A.  Correct.

 1    Q.  So just go ahead and give that a quick read
 2  through.
 3    A.  Okay.
 4    Q.  Okay.  So you say in 2019, the Kenai Police
 5  Department contacted numerous people leaving the
 6  residence with drug paraphernalia, right?
 7    A.  Correct.
 8    Q.  Okay.  Now you don't say in this affidavit which
 9  people and when, right?
10    A.  Actually the prior paragraph talks about on the
11  20th of May, about John Amend having a known history of
12  drug possession, was contacted by KPD officers leaving
13  Mr. Conner's residence in possession of heroin,
14  methamphetamine, cocaine, and marijuana.
15    Q.  Yeah.  We're going to come back to John Amend
16  here in a second.
17    A.  Okay.
18    Q.  So let's talk about the paraphernalia first.
19    A.  Okay.
20    Q.  So this sentence in the paragraph that we're
21  talking about here.  You state that the Kenai Police
22  Department contacted numerous people in possession drug
23  paraphernalia, right?
24    A.  Correct.
25    Q.  Okay.  You don't say which people or exactly when

1  those dates happened, right?

2      A.  No.

3      Q.  Okay.  Now, as far as these people that you're

4  referring to, there's no information there about those

5  people making statements to the Kenai Police Department

6  about using narcotics at Nathan Conner's residence,

7  right?

8      A.  Not in this paragraph, no.

9      Q.  Okay.  We'll go through the other ones, too, on

10 that.

11     A.  Okay.

12     Q.  So there's nothing in here about any of these

13 people saying that they got their drug paraphernalia

14 from Nathan Conner, right?

15     A.  No.

16     Q.  Okay.  Had the Kenai Police Department done any

17 kind of controlled buys from Nathan Conner's residence?

18     A.  There was, I think at some point, actually ABADE

19 (phonetic) got involved, the drug enforcement unit had

20 gotten involved.

21     Q.  When?

22     A.  It would have been prior to this, I believe.  But

23 I don't know what the end result of that was.

24     Q.  Okay.  So you don't know the end result of that,

25 right?

1    A.  No, I don't.

2    Q.  Okay.  All right.  Now let's talk about John

3 Amend here.  So you reference an incident specifically

4 on May 20th involving John Amend, right?

5    A.  Yes.

6    Q.  Now this person you say was arrested leaving

7 Mr. Conner's residence and was found in possession of

8 drugs?

9    A.  Correct.

10    Q.  Okay.  Who made that arrest?

11    A.  I believe that was either Officer Swangel or

12 Officer Franklin.

13    Q.  Okay.  Were they camped outside his house; do you

14 know?

15    A.  I don't know how it resulted.

16    Q.  Okay.  So how did they know that John Amend left

17 that residence?

18    A.  I think they contacted him as he was leaving;

19 that's my understanding.

20    Q.  You're just assuming that, though, right?

21    A.  No, that's what they told me.  Whether or not the

22 officers are camped out, I don't know how they came

23 about to contact Mr. Amend at that point.

24    Q.  Okay.  Did John Amend, was he searched before he

25 went to Nathan Conner's residence, or after?

1       A.   I believe it was after he was leaving.

2       Q.   Okay.  Did John Amend make any statements to law

3  enforcement after that arrest that he acquired drugs

4  from Nathan Conner's house?

5       A.   I don't know.  I have no idea.

6       Q.   Okay.  So did he make any statements that he sold

7  any of those drugs at Nathan Conner's house?

8       A.   I have no idea.

9       Q.   Okay.  Was he contacted in a vehicle or was he on

10  foot?

11      A.   I don't know that.

12      Q.   How much drugs were there?

13      A.   I don't know that.

14      Q.   Okay.  All right.  Now this was all

15  information -- coming back to Exhibit D-5 here, where

16  you're about to initiate the traffic stop.  Was this

17  information that you -- that was known to you, that we

18  just discussed, was that known to you at the time you

19  were about to conduct this traffic stop on Mr. Conner?

20      A.   The citizen complaints and the John Amend stuff?

21      Q.   Right.

22      A.   Yes.

23      Q.   Okay.  Have you personally arrested -- were you

24  aware of Mr. Conner getting arrested for possession of

25  drug paraphernalia?

1    A.  No.

2    Q.  All right.  Were you, prior to conducting this

3  traffic stop, aware of information about Mr. Conner

4  getting arrested in possession of drugs?

5    A.  No.

6    Q.  Okay.  The Kenai Police Department, how many

7  officers are in that unit?

8    A.  There are 18 sworn.  That includes the chief and

9  the lieutenant and three sergeants.

10    Q.  Okay.  Do you all know each other pretty well?

11    A.  Fairly well.

12    Q.  Okay.  On direct examination you testified about

13  some threats being in your computer system.  Who put

14  those in?

15    A.  That would have been now Lieutenant Langham, when

16  he was a patrol officer.

17    Q.  Do you have background information on that, why

18  that information was put in about threats?

19    A.  As far as like the --

20    Q.  What happened?  Why was that information put in?

21    A.  I don't know.

22    Q.  You have no idea?

23    A.  Nope.

24    Q.  When did you access that information in your

25  database?

1    A.   That was -- that was information that was

2   accessed when we were getting all of these calls from

3   neighbors complaining about the traffic stuff and the

4   things going on at Mr. Conner's place.

5    Q.   Was there information -- sorry, if I already

6   asked this -- about specifically what event we're

7   talking about, these threats?

8    A.   Like a specific police report number or?

9    Q.   Like, is there an allegation that you saw that

10  Mr. Conner had, you know, engaged in violence towards an

11  officer, were there details in this computer --

12   A.   It just said -- the notation -- it was an officer

13  safety advisement that just noted he had made threats to

14  KPD officers, specifically when they were off duty.

15   Q.   But you don't know anything else about that?

16   A.   No.  I don't know the context in which he had

17  that conversation with Lieutenant Langham.

18   Q.   Okay.  Go ahead and turn to the binder, bringing

19  you to Exhibit D-3 (indiscernible) --

20   A.   What was it again?  D?

21   Q.   Three.  (Indiscernible.)  And I'm going to ask a

22  couple questions.  Are those two maps there -- are those

23  two maps there, exhibit D-3, two page...

24   A.   Yes.

25   Q.   Okay.

          MR. EILERS:  And just so that the Court's

aware, Exhibit D-3 in my motion was a Map Quest.  These

are actually satellites.  So I just wanted to let the

Court know about that.

          THE COURT:  Thank you, Mr. Eilers.

BY MR. EILERS:

   Q.  Are these two maps a fair and accurate depiction,

as far as you can tell, of the area in which this

incident on June 14th occurred?

   A.  Yes.

   Q.  Okay.  Let's go ahead, and we're going to try to

do this, again, however you can see it best, Officer.

          So we're looking at the second page of Exhibit

D-3.  And on the left side of it, going from south up to

north, that's Swires Road, right?

   A.  Are you pointing at something?  Sorry.  I can see

Swires Road on the map.

   Q.  (Indiscernible) -- right here?

   A.  Yes.

   Q.  Okay.  Now you testified that Mr. Conner, you saw

him make this lane change from Swires Road onto the

Kenai Spur Highway heading left, right?

   A.  Correct.

   Q.  Okay.  Now Swires Road here, is that -- how many

lanes are here?

1       A.  I think there's three.

2       Q.  This middle one, that's a designated left-turn

3   lane, right?

4       A.  Yes, I believe so.

5       Q.  Is somebody required to use a turn signal when

6   they're in a designated left-turn lane?

7       A.  Yes.

8       Q.  Okay.  Now this happened at 8:00 at night, right?

9       A.  Yes.

10      Q.  But it was in June, and we're in Alaska, so it

11  was light out, right?

12      A.  Correct.

13      Q.  Okay.  Now it's easier to see a turn signal

14  illuminate during the night than it is during the day,

15  right; is that fair to say?

16      A.  Yes.

17      Q.  Okay.  Now when you saw this truck turn out, were

18  you parked on the side of the road, or were you driving?

19      A.  I was actually driving.

20      Q.  Okay.  When you saw that lane change happen, were

21  you in the inside or the outside lane?

22      A.  Are you talking about the --

23      Q.  The slow lane or fast lane?

24      A.  No.  I mean, are you talking about when he pulled

25  off onto the highway from Swires?

1   Q.   Right.  From the first left turn on to Kenai.

2   A.   I believe I was on the inside lane.

3   Q.   This lane here?

4   A.   Yeah.  Not the farthest one to the shoulder, but

5   on the inside.

6   Q.   Right.  So kind of what we would consider the

7   fast lane?

8   A.   Yes, correct.

9   Q.   Okay.  Now when a truck -- a pickup truck has got

10  a rectangular shape, right?

11  A.   Okay.

12  Q.   Is that right, kind of?

13  A.   Yeah.

14  Q.   Okay.  Now the left turn signal is on the front

15  and the back on the left side of that vehicle, right?

16  A.   Correct.

17  Q.   So when a truck enters the highway here, and

18  you're back here, you're only going to be able to make

19  an observation of those turn signals at the very last

20  moment after it's in the lane, right?

21  A.   Either at the very beginning, or at the very end

22  of where they're completing the turn, yes.

23  Q.   Okay.  And when you first saw his truck enter the

24  highway, you were doing the speed limit, right?

25  A.   I believe so, yes.

1    Q.  Okay.  After you saw the lane change did you

2  accelerate towards the vehicle, or did you maintain

3  distance, or did you slow down?

4    A.  I don't know.  I think I maintained speed.

5    Q.  Okay.  Now go ahead and go back down to D-5.

6  That's the dash cam.  This doesn't have audio, but just

7  going and play the -- hit play, and we're going to go

8  for about 20 seconds or so.

9       So we're playing Exhibit D-5 here.  You're

10  maintaining distance here, right?

11    A.  Okay.

12       DEPUTY CLERK:  Mr. Eilers, can I ask you to be

13  near a microphone.

14  BY MR. EILERS:

15    Q.  So you're maintaining distance here, right?

16    A.  Correct.

17    Q.  Okay.  Go ahead and pause.

18       Now when you first turn your dash cam on, you're,

19  what, ten car lengths behind?

20    A.  I don't know if it's ten.  Oftentimes, the

21  distance looks greater with this camera.  It looks

22  greater than what we actually are.

23    Q.  Okay.  Now you weren't rapidly accelerating

24  towards the vehicle, right?

25    A.  No.

1      Q.   Okay.  Now we're at second 13.  We can see that

2  Nathan Conner's vehicle is turning off to the right,

3  correct?

4      A.   Correct.

5      Q.   Okay.  And from this video we can see that his

6  right-turn signal works on the vehicle, right?

7      A.   Yes, I did see that.

8      Q.   Okay.  Now -- I know this was some time ago.  Do

9  you remember at what point you turned your overhead

10  lights on?

11      A.   It would be around that timeframe right there.

12      Q.   Okay.  So he's already off of the shoulder here?

13      A.   There, or just prior to that.

14      Q.   Okay.  And, again, it's daylight, right?

15      A.   Correct.

16      Q.   It's easier to see your overhead lights at night;

17  they're going to pop out a lot more than they would

18  during the day, right?

19      A.   Potentially.

20      Q.   Okay.  Go ahead.  And stop right there.

21          Now, you said on direct examination that, and

22  correct me if I'm wrong, that you can see that Nathan

23  Conner was looking at you at this point, right?

24      A.   Correct.

25      Q.   How do you know he saw you?

1      A.  He looked in the mirror.  I saw his face and

2  looked down, like looking at an angle, not looking

3  straight ahead.

4      Q.  Did you lock eyes with him?

5      A.  I don't know about locking eyes, but I saw him

6  look in the mirror.

7      Q.  Okay.  We'll go to -- and stop.

8          So before that turn happened, it's your testimony

9  that Nathan Conner, you're positive that he saw you?

10     A.  I believe he did, yes.

11     Q.  And what, again, makes you positive that he saw

12 you?

13     A.  Because I saw his face look in the mirror.

14     Q.  Okay.  Now, so it's your testimony that he's

15 looking left in the mirror as he was turning right?

16     A.  Just prior to it, yes.

17     Q.  Okay.  Now he's turned onto this road here, you

18 said -- you're not sure if that's a public or a private

19 road?

20     A.  Well, looking at it, even after I looked at the

21 map that you presented in D-3, so Hayes is not -- that's

22 not Hayes.  That actually goes -- all the houses there,

23 I believe, have a Lynnwood Lane address.  So that's

24 going to be still Lynnwood Lane.

25     Q.  Okay.  And Lynnwood Lane, that's a public road,

1 right?

2    A.   Correct.

3    Q.   Okay.   So traffic laws apply on that road, right?

4    A.   Correct.

5    Q.   Okay.   And public traffic uses that road,

6 correct?

7    A.   Correct.

8    Q.   All right.   Now off to left here, what we're

9 looking at in Exhibit D-5, off to the left there, that's

10 private property, right?

11    A.   It's a driveway it looks like.

12    Q.   Right.   Go ahead and play.   Now -- go ahead and

13 keep going.   Stop.

14       You see those brake lights there?

15    A.   I do.

16    Q.   Okay.  Keep going.  Stop.  Back up.

17       While he's doing that, off to the left we can see

18 a grass area, right?

19    A.   Yes.

20    Q.   Okay.   And off to the right is a grass area?

21    A.   Correct.

22    Q.   Okay.   And on each side of those are houses?

23    A.   Correct.

24    Q.   And on this road there's no lane indicators,

25 right?   I mean, there's no white line on the right,

1    correct?

2        A.   No, it's gravel road.

3        Q.   Okay.  So there's nothing to designate where the

4    shoulder might be, right?

5        A.   Correct.  Other than the grass.

6        Q.   Okay.  And so if Nathan Conner had stopped there

7    at 731, that we were looking at, he would have been

8    blocking Lynnwood Lane, right?

9        A.   He could have stopped prior to that; there's a

10   large open area on the right.

11       Q.   Where?

12       A.   Just prior to there.

13       Q.   Can you see that on the video?

14       A.   No, but you can see it on your map.  And I know

15   that area.

16       Q.   Okay.  All right.  Let me just ask it this way

17   for efficiency purposes:  Did you see Mr. Conner reach

18   his arm out of the truck to signal to you when he was

19   tapping his brakes?

20       A.   I did not.

21       Q.   Okay.  Do you see that hand sticking out there?

22       A.   I can't see anything but blurry.

23       Q.   That's fine.

24            Go ahead and go back to Exhibit D-3, Bruce, and

25   go ahead and zoom in on the right-hand turn, so that we

1    can see (indiscernible.)

2          THE COURT:  Mr. Eilers, I don't know if that

3    microphone back there is activated.  If you turn it to

4    yourself, the one that's on the stand to your left.

5          DEPUTY CLERK:  And it is activated, I just

6    turned it up.

7          THE COURT:  Thank you.

8    BY MR. EILERS:

9       Q.  So earlier you testified that there's a wide open

10   area off to the right where Nathan Conner could have

11   pulled over, right here, right?

12      A.  Correct.

13      Q.  Okay.  Is that -- at what point does the private

14   property begin and the road end?

15      A.  I don't know.

16      Q.  Okay.  So there's no line delineating that?

17      A.  No.

18      Q.  Okay.  And that's what, that's a pretty short

19   distance there where Nathan could have pulled off to

20   right there, right?

21      A.  Correct.

22      Q.  Okay.  Now after that, as we move forward to

23   Exhibit D-5, the dash cam, you testified on direct that

24   Mr. Conner was driving slow, right?

25      A.  Correct.

1    Q.  And if we move past that first brief section off

2  of the right that you were referring to when you first

3  make that turn, there's private property on each side.

4  Had Nathan Conner stopped the vehicle he would have been

5  blocking Lynnwood Lane, right?

6    A.  Most of it, yes.

7    Q.  Okay.  All right.  We're going to work our way

8  through this.  Through this video here.

9         MR. EILERS:  Now I'm mindful, Your Honor, that

10  we're coming up on noon.

11        THE COURT:  Yes.

12        MR. EILERS:  If it's okay with the Court, if I

13  can get to a place where it makes sense to stop...

14        THE COURT:  Of course.

15        MR. EILERS:  Okay.  So I'll be mindful of lunch

16  here.

17  BY MR. EILERS:

18    Q.  Okay.  Now Mr. Conner's driving slow here.  Can

19  you tell me, moving from this point forward, could you

20  tell me where Mr. Conner could have pulled off the road

21  without blocking it or entering private property?

22    A.  He could have stopped anywhere.

23    Q.  Right there, without blocking the road?

24    A.  He could have stopped there.

25    Q.  Right.  And he would have blocked the road,

1    right?

2        A.   No.  You can see how wide it is.

3        Q.   Okay.  Let's keep watching.

4             There's no line on each side of this lane

5    indicating where private property is, right?

6        A.   Correct.

7        Q.   Okay.  All right.  Stop.

8             Now, this is the part where you say that

9    Mr. Conner should have pulled off to the right, and you

10   pull off to the left to kind of intercept him at that

11   point, right?

12       A.   Correct.

13       Q.   Okay.  Now go ahead and hit play.  Stop.  All

14   right.

15            You see this front tire there?

16       A.   Correct.

17       Q.   And you see it's turning left, right?

18       A.   Correct.

19       Q.   How fast is Mr. Conner going there?

20       A.   Not very fast.

21       Q.   Like less than five miles an hour?

22       A.   Maybe five.

23       Q.   Okay.  Hit play.

24            And so what you said in your search warrant

25   affidavit and on direct examination, is that you had to

1    slam on your brakes to avoid a collision, right?

2        A.   I had to hit my brakes, yeah.

3        Q.   You actually -- the words you used in the search

4    warrant affidavit is you had to slam on the brakes,

5    right?

6        A.   Yes.

7        Q.   A bit of an exaggeration, don't you think?

8        A.   No.

9        Q.   Okay.  In your police report, you twice said that

10   Mr. Conner was arrested for felony failure to stop?

11       A.   Correct.

12       Q.   Okay.  Let's go ahead and look at Exhibit D-14.

13   I'm almost done with this.

14       A.   Okay.  I think I found it.

15       Q.   You found it?

16       A.   Yeah.

17       Q.   All right.  There's three pages to this -- or

18   yeah -- two pages to this exhibit, right?

19       A.   Two pages.

20       Q.   Right.  Okay.

21       A.   Correct.

22       Q.   The first page is the failure to stop statute,

23   right?

24       A.   Yes.

25       Q.   Okay.  Now let's just go down to subsection -- or

1  let's just go down to the very bottom there,
2  Subsection E.  It's at the very end.  Okay.  Can you
3  read that out loud.
4      A.  Sure.  Subsection E says:  Failure to stop at the
5  direction of a peace officer in the first degree is a
6  Class C felony, punishable as provided in AS1255.
7  Failure to stop at the direction of a peace officer in
8  the second degree is a Class A misdemeanor.
9      Q.  All right.  Now, again, in order to commit the
10  crime of failure to stop, a person needs to -- when
11  they're told to stop, they need to do so as soon as
12  practical and in a reasonably safe manner, right?
13      A.  Yes.
14      Q.  Okay.  Now let's just go back to the beginning of
15  this statute.  Subsection A, it tells us three ways in
16  which this crime can be a felony, right?
17      A.  Okay.
18      Q.  Correct?
19      A.  Correct.
20      Q.  Okay.  Subsection -- let's just start with 2, to
21  make this easy.  Subsection 2 says:  That the person
22  committing vehicle theft becomes a felony, right?
23      A.  Correct.
24      Q.  All right.  So Mr. Conner's vehicle wasn't
25  stolen, right?

```
 1    A.  I had no reason to believe that he was committing
 2  vehicle theft.
 3    Q.  All right.  Subsection 3 says that it becomes a
 4  felony if a serious physical injury occurs, right?
 5    A.  Correct.
 6    Q.  All right.  And that didn't happen here?
 7    A.  No.
 8    Q.  Okay.  So Subsection 1, that's the third way to
 9  do this, and it references statute 28.35.400, right?
10    A.  Correct.
11    Q.  All right.  Turning to the second page.  We know
12  now that's a reckless driving, right?
13    A.  Correct.
14    Q.  To commit reckless driving a person needs to
15  engage in a substantial and unjustifiable risk of danger
16  essentially?
17        MR. COLLINS:  Your Honor, I'm going object at
18  this point.  For the reasons that we're not on -- the
19  defendant -- Mr. Eilers is aware that a police officer
20  submits charges.  It's the prosecuting attorney decides
21  whether or not to pursue those charges.  So his
22  knowledge of whether or not the crime was committed is
23  ultimately determined by a different standard than
24  whether or not there's probable cause to believe an
25  offense was committed.
```

```
 1            THE COURT:  To be clear, just so I'm certain I
 2   understand here.  In the affidavit for the search
 3   warrant Officer Miller indicated that the offense at
 4   issue here, or at least one of the offenses at issue
 5   here, was a felony failure to stop.  He highlights the
 6   term felony.
 7            MR. EILERS:  Right.
 8            THE COURT:  I'm going to overrule the
 9   objection.  I recognize that it may not be relevant to
10   the underlying charges that are at issue here.  However,
11   I do think that Mr. Eilers can permissibly go into this
12   line of questioning to determine credibility and/or
13   knowledge of the officer who applied for the search
14   warrant.
15            So please proceed.
16   BY MR. EILERS:
17       Q.   What part of Mr. Conner's driving was reckless?
18       A.   Where we almost collided there at the end.
19       Q.   So it's your testimony that that was reckless
20   driving?
21       A.   Yes.
22       Q.   How is that reckless?
23       A.   He creates an issue where potential damage to
24   another vehicle or property can occur.
25       Q.   How did he do that?
```

1     A.   Turning in front of a police car.

2     Q.   And you were behind him, right?

3     A.   I was behind him and off to the side a little

4  bit, yeah.

5     Q.   Where you cut left and then accelerated, right?

6     A.   Right.

7     Q.   Okay.  So it was reckless driving for Mr. Conner

8  to not see that and continue his left turn lane at

9  three, four, five miles an hour?

10    A.   Well, he's required to yield to right, and he was

11  failing to do so.

12    Q.   Where in the statute does it say that someone's

13  required to yield to the right?

14    A.   I believe it's in the -- there's a traffic

15  statute for it.

16    Q.   And we're on the right exhibit.  Let's go back to

17  the first page.  Where does it say that someone's

18  required to yield to the right?

19    A.   Are you talking about in the fail to stop at the

20  direction of a police officer?

21    Q.   Right, failure to yield.

22    A.   It would be in an administrative code where that

23  would be.

24    Q.   Okay.

25    A.   So it would be like 13.8(a)(c).

      Q.  So a violation of that administrative code to you
is the crime of reckless driving?

      A.  Well, reckless you have to show that an accident
could occur, or did occur.  And in this case it didn't
occur, but it could have occurred.

      Q.  If I get in a fender bender, is that reckless
driving, per se?

      A.  No.

      Q.  Okay.  So again, what is it about this instance
that made it reckless driving?  I really want to pin
this down.

      A.  Well, he's not yielding for a marked patrol
vehicle, with lights, siren.  I'm attempting to get him
stopped, and he's not stopping.  So as I move out to the
side, I end up having to stop as he turns inward to
avoid colliding with him.  Where he could have avoided
by that by merely yielding to the right and stopping.

      Q.  And that, in your mind, created a substantial and
unjustifiable risk of harm?

      A.  Well, it would have put -- it could have been
more dangerous to him, yes.  It definitely would have
caused damage to his truck and my patrol car.

      Q.  Okay.  So what we witnessed there, in your mind,
was the crime of reckless driving as he made that left
turn there?

1    A.  Right in front of me.

2    Q.  Yes.

3    A.  Yes, that's --

4    Q.  That's your testimony?

5    A.  Yes, sir.

6    Q.  All right.

7         MR. EILERS:  Your Honor, I think this is a good

8    time to take a break.

9         THE COURT:  Very well.  It appears to be

10   12:05 -- it looks like closer to 12:10.  We will take

11   our lunch break and reconvene at 1:20.  And continue

12   with Officer Miller's testimony.

13        Anything else we need to address before we

14   break, Mr. Collins?

15        MR. COLLINS:  No, Your Honor.

16        THE COURT:  Mr. Eilers?

17        MR. EILERS:  I can just tell the Court that

18   we're probably about three quarters of the way through

19   the process.

20        THE COURT:  Very well.  Well, thank you all.

21        Madam Clerk, we may go off record.

22        DEPUTY CLERK:  All rise.  This matter is in

23   recess until 1:20 p.m.

24            (Recess taken at 12:09 p.m. to 1:20 p.m.)

25        DEPUTY CLERK:  His Honor, the Court, the United

1    States District Court is again in session.

2           THE COURT:  We are back on record.  Good

3    afternoon, gentlemen.

4           So before you continue, Mr. Eilers, I do want

5    to make it clear that for the purposes of this

6    evidentiary hearing, there really isn't a tomorrow.

7    One, tomorrow's a holiday.  But looking at availability

8    of courtrooms, I think it would be difficult for us to

9    get back together for quite some time.  So I'm not

10   trying to rush anyone.  We have the entire afternoon,

11   but just so parties are aware, I don't think there's a

12   further continuance, unless we're looking at maybe ten

13   days out.

14          MR. EILERS:  I can tell the Court that

15   Mr. Conner's testimony will be very brief.  I can also

16   tell the Court, with the sergeant coming to testify for

17   the troopers, with Mr. Collins bringing him now, because

18   of our expert, that's going to dramatically limit the

19   scope of my expert testimony.  We can possibly limit

20   depending how (indiscernible) the testimony is.

21          (Indiscernible.)

22          THE COURT:  Very well.  Mr. Eilers, please

23   continue.

24   BY MR. EILERS:

25     Q.  Officer Miller, we were last talking about

1   reckless driving.

2       I want to kind of shift gears now.  On June 14th

3   Mr. Conner's truck pulled off of the Kenai Spur Highway

4   onto what we've been referring to as Lynnwood Lane,

5   right?

6       A.  Correct.

7       Q.  All right.  Now as the turn was being made, you

8   said that you saw Mr. Conner look in your direction

9   through the -- through his side mirror, right?

10      A.  Correct.

11      Q.  Okay.  Now at what point did you confirm that it

12  was Nathan Conner?

13      A.  I recognized him prior to the vehicle ever coming

14  to a stop.

15      Q.  Okay.  At what point?

16      A.  That was well before -- it would have been -- so

17  like, if I recall correctly, it was just as we -- I

18  recognized him when I saw -- in the mirror, but you can

19  hear the confirmation I think on my body camera, that I

20  say that it's Nathan Conner.

21      Q.  Okay.  Great.  We're going to go through that.

22      Now on direct examination you testified that you

23  knew before the stop that Mr. Conner's license was

24  suspended, right?

25      A.  Correct.

1    Q.  Okay.  Let's go ahead and continue.

2         MR. EILERS:  And if we could just dim the

3  lights and watch along here.

4         THE COURT:  Sure.

5  BY MR. EILERS:

6    Q.  So this is your body cam as you're getting ready

7  to conduct this stop.  At a certain point here you'll

8  adjust the body cam, and we'll be able to see, and you

9  turn the audio on.  So we'll wait for the audio to

10  start.  All right.  Stop.

11         Okay.  So we can hear your siren now, right?

12    A.  Correct.

13    Q.  And again, that siren wasn't (indiscernible.)

14    A.  Correct.

15    Q.  Now let's listen closely here.  Stop.

16         You said it's Nathan Conner, I think, right?

17    A.  Uh-huh.

18    Q.  Okay.  So you weren't sure?

19    A.  I believed it to be him.

20    Q.  Okay.  But you weren't positive?

21    A.  Correct -- there's always a possibility that it

22  may not 100 percent be him, but I recognized who I

23  believed to be him.

24    Q.  Okay.  Well, let's talk about the license

25  suspension.  Were you positive of that?

1     A.   The revocation?

2     Q.   Yes.

3     A.   Yes.

4     Q.   So you were positive that his current license

5 status at that moment was suspended?

6     A.   Correct.

7     Q.   Okay.  Let's keep going.  And just for the record

8 we're playing along (indiscernible.)

9          (Recording played.)

10 BY MR. EILERS:

11    Q.   We are now at two minutes.  Go ahead and pause

12 it.  We're at two minutes and two seconds.  Go ahead and

13 just keep your eyes towards the top at Mr. Conner's

14 face.  Play.  Dim the lights.  Stop.

15         You see those sunglasses on his face?

16         Go ahead and hit play there.

17    A.   Yes.

18    Q.   Okay.  Stop.  So he's got pretty large sunglasses

19 on, right?

20    A.   Yes.  He has sunglasses on.

21    Q.   Okay.  So when Mr. Conner was turning from Kenai

22 Spur Highway on to Lynnwood Lane, you couldn't see his

23 eyes, right?

24    A.   No.  Not with the sunglasses, no.

25    Q.   Okay.  Let's go ahead and continue.

1          (Recording played.)

2          MR. EILERS:  Stop.

3     BY MR. EILERS:

4          Q.  Now, you said Tyler's house, right?

5          A.  Correct.

6          Q.  You know who Tyler is, right?

7          A.  Yes.

8          Q.  What's Tyler's last name?

9          A.  McConnell.

10         Q.  And where's he live?

11         A.  714 Lynnwood.

12         Q.  Okay.  And in your search warrant affidavit you

13    indicate that that residence is associated with

14    suspected substance -- or controlled substance activity?

15         A.  Correct, yes.

16         Q.  Okay.  All right.  Now, in fact, in your search

17    warrant affidavit you noted that a couple days prior you

18    found a used baggy with residue, right?

19         A.  Yes.

20         Q.  Okay.  Now I know this was some time ago, but in

21    the search warrant affidavit you said that used baggy

22    was consistent with the use of controlled substances

23    essentially?

24         A.  Correct.

25         Q.  Okay.  So that would be considered drug

1    paraphernalia, right?

2        A.   Correct.

3        Q.   Okay.  Now that couple days prior, did you seize

4    that baggy that you found in the driveway?

5        A.   No.

6        Q.   Okay.  So you didn't test it, right?

7        A.   No, I did not.

8        Q.   What about that baggy made you conclude that it

9    was consistent with controlled substances --

10       A.   I'm sorry.

11       Q.   What about that bag made you conclude that it was

12   consistent with controlled substance activity; do you

13   remember?

14       A.   The size, the shape, you know, they're small.

15   People will buy these bags that they commonly use for

16   hobby crafts or jewelry or beading or whatever.  And

17   they come in different colors; they come in different

18   sizes.  You know, it's commonly used to the -- to use

19   those varying sizes, whether when somebody purchases

20   controlled substances or somebody sells them or

21   possesses them, those are commonly the bags you'll find

22   them in.

23       Q.   Now you said in the search warrant affidavit that

24   it was a used baggy.  What makes you conclude that it

25   was used?

1    A.   At this point, I mean, it's two and a half years.

2   It probably looked used.

3    Q.   Okay.

4    A.   There's different between new and used.  It's

5   been in a driveway for I don't know how long.

6    Q.   Okay.

7    A.   So it's open to the elements and everything else.

8    Q.   Now do you remember where in the driveway you

9   found that bag?

10    A.   No.

11    Q.   Okay.  Again, this was two days prior to this

12   incident, right?

13    A.   I believe so, yes.

14    Q.   All right.  And for all you know -- well, this

15   residence and the residence next door, connects these

16   apartments where the people were suspected drug users in

17   the house, right?

18    A.   Correct.

19    Q.   Okay.  Now so it's possible that this used baggy

20   had drugs in it at some point, right?

21    A.   Sure, yes.

22    Q.   And it's possible even that there were trace

23   amounts of controlled substance in that bag when you saw

24   it, right?

25    A.   Correct.

1    Q.  All right.  And you don't remember where in the

2    driveway this bag was, right?

3    A.  No, I don't.

4    Q.  Okay.  And so for you all know that used baggy

5    could have been sitting right underneath where his truck

6    was parked, right?

7    A.  As far as where the drive -- yes, it could have

8    been anywhere in that driveway.

9    Q.  Okay.  And that's the same place where this truck

10   was parked when Donna did the K-9 sniff, right?

11   A.  Where the truck's parked now?

12   Q.  Right.

13   A.  Correct.

14   Q.  Okay.  Speaking of Donna, you said that you had

15   Trooper Woodruff help you, or show up as a supporting

16   officer, numerous times to do sniffs for you, right?

17   A.  Correct.

18   Q.  All right.  And so every time Donna's done a

19   sniff at your request, ultimately drugs or paraphernalia

20   were found?

21   A.  Correct.

22   Q.  Okay.  So you've never seen Donna conduct a

23   search that didn't result in an indication that there

24   were drugs in there?

25   A.  Or paraphernalia.

1    Q.   Right.

2    A.   Correct.

3    Q.   You've never seen that happen?

4    A.   No.

5    Q.   Every time, to your knowledge, Donna alerts and

6  indicates to controlled substances?

7    A.   Just in my cases.

8    Q.   Right.

9    A.   I can't testify to what the history of Donna is.

10   Q.   Right.

11   A.   I just know that when Trooper Woodruff has come

12  and done the dog sniff or search, or whatever the phrase

13  is, that Donna has indicated on a vehicle.  And there's

14  always been an explanation for that reaction.

15   Q.   Okay.

16   A.   Whether it's paraphernalia or actual drugs.

17   Q.   Fair enough.  Okay.  Let's continue playing at

18  two-minute 21 seconds (indiscernible.)

19           MR. EILERS:  Go ahead and play.

20           (Recording played.)

21           MR. EILERS:  Stop.

22  BY MR. EILERS:

23   Q.   You asked Nathan Conner whether he had a valid

24  license, right?

25   A.   Uh-huh.

1    Q.  So you didn't know, right?

2    A.  No.  I was aware of his revocation.  I ask

3  people --

4    Q.  Uh-huh.

5    A.  -- about their license status because that's one

6  of the elements of when you're trying -- to do an

7  investigation for a license revocation, suspension, or

8  cancellation, is their knowledge of that.

9    Q.  Okay.

10    A.  So what they're -- I verify everything.  I mean,

11  even though I knew before Nathan Conner -- what I

12  believed that his license was revoked at the time of

13  that, I still have to verify that to make sure that

14  that's consistent.  So everything I do, I try to

15  verify --

16    Q.  Okay.

17    A.  -- before I take any action.

18    Q.  Okay.

19        MR. EILERS:  Let's move on.

20        (Recording played.)

21        MR. EILERS:  Stop.

22  BY MR. EILERS:

23    Q.  So at this point, Mr. Conner asked for permission

24  to remove his sunglasses, right?

25    A.  Correct.

1    Q.  All right.  Now part of your training, you're

2  trained on how to detect on whether somebody's impaired,

3  right?

4    A.  Correct.

5    Q.  All right.  Whether someone was drunk or high on

6  drugs?

7    A.  Correct.

8    Q.  Okay.  Go ahead.

9        (Recording played.)

10  BY MR. EILERS:

11    Q.  So I'm going to try to condense this.  There were

12  no signs that Mr. Conner was impaired that day, right?

13    A.  I didn't believe he was impaired, no.

14    Q.  Okay.  And you didn't notice any odors that were

15  consistent at that moment in time with controlled

16  substances that day?

17    A.  I did not.

18        MR. EILERS:  Okay.  Go ahead and play.

19        (Recording played.)

20        MR. EILERS:  Stop.

21  BY MR. EILERS:

22    Q.  So Mr. Conner asked you why you pulled him over,

23  right?

24    A.  Yes.

25    Q.  Okay.  And in response you said that he didn't

1  make a -- didn't indicate a turn onto Kenai and then
2  failed to use a turn signal there, right?
3      A.  Correct.
4      Q.  And made the lane change?
5      A.  Correct.
6      Q.  All right.
7          MR. EILERS:  Let's back up a little bit.  Back
8  up like ten seconds.  Let's play this one more time.
9          (Recording played.)
10 BY MR. EILERS:
11     Q.  All right.  Let's just pay close attention here.
12         Now with your hands there, you did a little flip
13 of the ID, right?
14     A.  Yeah.
15     Q.  What was that, a nervous tick?
16     A.  I have no idea why I did that.
17     Q.  A nervous tick because you were making up a lie?
18     A.  No.
19     Q.  Okay.  Now you kind of stuttered there a little
20 bit when you were responding to Mr. Conner's question
21 about why you pulled him over, right?
22     A.  I don't recall that.
23     Q.  Okay.
24         MR. EILERS:  Go ahead and play.
25         (Recording played.)

1  BY MR. EILERS:

2      Q.  Now, Mr. Conner at this point -- we couldn't

3  really hear it there -- but Mr. Conner said he was going

4  to check his turn signals; is that a fair

5  characterization of what he said?

6      A.  I believe so, yeah.

7      Q.  Okay.  And we know that his turn signals worked,

8  right?

9      A.  We definitely know the right one worked --

10     Q.  Okay.

11     A.  -- at the end there.

12     Q.  Okay.

13         MR. EILERS:  Go ahead and continue.

14         (Recording played.)

15         MR. EILERS:  I'm trying to --

16         THE COURT:  Don't feel rushed.

17         MR. EILERS:  Sorry, Your Honor, there isn't a

18  more efficient way to do this.

19         (Recording played.)

20         MR. EILERS:  Stop.

21  BY MR. EILERS:

22     Q.  So just to the left there's a pocket down at the

23  bottom of the door, right?

24     A.  Correct.

25         MR. EILERS:  And we're at 6:31, for the record.

```
1    BY MR. EILERS:

2        Q.   And that's where you saw an object that you say

3    was consistent with a concealed firearm, right?

4        A.   A concealable firearm.

5        Q.   Concealable.  Okay.

6        A.   Yes.

7        Q.   Okay.  So for all you knew, it's your testimony

8    that that was a real gun, right?

9        A.   I didn't know either way.

10       Q.   Okay.  But it could have been?

11       A.   It could have been, yes.

12       Q.   It could have been locked and loaded, right?

13       A.   Correct.

14       Q.   Okay.  Now this door -- the window's open, right?

15       A.   Correct.

16       Q.   Okay.

17            MR. EILERS:  Let's continue.

18            (Recording played.)

19   BY MR. EILERS:

20       Q.   So you can see the cash in his hand there, right?

21       A.   Correct.

22            (Recording played.)

23   BY MR. EILERS:

24       Q.   We can see the cash in his hand there, right?

25       A.   Right.
```

1    Q.  He tried to take it with him on his person as he

2    got out, right?

3    A.  Correct.

4    Q.  Okay.  Now if someone's driving on a suspended

5    license, can they go to jail for that?

6    A.  Yes.

7    Q.  Okay.  And if that person goes to jail and they

8    have cash on that person, can they bail out with that

9    money, potentially?

10    A.  Potentially, yes.

11    Q.  Okay.

12        (Recording played.)

13        MR. EILERS:  Pause it.

14  BY MR. EILERS:

15    Q.  Now off to the right, we can see that another

16  officer is arriving, right?

17    A.  Correct.

18    Q.  Okay.

19        (Recording played.)

20  BY MR. EILERS:

21    Q.  Okay.  Now who is this officer that showed up; do

22  you remember?

23    A.  That I believe is Officer Swangel.

24    Q.  Okay.  How long has Officer Swangel been on the

25  force?

1      A.   She has been a police officer now a little over

2    ten years.

3      Q.   Okay.  Now at this point we're at 7:18.  You

4    returned to your vehicle, right?

5      A.   I believe so.

6      Q.   You went and got in your car, and you told this

7    other officer to keep an eye on Mr. Conner, right?

8      A.   Correct.

9      Q.   And at that moment in time Mr. Conner was not in

10   handcuffs, right?

11     A.   He was not.

12     Q.   Okay.  And this officer was standing behind

13   Mr. Conner while he's at the tailgate, right?

14     A.   She's standing there with him.

15     Q.   Right.  And you just told her to kind of keep an

16   eye on Mr. Conner, right?

17     A.   Correct.

18     Q.   Okay.

19          MR. EILERS:  Let's go ahead and play.

20          (Recording played.)

21          MR. EILERS:  All right.  Let's go ahead and

22   stop there.

23   BY MR. EILERS:

24     Q.   Now at this point, you ran some records checks,

25   right; is that right?

1     A.   More than likely, yes.

2     Q.   Okay.  At what point did you call for Trooper

3  Woodruff to do the sniff?

4     A.   I don't -- I think it was after I observed the

5  potential paraphernalia in the truck itself.

6     Q.   Okay.  So -- okay.  I know this was some time

7  ago, too.

8          Now this other officer shows up and is standing

9  behind Mr. Conner while he's unsecured.  Do you say

10  anything to this supporting officer about a possible

11  concealed firearm in the front door?

12     A.   I don't know that I did.

13     Q.   All right.  Okay.  Even though it poses a

14  potential danger, right, because Mr. Conner's a suspect,

15  and he's on scene, and he's not secured, right?

16     A.   Correct.

17     Q.   And even though it's in front of this residence

18  with suspected drug users, right?

19     A.   Correct.

20     Q.   And in fact, one of those alleged drug users came

21  out during the stop; Amanda Keeve came out, right?

22     A.   Uh-huh.

23     Q.   And she could have gone in that window and

24  grabbed that gun, right?

25     A.   She could have.

1    Q.  Right.  And you could have secured that firearm,

2    but you didn't, right?

3    A.  I did not.

4    Q.  Okay.  Now when you later applied for a search

5    warrant, you emphasized that this was a potential

6    firearm in that door, right?

7    A.  Correct.

8    Q.  Okay.  Now, ultimately this vehicle's towed,

9    right?

10    A.  Yes.

11    Q.  And you've seen vehicles towed a bunch of times?

12    A.  Yes.

13    Q.  Okay.  Do you remember who towed it on this

14    occasion?

15    A.  I do not.

16    Q.  Okay.  Now when somebody goes to tow a vehicle,

17    do they sometimes -- does the tow truck driver go in and

18    put the vehicle in neutral?

19    A.  Yes.

20    Q.  Okay.  So you left that firearm there, what could

21    have been a firearm, right there in the door while this

22    tow truck driver could have reached inside, right?

23    A.  Correct.

24    Q.  Okay.  Now there was a couple cell phones in the

25    truck, right?

1      A.   Correct.

2      Q.   And you reached inside to wrap one in foil and

3   put another one in a Faraday bag, right?

4      A.   Correct.

5      Q.   But still you left that gun in there, right?

6      A.   Correct.

7      Q.   Okay.  Now had you handled that gun it would have

8   taken about two seconds to realize it wasn't a real

9   firearm, right?

10     A.   Yes.  But that would require -- that would have

11  been, I believe would have been an actual search of

12  Mr. Conner's property.  And without a warrant --

13     Q.   Was it a search when you reached in to put the

14  cell phones in the Faraday bags?

15     A.   No.  That was to preserve -- to keep any evidence

16  from being destroyed.

17     Q.   So as to potential firearms in plain view of the

18  door, that's, in your mind, a search, to grab that and

19  secure that firearm?

20     A.   If there's a reason for me that necessitates that

21  I immediately have to secure that.  But that's why I

22  removed Mr. Conner from the driver's seat.

23     Q.   Right.

24     A.   So I wouldn't have to pull a firearm out with

25  multiple people around.  So I removed him from that

1    firearm and to the back of the truck.  That's why that

2    firearm -- in this case what was actually a BB gun --

3        Q.   Uh-huh.

4        A.   -- stayed right where it was.

5        Q.   So you don't think officer safety is a legitimate

6    reason for you in those circumstances to secure the

7    firearm?

8        A.   I was exercising officer safety, which is why I

9    left it in the door pocket and removed Mr. Conner from

10   the accessibility of that.

11       Q.   Well, what about Amanda Keeve, with the idea that

12   she could have came out --

13       A.   She turned around and went back inside.

14       Q.   (Indiscernible) right?

15       A.   Yeah.

16       Q.   Okay.  And then earlier we talked about the fact

17   that under Alaska law you have a right to seize

18   concealed firearms in certain circumstances, right?

19       A.   Yes.

20       Q.   And you could have done that here?

21       A.   Not under the concealed portion.  The concealed

22   is only if it's on a person.  And in this case, that

23   firearm wasn't on Mr. Conner's person.

24       Q.   But you saw it in the door in plain view, right?

25       A.   I saw a portion of it in plain view.

1    Q.  All right.  I'll move on.

2        On direct examination you testified about a

3    number of bags and lock boxes, sunglasses case, things

4    like that, right?

5    A.  Correct.

6    Q.  All right.  And what you said was that, you know,

7    those things could be everyday-use containers, right?

8    A.  Yes.

9    Q.  Okay.  And what you said was that it's the

10   combination of those with this butane torch and tinfoil

11   that lead you, in part, to the conclusion that there may

12   be controlled substances in that vehicle, right?

13   A.  In addition to the other stuff, the reports of

14   drug use and/or sales at Mr. Conner's residence.  The

15   type of people that are associated with the residence

16   which, he came to a stop to.  So, yes, the totality of

17   all those things together.

18   Q.  Okay.  Now when the -- between when the vehicle

19   was seized and when it was searched back at the police

20   station, had that vehicle been -- had anyone else had

21   access to that vehicle to manipulate evidence?

22   A.  No.  It was loaded onto the tow truck and then it

23   was followed by, I believe, Officer Swangel, who then --

24   it's then stored in a locked garage that you have to

25   have a key -- a code to even access.

1    Q.   Okay.  Now you didn't take the photographs of the

2 truck that occurred during the search, right?

3    A.   No, I don't think so.

4    Q.   Were you there when the photos were taken?

5    A.   Yes.

6    Q.   Okay.  So you're standing next to this other

7 officer, as they're taking a number of photos while

8 you're doing the search?

9    A.   Yes.

10   Q.   And what you're looking for are items of

11 evidentiary value, right?

12   A.   Correct.

13   Q.   Now, these photographs -- they're Exhibit D-15

14 and they've been admitted into evidence, so hopefully we

15 can speed through this.  There's a number of photographs

16 of the exterior of the vehicle, right?

17   A.   Correct.

18   Q.   The bed of the truck, right?

19   A.   Uh-huh.

20   Q.   The tool box, right?

21   A.   Correct.

22   Q.   And inside the vehicle, right?

23   A.   Correct.

24   Q.   Okay.  Now in your search warrant affidavit you

25 say under oath, as part of this application, that there

1   was a folded-up piece of tinfoil at the back of the
2   driver's seat where the back portion connects with the
3   seat, right?
4       A.  Yes.
5       Q.  Okay.  What happened to that piece of tinfoil?
6       A.  I don't know.  I don't think we seized it.
7       Q.  Did you take pictures of it?
8       A.  I don't know.  I don't know if it got
9   photographed or not.
10      Q.  Okay.  Now what you say in your search warrant
11  affidavit is that there also was a butane torch sitting
12  on the floor board at the center of the truck at the
13  front seat, right?
14      A.  Correct.
15      Q.  What happened to that butane torch?
16      A.  I'm sure we didn't seize it.
17      Q.  Okay.  Now after you executed the search warrant,
18  you filled out an inventory sheet, right?
19      A.  Yes.
20      Q.  Listing the items of evidentiary value?
21      A.  Yes.
22      Q.  Right.  There's nothing in there about tinfoil,
23  right?
24      A.  Which -- let me look at it.
25      Q.  Exhibit D-10, page 5.

```
1    A.   Page 5, you said?

2    Q.   Correct, at Exhibit D-10.

3    A.   No.  There is nothing about -- there's no tinfoil

4  and there's no butane torch that was seized as a result

5  of this search warrant.

6    Q.   Nor were they photographed, right?

7    A.   I don't know.

8    Q.   Okay.  Now did you physically conduct the search?

9    A.   Yes.  I participated in the search, yes.

10   Q.   Okay.  Now in your search warrant affidavit what

11 you say is that the affiant recognizes that items such

12 as tinfoil, butane torches, are common drug

13 paraphernalia associated with drugs like heroin and

14 methamphetamine, right?

15   A.   Correct.

16   Q.   Okay.  So tinfoil and butane torches being in the

17 vehicle has important evidentiary value, right?

18   A.   Yes and no.  I mean, we don't often seize

19 everything that we come across in a vehicle.

20   Q.   Okay.

21   A.   We usually try and photograph stuff in place, and

22 we don't seize -- because you can get tons of drug

23 paraphernalia in just -- so we try to seize the items

24 that would be of value.

25   Q.   Okay.  Now if you saw aluminum foil that had
```

1    been -- actually, let's just break this down.

2        On direct examination you testified how aluminum

3    foil, tinfoil is used for drug paraphernalia -- or for

4    drug use, right?

5    A.   Correct.

6    Q.   What happens is somebody torches up the foil,

7    right?

8    A.   Uh-huh.

9    Q.   It gets hot.  The drug burns, smoke comes out,

10   and you can inhale the smoke at that point, right?

11   A.   Correct.

12   Q.   That's how foil is used to consume drugs?

13   A.   Correct.

14   Q.   Okay.  So if foil is used, or has been used,

15   you're going to see the burn marks, black residue on it,

16   things like that, right?

17   A.   Correct.

18   Q.   And you didn't find anything like that -- you

19   didn't see anything like that prior to conducting this

20   search, right?

21   A.   I don't recall, no.

22   Q.   Okay.  And you didn't seize any burnt foil or a

23   torch during the search, right?

24   A.   No.

25   Q.   Okay.  Now just briefly about cigarettes.  Okay.

1  The foil that you pull out of cigarette packs are

2  different than regular like Reynolds foil you would use

3  for cooking, right?

4      A.  Yeah.  I think it has a different consistency.

5      Q.  It's more like paper, right?

6      A.  I think one side is aluminum foil, and it's

7  almost like it's a two-part thing.

8      Q.  Right.

9      A.  One part is white; the other side looks like

10  tinfoil.

11      Q.  So at the same time, you hope that a firearm

12  doesn't go off -- do you agree with me that taking a

13  lighter, to try to use drugs with the foil off a

14  cigarette pack, that it would burst into flames?

15      A.  I have no idea.

16      Q.  Okay.

17      A.  I've never tried it.

18      Q.  Okay.  Have you ever experienced, if someone used

19  the foil in a cigarette pack to actually consume

20  narcotics, to use that as the aluminum foil or the

21  paraphernalia?

22      A.  I have no idea.

23      Q.  Okay.  That's good enough.

24          I want to talk about the cell phone really

25  quickly.  When you applied for this search warrant, you

1  had spoken with a trooper who told you that they saw

2  some messages on a cell phone, right?

3      A.  Yes.

4      Q.  Okay.  What you were told is that the phone read

5  something to the effect of "also have 20 percs," right?

6      A.  Yes.

7      Q.  Okay.  And that was a message that was received

8  on Mr. Conner's phone, as you understand it?

9      A.  That's my understanding, yes.

10     Q.  Okay.  And we're talking about the Percocet,

11 right?

12     A.  Right.

13     Q.  And someone's telling Mr. Conner, according to

14 this text message, that they have Percocet to purchase,

15 right?

16     A.  I would have to see exactly what the exact quote

17 was.

18     Q.  Okay.  It's Exhibit D-9, at page 4.

19     A.  Okay.  I'm sorry, what page you said?

20     Q.  It's D-9, page 4.

21     A.  Okay.  Yeah.  And in there -- and then

22 Hershberger also had photographed, I believe, that same

23 text that would have that quote -- what was exactly

24 said.  But that was -- also have 20 percs, I think a

25 summarization of what the text said.

1    Q.   That's what you put in your search warrant

2    affidavit, right?

3    A.   Correct.

4    Q.   Okay.  And that's somebody telling Mr. Conner

5    that they have Percocet?

6    A.   I don't know.  I would have to look at the text

7    on the cell phone itself.

8    Q.   Okay.  All right.  Can we just go to Exhibit D-7.

9    It's body cam number 2.  This won't take long.

10         Just go ahead and play.

11         All right.  So your body cam is muted at this

12   point, right?

13   A.   So when you activate it, it doesn't -- the

14   audio -- I have no way of controlling the audio.

15   Q.   Okay.

16   A.   So with these, that was an older version of the

17   camera, so it doesn't record audio for the first

18   30 seconds.

19   Q.   Okay.

20   A.   So I have no control over that.  I wish I did.

21   Q.   Okay.  Now if you had to guess why you didn't

22   return to the vehicle, what was it for?

23   A.   For -- I'm sorry, which vehicle?

24         (Recording played.)

25         MR. EILERS:  Stop.

BY MR. EILERS:

Q.   So why did you go back to the patrol vehicle?

A.   More than likely that's when I did the confirmations for his revocation and whether or not he was on PED.

Q.   Right.  So you went back to the vehicle, then ran a records check, and the first thing you said when you got out of vehicle is, your license is suspended for DUI, right?

A.   Correct.

Q.   You didn't say that before you ran the records check, right?

A.   No.

Q.   Because you didn't actually know for sure whether his license was suspended?

A.   Well, like said, I have to actually verify those things.  Because if I don't verify it, and I arrest Mr. Conner without verifying that, who knows.  In a day's time or two days' time, or however far I knew that, if suddenly he had gotten his license back, and I just arrest him because I know his license is revoked then he goes to jail for me not doing my job.

Q.   Right.

A.   Right.

Q.   So since you had last checked -- between when you

had last checked that his license was suspended and when

you ran that records check, you weren't positive that

his license was suspended.  It could have been

reinstated during that time?

A.   There's always that possibility.

Q.   Right.  Now on direct examination and during

cross examination you testified that you know -- that

you knew that his license was suspended, right?

A.   Yes.

Q.   Yeah.  And now that we've got this video, what we

see is that when you say you know, you didn't actually

know until you ran the records check, that's when you

knew it, right?

A.   I knew the last time I had conducted -- that I

had conducted, I knew it was suspended.  But, again,

everything I do, I have to verify.  Even if I had run

Mr. Conner two hours prior and knew that he was revoked,

I would still check it again and verify why it's

revoked -- what the status is and if it's -- and why it

was revoked.

Q.   Okay.  Now a review of this video evidence kind

of helped clear that up about what it means when you say

that you know something, right?

A.   It means I believed at the time he was revoked,

yes.

1     Q.   Okay.  Now we don't have video evidence of what

2  you claim to be these traffic violations, where

3  Mr. Conner made the lane change and entered Kenai Spur

4  Highway, right?

5     A.   Correct.

6     Q.   All right.  We got to rely on your testimony for

7  that, right?

8     A.   Correct.

9     Q.   Okay.  And you're testifying that you made a

10 determination that those traffic violations had

11 occurred, right?

12    A.   Yes.

13    Q.   Just like you testified that you determined that

14 Mr. Conner engaged in reckless driving?

15    A.   Correct.

16         MR. EILERS:  No further questions.  Thank you.

17         THE COURT:  Thank you, Mr. Eilers.

18         Mr. Collins, redirect.

19         MR. COLLINS:  Thank you.

20                   RE-DIRECT EXAMINATION

21 BY MR. COLLINS:

22    Q.   Officer Miller, just to pick up where we just

23 dropped off.  In regards to the reckless driving, why

24 did you believe Mr. Conner had committed that conduct?

25    A.   Well, in -- so the reckless driving constitutes,

basically, if you potentially can cause an accident that causes damage to property, or to -- or injury to another person, then that would constitute reckless driving, if you did that.

And I also believe this was one of those cases where I consulted the district attorney to determine whether or not the appropriate charge for the remand should have been a felony for the failure to yield or the failure to yield in a second degree felony stop for a police officer in the second degree. And the -- based off the near collision and the potential that two vehicles could have been damaged, was enough to justify that reckless driving.

Q. And does reckless driving have a speed element to it? Does someone have to be travelling a certain speed and then turning left in front of a moving car to be subject to this charge?

A. No.

Q. If -- earlier you had testified about when an officer activates their lights or sirens essentially, that the driver has an obligation to pull over; is that correct?

A. Correct.

Q. To which side of the road are the, or whatever avenue the car's on, is the individual, the driver

1    required to pull over?

2         A.   To the right.

3         Q.   Is that just a rule of yours, or is that a rule

4    of law in the state of Alaska to which you're aware?

5         A.   It's Title 13, in the Alaska Administrative Code

6    for traffic law.

7         Q.   So it's a published, printed law?

8         A.   Correct.

9         Q.   That the person has to pull over to the right; is

10   that correct?

11        A.   Correct.

12        Q.   And at the time that you were driving on that

13   road, Lynnwood I think it is -- we determined that it's

14   not Hayes, but -- I'm sorry it's escaped me.

15             You were driving behind Mr. Conner at one point;

16   he then turned left in front of you, correct?

17        A.   Correct.

18        Q.   Was that consistent with the requirement to pull

19   to the right?

20        A.   No.

21        Q.   And he did end up pulling into the driveway of

22   714 Lynnwood, correct?

23        A.   Correct.

24        Q.   Do you know if -- do you know if Mr. Conner held

25   the belief that if he pulled into a private driveway

1  that law enforcement could not tow his car?

2     A.  Yes.

3     Q.  And that's based on what?

4     A.  Jail phone calls.

5     Q.  The Faraday bag that you identified as being the

6  thing into which you put the cell phones, what was that

7  purpose?

8     A.  That's to prevent the destruction of evidence.

9  So with a cell phone, if it gets a signal, you can wipe

10  a cell phone remotely.

11    Q.  Okay.  In this case, was there any indication

12  that anyone was trying to wipe the phone?

13    A.  I wouldn't know that.  It could be done from --

14  it can be done from anywhere.  So to prevent that you

15  wrap -- you put them in those bags or wrap them in

16  tinfoil to prevent the signal.

17    Q.  Once it's wrapped in the tinfoil wrapper, or a

18  Faraday bag, is the phone able to update, maintain

19  communication with cell phone towers?

20    A.  No.  It cuts all the ability to receive any type

21  of signal.

22    Q.  So if someone had sent a message while the phone

23  was in the Faraday contraption, would that phone have

24  registered the receipt of that text message?

25    A.  It would only if it -- the phone received a

signal when you opened up the Faraday bag or opened up

the tinfoil, allowing it to receive a signal.

Q.  And to be clear with regard to the cameras, there

were two videos that the defense played?

A.  Correct.

Q.  One was, I'll call the dash cam?

A.  Correct.

Q.  And is it fair -- is it correct that the dash cam

lens is not at your eye level?

A.  No, it's not.

Q.  And the body cam video that we saw, it showed

essentially your right cheek for a while?

A.  Yes.

Q.  And then at one point it dropped down to your

feet, correct?

A.  Correct.

Q.  Then would that imply that this camera was at

your shoulder level?

A.  It would have been right here on my neck on

the -- there was a magnetic mount for that version of

the camera.  But they're not easy -- that's one of the

frustrating parts with these body cameras that we have

is there's no perfect -- unless you wear it on your

face, there's no perfect way to see everything.  And

then inevitably, if something happens, they get knocked

off because they don't stick to the magnetic mounts, as
well.

Q.  Is it fair to say that the camera only sees what
the camera sees and not exactly what you see?

A.  Correct.

Q.  You were present when Donna came on scene,
correct?

A.  Correct.

Q.  But you did not supervise Trooper Woodruff's
activities with her, correct?

A.  Correct.

Q.  Did you see Donna react to the ground around the
truck at any time?  By that react, I mean give an
indication to the ground?

A.  I couldn't tell you what Donna's reactions were.
I'm not a trained handler.  So even if she did react, I
wouldn't be one that could testify to what that actually
means.  So...

Q.  The items that Mr. Eilers questioned you about,
in particular the butane torch and the foil, did you
inspect them before you applied for a search warrant?

A.  No.

Q.  So you did a further inspection after the search
warrant?

A.  I don't know if we actually opened up those

1    pieces of tinfoil or not.  I can't remember what we did

2    with those.

3        Q.   But your application for the search warrant was

4    based upon what information?

5        A.   The information that we had at the time of the

6    stop at the scene.  What we visualized from the exterior

7    of the truck.

8        Q.   And in that regard, when you were outside the

9    vehicle, the truck, at Lynnwood, you didn't know at that

10   time that there was a firearm in the backpack?

11       A.   No, I did not.

12       Q.   And at that time you didn't know there was actual

13   methamphetamine and heroin in the car -- truck, as well?

14       A.   I did not.

15       Q.   Did you discover a firearm in the truck,

16   subsequently?

17       A.   Yes.

18       Q.   Did you discover drugs in the truck subsequently?

19       A.   Yes.

20       Q.   And in particular, either methamphetamine or

21   heroin?

22       A.   Both methamphetamine and heroin.

23       Q.   In the car -- in the truck?

24       A.   In the truck.

25            MR. COLLINS:  I haven't any other questions of

1    this witness, Your Honor.

2           THE COURT:  Thank you, Mr. Collins.

3           Mr. Eilers, recross?

4           MR. EILERS:  Very briefly, very briefly.

5                    RE-CROSS-EXAMINATION

6    BY MR. EILERS:

7    Q.  Officer Miller, you said something on re-direct

8    about consulting with the district attorney?

9    A.  Yes.

10   Q.  Can you clarify for us what you're talking about?

11   A.  A lot of times when we have cases that we want

12   to -- or an event we want to make sure that, you know,

13   we want to apply something that would fit the statute,

14   if there's probable cause or not, in order to be able to

15   at least lean on that person for a charge.

16   Q.  Okay.

17   A.  So it's just -- we'll call up whoever the on-call

18   district attorney is, relay the facts to them, and then

19   go with whatever their recommendation would be.

20   Q.  Okay.  Now you can apply for a search warrant in

21   Kenai, right?

22   A.  You can up to about 4:00 in the afternoon.

23   Q.  All right.  What time -- in this case you applied

24   for a search warrant in Anchorage, right?

25   A.  Correct.

1    Q.   Because it was after hours?

2    A.   Correct.

3    Q.   At what time was that you applied for that search

4    warrant?

5    A.   I want to say it was about 5:00 a.m., maybe.

6    Q.   Okay.  Do you know the office hours of the

7    district attorney's office?

8    A.   It was either -- we either applied for or that is

9    when it was approved.  I'm not sure.  I'm sorry, what

10   was your last question?

11   Q.   Do you know the office hours of the district

12   attorney's office?

13   A.   Yeah.  They don't open up until 8:30 in the

14   morning.

15   Q.   So at what point was it when you applied for the

16   search warrant that you talked to a district attorney?

17   A.   They have an on-call list.

18   Q.   Okay.

19   A.   So there is an after-hours list that we can call

20   them and talk to them.

21   Q.   Was it a video call or just a telephone call?

22   A.   Just a telephone call.

23   Q.   Okay.  Did you play the video from the stop to

24   the district attorney?

25   A.   No.

1     Q.  Okay.  A couple more just quick questions.

2          In the course of your investigation you

3  discovered that the window was missing from the driver's

4  door?

5     A.  Correct.

6     Q.  Okay.  In your search of the vehicle you also saw

7  that there were cigarettes inside, right?

8     A.  In the vehicle?

9     Q.  Right.

10    A.  I don't remember.

11    Q.  Okay.  Well, let's talk about this butane torch.

12 You can buy a lighter/butane torch at a gas station,

13 right?

14    A.  Yes.

15    Q.  All right.  People use them to smoke cigarettes

16 with, right?

17    A.  I've actually never seen anybody light a

18 cigarette with one.

19    Q.  Okay.  Well, one purpose of a butane torch

20 would -- well, one of the benefits of a butane torch is

21 that it's wind proof, right?

22    A.  Correct.

23    Q.  Okay.  Have you ever tried to light a cigarette

24 while driving down the highway at 50 miles an hour with

25 an open window?

```
 1      A.  I can't say that I have.
 2      Q.  All right.  It would probably be easier to do
 3   that with a butane torch, right?
 4      A.  If it's wind proof, yes.
 5      Q.  All right.
 6           THE COURT:  Thank you, Mr. Eilers.
 7           Officer Miller, I have a few questions for you.
 8           THE WITNESS:  Yes, sir.
 9           THE COURT:  I'll be brief.
10           So on the day in question, was this a situation
11   where you were tasked with sort of patrolling, looking
12   for traffic violations, or you happened to be driving
13   and witnessed a traffic violation?
14           THE WITNESS:  I just happened to be driving and
15   witnessed it.
16           THE COURT:  Okay.
17           THE WITNESS:  That's all.
18           THE COURT:  And is there generally a dash cam
19   policy as to -- or dash cam or body cam -- when you are
20   to activate them?
21           THE WITNESS:  We try to activate it as soon as
22   possible.  A lot of times we can -- or depending on what
23   it is, trying to let dispatch know what we're doing, the
24   locations, the radio traffic and all of that.  We try to
25   get the cameras going as quickly as we can.
```

 1          Sometimes we don't -- like my old camera, the
 2    frustrating thing with that thing is you try to activate
 3    it and you would find out halfway through the contact
 4    that it didn't activate, and you would have to activate
 5    it again.
 6          In this case, I don't know at what point -- I
 7    think it was after I had gotten my radio traffic out and
 8    those types of things.  I got all the cameras activated
 9    in order to prepare to stop the vehicle.
10          THE COURT:  So, Officer Miller, would it be
11    fair to say that either from an informal or formal
12    policy perspective, the expectation wasn't that you
13    would capture traffic violations on the dash.  The
14    expectation would be that you activate the dash cam once
15    you realize something had gone wrong?
16          THE WITNESS:  Correct.  And our goal is that we
17    would want to capture that, but we don't have anything
18    that mandates that we immediately do that.
19          THE COURT:  Okay.  And we had the two videos,
20    one from the dash cam, one from the body cam, that
21    captured the turn off the road and ultimately the
22    contact with Mr. Conner.  Do you typically turn them on
23    simultaneously, or are they two different buttons; your
24    body cam and your dash cam?
25          THE WITNESS:  They are two different buttons.

The dash camera in that car is back up, up here above my head.  And at that time that camera that I had was down here in one of my pockets.

THE COURT:  But you would typically kind of do one right after the other?

THE WITNESS:  Try to, yes.

THE COURT:  Okay.  When you talked a little bit about -- and I'm paraphrasing here.  You talked about these somewhat innocuous items, or at least the items in toiletry bags innocuous.  But ultimately the cumulative impact of all these items together leads you to believe, based on your training and experience, that they may be evidence of drug traffic, correct?

THE WITNESS:  Or possession, yes, sir.

THE COURT:  In this case if you hadn't seen the tinfoil and/or the butane torch would that have altered the lens in which you viewed all these other, again somewhat innocuous items?

THE WITNESS:  No -- yes, without the -- I think it's the obvious stuff that I would corollate to the drug paraphernalia.  I would still key in on the pouches and stuff, but it would take a little bit -- it would take those items combined together.  I wouldn't just jump to a conclusion because somebody had an eyeglass case on their dashboard.  It would have to be in

1    conjunction with a lot of things going on.

2           THE COURT:  Would it be fair to say in this

3    case, it was the butane torch and the tinfoil in

4    particular that sort of altered how you were viewing the

5    other items in the car?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Okay.  If -- have there ever been

8    incidents where you have requested a K-9 search absent

9    other independent factors that suggest that there would

10   be drug possession or drug trafficking?

11          THE WITNESS:  I'm sorry.  I don't understand

12   the question.

13          THE COURT:  So say, for example, that you

14   pulled over Mr. Conner.  You didn't see anything

15   necessarily in the interior of the car, but you had

16   other reason to believe, you know Mr. Conner from prior

17   incidents, or what have you.  Would you ever call

18   Trooper Woodruff and say, "I can't see anything but I

19   think there might be something in there.  Can you bring

20   Donna over and do a search"?

21          THE WITNESS:  No.  I've never requested a K-9

22   search, at least absent at least some kind of what would

23   be perceived to be drug paraphernalia.

24          THE COURT:  And Mr. Eilers had asked you some

25   hypotheticals.  But hypothetically, if Trooper Woodruff

1  would not -- wouldn't have been available on the night

2  in question, would you still move forward with the

3  application for search warrant, absent that extra sort

4  of data point of Donna alerting on the vehicle?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.  And I think finally, what I

7  want to ask you about is, you had identified all these

8  items in the application for search warrant.  And then

9  you conducted the search, found evidence of a different

10  crime -- or evidence of the actual crime.  Is it

11  customary for you to also seize each and every item that

12  you listed in your affidavit for the search warrant?

13          THE WITNESS:  No.

14          THE COURT:  Okay.  What do you typically seize

15  when you're conducting the actual search warrant?

16          THE WITNESS:  We try to go with what the best

17  evidence is and try not to overload -- because a lot of

18  time we can just get overloaded, I mean, with needles

19  and tinfoil.  We usually try to stick to the stuff that

20  would be -- that you would actually -- that would have

21  some substantial evidentiary value.

22          Drug paraphernalia itself, especially like

23  tinfoil and lighters and even used needles, that's so

24  prevalent these days that -- we find this stuff -- we

25  don't necessarily seize it, even though, you know, you

1    could say basically it's any testable amount in the

2    state of Alaska.  But it wouldn't be realistic to charge

3    everybody that had a used needle with a controlled

4    substances crime, based on just a used needle.  We'd

5    overload the system with that.

6          So what we try to do is when we serve these

7    search warrants, is go with what the best -- with the

8    substantial evidence.  And drug paraphernalia we try to

9    photograph it in place, that's there.  And just not

10   seize every piece of tinfoil, every needle, every pipe,

11   you know, unless that -- you know, unless there's some

12   kind of like drugs attached to it.  There's a

13   substantial amount.  Then those would probably go into

14   evidence because there would be -- potentially a

15   controlled substance on them.

16          THE COURT:  Do you make a distinction in your

17   experience of doing these, where you conduct the search,

18   and obviously you'll find small amounts and you think it

19   would be personal use, large amounts you would think

20   distribution, correct?

21          THE WITNESS:  Correct.

22          THE COURT:  Do you make a distinction, or have

23   you made a distinction, as part of your practice, if you

24   look at amounts and you are of -- at least of the

25   thought that this is possession with intent to

distribute, that you are less concerned about seizing

items that would be connected with personal use?

THE WITNESS:  Correct.

THE COURT:  Okay.  Thank you very much, Officer

Miller.  You are excused.

THE WITNESS:  Thank you, sir.

THE COURT:  Mr. Collins, your next witness.

MR. COLLINS:  At this moment I have to send a

text to get my next -- Brian Zeisel.

THE COURT:  Mr. Conner, are you doing okay?  Do

you need a break?

(Oath administered to the witness)

DEPUTY CLERK:  For the record, please state and

spell your full name.

THE WITNESS:  It's Brian Thomas Zeisel.  First

name is spelled B-r-i-a-n, last is Z-e-i-s-e-l.

DEPUTY CLERK:  Thank you.

THE COURT:  Please proceed, Mr. Conner.

OFFICER BRIAN ZEISEL, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

MR. COLLINS:

Q.  Good afternoon.  And for whom do you work?

A.  I work for the Alaska State Troopers.

Q.  And for practical purposes, if you feel

comfortable speaking with your mask, you may continue.

```
1   If you feel more comfortable, and I believe Mr. Eilers
2   would prefer, that you remove your masks.
3           THE WITNESS:  Is that okay?
4           THE COURT:  That's fine.
5           THE WITNESS:  Thank you.
6   BY MR. COLLINS:
7      Q.  So sorry.  For whom do you work?
8      A.  I work for the Alaska State Troopers.
9      Q.  In what capacity?
10     A.  I'm currently working at the state-wide drug
11  enforcement unit in Fairbanks.  I'm the supervisor
12  there.
13     Q.  And do you have a particular rank?
14     A.  Yes, sir.  I'm a sergeant with the troopers.
15  Been with the troopers now for 19 years.  And in that
16  capacity, I've been a patrol trooper, K-9 handler.  I'm
17  currently the lead K-9 instructor for the Alaska State
18  Troopers.
19     Q.  For how long have you been associated with the
20  Alaska State Trooper K-9 Program?
21     A.  Since 2008.
22     Q.  For how long has the Alaska State Troopers run a
23  K-9 program?
24     A.  Since the earlier 1990s.
25     Q.  And you came on when?
```

1    A.   For the academy?

2    Q.   The troopers.

3    A.   The troopers back in August of 2002.

4    Q.   When did you become interested in the K-9

5  program?

6    A.   After I returned back from a deployment because I

7  was in the Air National Guard.  During my deployment, I

8  got to witness some Kurdistan law enforcement with their

9  K-9s.  And I knew the Alaska State Troopers had a K-9

10  program as well.  But I got to personally work with some

11  of their K-9 teams, as well as some of the security

12  forces K-9 teams.  So that's what piqued my interest.

13  Actually, it was ironic how it I worked out because I

14  actually returned from that deployment and right away

15  there was a position open for a K-9 handler, back in

16  2008, which is when I applied for that position.

17    Q.   What is your familiarity with the program that

18  the Alaska State Troopers employ in running their K-9

19  program?

20    A.   So the Alaska State Trooper K-9 Program is -- its

21  chain of training itself originates out of Germany.  So

22  it's basically, the term is it's police drug detection

23  certification program -- dog certification program.  And

24  it originates from Germany, based on their Schutzhund

25  training.  But then a group of law enforcement

professionals with K-9 history formed the Alabama Law
Enforcement Training Center in Tuscaloosa, Alabama.  And
from that center, those individuals branched off into
different agencies.

       So one of the original founders there is now --
was at the time, shortly after that, was the head of the
border patrol, US Border Patrol K-9 Program.  Another
one was Randy Parker, who is the Gillette, Wyoming,
sheriff, sheriff's office.  He was their lead instructor
and coordinator for the Gillette, Wyoming, K-9 Program,
which is where that chain of training goes, from
Tuscaloosa, Alabama, then it goes to the Anchorage
Police Department and then the Alaska State Troopers.
Because the Anchorage Police Department Program is older
than the State Troopers K-9 Program.

    Q.  You've identified several, several different
agencies that involve K-9s.  Is there a United States
national organization or board that oversees K-9
programs throughout the United States?

    A.  No, sir.

    Q.  And when we're talking about K-9s, are we talking
about one particular purpose for which dogs are used?

    A.  No, sir.  The K-9 -- in essence K-9s can be
essentially trained for, I mean -- more tasks than
probably I could even bring up in this short time we

have.  But they're primary used for drug detection, patrol work, apprehension work, building searches, bomb detection.  They're also used for electronic device detection.  I mean, it just goes on and on.

So these dogs can be trained in just an amazing amount of things to use, to assist in law enforcement training search and rescue.  They even have dogs that can -- not law enforcement, but they can actually detect early signs of someone who's about ready to experience a seizure, or something like that.

So, I can't remember what they're called offhand, but so it's amazing what they can do.  What they can be trained to do.

Q.  So you use the phrase "training."  Is a dog innately able to do any of the tasks that you just described?

A.  No, not innately, not until they're trained.  But the important part of this process, though, is a selection process for these dogs.  So it doesn't, it doesn't necessarily go by the breed of the dog.  In essence, the breed really doesn't matter.  There's other breeds that are more, I guess, prone to do better in law enforcement work than other breeds.  Just based on their initial drives, basic drives and characteristics that these dogs possess.

1          From that point, we run them through selection

2    tests.  Just to determine the kind of drives those dogs

3    are working out of.  And what kind of training issues

4    we're going to experience during the training process of

5    these dogs.

6    Q.  You use the phrase "drive."  What exactly is

7    that?

8    A.  Drive is how -- the dog's subconscious impulse to

9    react to stimulus, or stimuli.  So a dog will display a

10   certain drive.  It could be a fight drive.  It could be

11   a retrieve drive.  If anybody's experienced dogs who --

12   you can a ball and you can throw, and the dog will chase

13   after that ball and bring it back to the handler.

14   There's some dogs you'll throw the ball, and they'll

15   kind of look at you funny, like, what I'm supposed to

16   do.  They just don't have that particular drive to go

17   retrieve.

18          So that's what those drives are.  It's

19   subconscious impulses to react to the certain stimuli

20   that's presented to them.

21   Q.  How intensive is your screening process for these

22   dogs?

23   A.  The process itself is very intensive because we

24   want to make sure -- we're spending a lot of money for

25   these dogs.  The last purchases we made for our dogs,

1  for a dual-purpose dog, that's just for drug and patrol

2  work, is about $12,000.  That's just the basic cost for

3  an untrained dog.

4        From that point on, we invest a ton of time in

5  training the dog.  The academy itself for a dual-purpose

6  dog for the state troopers is about 12 months long.  And

7  it's long days; it's six to seven days a week of intense

8  training.

9        So there's a lot that goes into the selection

10  process to make sure that we're getting a dog that is

11  going to be able to be successful in the training

12  program.

13  Q.   The source of these dogs, is there just one?  I

14  mean, how many sources of these particular types of dogs

15  does the Alaska State Troopers rely upon?

16  A.   So if you're referencing where we get the dogs

17  from, there's a couple different kennels.  And often

18  time, it determines the timing of when we're going --

19  when we need to run an academy.  It's very logistically

20  challenging for us to run an academy because we're not

21  just K-9 handlers or K-9 instructors.  We have our other

22  jobs.

23        Like I said, I'm the state-wide -- I work in the

24  state-wide drug enforcement unit.  I'm a supervisor

25  there.  So to hold an academy to be an instructor for

1  12 months, I'm basically, for 12 months I'm out of my

2  supervisory position, conducting training.  So it's

3  very, very logistically challenging.  So when it's time

4  for us to place a dog in a particular unit or a

5  particular geographical location, the timing is very

6  important.

7         So we typically get our -- historically have

8  gotten our dogs from a kennel down in Alabama called

9  Kasseburg Kennel.  But we have also purchased dogs from

10 Adlerhorst International, which is in Jurupa Valley,

11 California.  And the reason we've gone there -- this has

12 been since I've been the instructor, my recollection of

13 where we've gotten dogs.  The reason we would go there,

14 is because Anchorage Police Department has purchased

15 their dogs there, has gone through selection testing for

16 dogs there.

17        So Anchorage Police Department has a very equally

18 as credible K-9 program, reliable K-9 program, as the

19 state troopers have.  So we rely on them as well.

20    Q.  So is it fair to say you just don't go to the

21 pound and find a dog up for adoption?

22    A.  No, sir.  No, sir.  These dogs are actually

23 imported typically from Europe, as well.  So that's

24 where these kennels get these dogs from initially.

25    Q.  I asked you about any national, United States

1  national certification board.  Is there an international
2  certification board?
3      A.  Not that I'm aware of.
4      Q.  Earlier you testified that the program that the
5  Alaska State Troopers uses is influenced by a German
6  program; is that correct?
7      A.  Yes.
8      Q.  And can you pronounce the name of that German
9  program, or give us at least --
10     A.  It's called -- I knew you were going to do to me.
11 It's Polizei-Zertifizierung für Drogenhafthunde.  And
12 again that's just translates -- and this is rough
13 translation.  I don't speak German.  It's police drug
14 detection dog certification, is what that stands for.
15     Q.  That program, is that -- do you follow it to the
16 letter, the period, the comma, as it comes out of
17 Germany?
18     A.  No.
19     Q.  Are you the only agency in the country that
20 follows your example?
21     A.  No.  Like I said, the Anchorage Police Department
22 also uses that, as well.
23     Q.  In your tenure with the K-9 program, have you
24 gone to other states, other municipalities and see how
25 they run their programs?

1   A.   The only other program that I actually attended

2   was Indiana, Jacksonville, Indiana.

3   Q.   And that was with whom -- for what purpose?

4   A.   Basically it was attending a Southern Police

5   Institute administrative officer course, and their

6   assistant chief was attending that.  And I went to one

7   of their training events.

8   Q.   So am I correct that the Alaska State Program is

9   somewhat unique; it has its own characteristics and

10  protocols?

11  A.   Yes.  I would also argue that there's many

12  programs within state -- or within the country, excuse

13  me -- that have varying degrees of philosophies.  You

14  know, dog training is not -- I would argue it's not

15  difficult.  It's just being consistent with your

16  training.  So I don't -- I don't have a position that

17  any other K-9 program within the state law enforcement

18  training program is worse than any other.  I just think

19  that they're -- the types of certifications they do

20  maybe aren't as difficult as ours.  Maybe they're

21  achieving the same result, but I would argue that ours

22  is more challenging than many other programs in the

23  Lower 48.

24  Q.   And why do you think it's more challenging?

25  A.   Well, we use -- first of all, our searches are

much more difficult.  Because they're actually used --
we actually do our searches in a realistic environment.
So we don't have some specific area where that's where
we conduct our certification every day.

So we can do a certification in Fairbanks for one
academy, or one training session, or quarterly, and it
could be in somebody's house, some person who's
voluntarily allowing us to use their home.  So whatever
they have in that home, as far as food, the people that
are there.  That environment is completely unique to the
dog.  So the only thing that's consistent is the odor of
the drugs that we've trained them to indicate on.  So
that's one example.

Another example is vehicles.  Nothing's ever the
same when you consider the certification itself.  The
environment that these dogs are certifying in could be a
very cold environment, depending on the time of year
that we train -- or conduct our certifications.  And we
call that conflicting, or four likings; it's basically
sight, sound, smell, and situation for the dogs what
they're exposed to.  So that's what makes it very
unique.  And the type of -- we don't rely on the same
toy to reward them with.

We'll have toys in the search areas that these
dogs are searching over because their goal is to find

1    that odor and indicate.  And then that's how they're

2    going to get their reward.  That's how we work them

3    through those different types of environment.  So

4    they're not going to just arbitrarily indicate because

5    there's a piping hot pizza there or there's a rubber toy

6    there, that or a rubber hose or something like that,

7    that they like to play with.  That kind of thing.  It's

8    all centered around the dog alerting on the odor and

9    making that final indication on the odor of the drug.

10   Which is the three that we focus on are the

11   methamphetamine, cocaine, and heroin.

12       Q.   What about marijuana?

13       A.   We don't because in the state of Alaska it's

14   legal now to have marijuana.  And so we don't have any

15   dogs any more that are in service that are marijuana

16   trained dogs.

17       Q.   And I may have asked you this, and forgive me if

18   I did, you are currently an instructor or a supervisor

19   of the program?

20       A.   I'm an instructor of the program, the lead

21   instructor of the program.  We have a K-9 coordinator,

22   but I'm the lead instructor.

23       Q.   How many instructors does the state troopers

24   employ?

25       A.   Currently there's four, including myself.

1    Q.  How often do you have to go through training to
2  fulfill that function as an instructor?
3    A.  We don't specifically, other than when I
4  graduated from instructor academy back in 2013.  We
5  don't do a recertification for our instructors.
6    Q.  Is that similar to other programs of which you're
7  aware?
8    A.  I believe so.
9    Q.  Do you continually train, though?
10    A.  Yes, we do.  So we continually do quarterly
11  trainings.  So once a handling team has completed their
12  academy, like I said, that's a four-month academy.  We
13  conduct quarterly trainings every three months.  We meet
14  together as a K-9 unit and conduct quarterly trainings,
15  which last approximately ten days.  Of which half that
16  time is dedicated to detection dogs, and the other half
17  is dedicated to patrol function, patrol training for
18  those dogs.
19        And at those times, depending on when the dog
20  certifications fall, we'll conduct certifications for
21  the dogs that are due for certification during that
22  time.
23    Q.  So to be clear, there's an annual certification
24  of each K-9 that the state troopers employ, correct?
25    A.  Yes, sir.

1    Q.  And that is separate from these quarterly

2  training -- ten-day training sessions, correct?

3    A.  Yes.

4    Q.  And who attends the quarterly training sessions?

5    A.  Quarterly training sessions are attended by all

6  the K-9 handlers for the state troopers, all the

7  instructors.  Oftentimes the K-9 coordinator, Lieutenant

8  Sims, is often there as well.  And we also have other

9  agencies that attend our K-9 program training as well.

10   Q.  The ten days of training on the quarterly, is

11  that considered part of the normal training of the K-9,

12  or is it an extra training?

13   A.  It's in addition to the normal everyday training

14  that the handlers do.

15   Q.  Are there training -- independent training

16  requirements outside of these quarterlies and the

17  certification period?

18   A.  Yes.  The handlers they're expected to train on

19  their own as well.  So if they're a detector dog,

20  obviously they're going to be doing nothing but detector

21  work.  If they're a dual-purpose dog that training

22  encompasses detection work, patrol work, tracking, that

23  kind of thing.  So all that is considered maintenance

24  training, and it's considered something that they

25  continually do.

1    Q.   What is the system of reinforcement that you're

2  program follows?

3    A.   The reinforcement -- are you referencing the type

4  of -- could you rephrase the question?

5    Q.   Well, does the -- do the troopers employ a

6  positive or negative reinforcement model?

7    A.   Thank you for clarifying that.

8         Ours -- it's a combination.  So for the drug work

9  in particular, it is absolutely positive reinforcement.

10    Q.   So what does that mean?

11    A.   So the way our training works is we want for

12  these dogs to have a very -- it should be enjoyable for

13  them.  It should be fun for them.  Because, quite

14  frankly, for a K-9, their work is actually their play.

15  So they really enjoy -- you should see how excited they

16  get when it's time for them to get ready to work.

17  They're very excited about it.  Because they're

18  anticipating the positive reinforcement that's going to

19  occur, and that's the toy or the praise tones.

20         So that's the other thing, we vary, too.  Some

21  people just think that the toy is the only reward that

22  these dogs are expecting.  And yes, they are expecting a

23  reward, and that oftentimes is a toy.  But the handlers'

24  voice tones quite frankly, and we hammer that into the

25  handlers, voice tones are very important when you're

1    dealing with training dogs.

2         If you have a very dull -- voice doesn't have any

3    inflection, you're probably going to have a tough time

4    as a handler.  Because you're not going to be able to go

5    to, you know, that gruff corrective tone to that high,

6    high happy tone.  Because dogs -- it's amazing.  If

7    you've ever -- children -- I have six children -- if you

8    ever talk to your baby and you're high happy, that baby

9    just starts smiling.  They think you're the greatest

10   thing.  It's the same thing with dogs.  You're basically

11   dealing with a full-time toddler in the life of this dog

12   as far as their emotional sense.  So it's very positive

13   in the rewarding system.

14        So, like I said, it could be voice tones.  It

15   could be toys that they get rewarded with.  And some

16   programs will do food rewards, as well.  So there's a

17   variation of rewards that these dogs can receive, and

18   it's all positive reinforcement.

19   Q.   Do the troopers employ the food reward system?

20   A.   No.  Only during obedience.  So we don't

21   incorporate food in an actual -- when we're actually

22   training to search for drugs.  So doing an obedience

23   session, yes, we'll do that initially.  But that's not

24   the primary source of training or reward for the dogs.

25   Q.   So that's an early phase of reward?

1    A.   It is.

2    Q.   How does the program adjust the possibility that

3    a smart dog might figure out the system and give an

4    indication in order to get the high praise or the toy?

5    A.   So, during training when we have dogs that do

6    that -- basically what you're referencing is like a

7    false indication.  The dogs indicating, but there's

8    nothing there?

9    Q.   Correct.

10   A.   Okay.  So we train these handlers and the dogs

11   together as a team.  So it's a team effort.  So we want

12   to show during some of these training events -- we don't

13   just do -- every time a dog goes into a room, or a team

14   goes into a room, there's not always going to be drugs

15   in the room.  In fact, we intentionally do things called

16   stupid handler drills, we call them, and it's just --

17   basically what we're having the handler do is just over

18   present an area.  And we push these dogs to the limit;

19   we push these teams to the limit.  Because we want the

20   handlers to know how far they can work their dog before

21   their dogs are going to sit and indicate, even if

22   there's no odor there.  Because you can make a dog --

23   you can force a dog to sit and indicate.  You can do it,

24   if you work hard enough.  We want the handlers to

25   recognize that.  But the dogs aren't going to get a

1    reward for that.

2         So that's the only time -- when I talk about the

3    reinforcement, that's the only time we're going to tell

4    the handler, nope, just tell them a nein or a pfui, and

5    get them moving on to something else.  Get them to an

6    area where there are odors, and we reinforce that, look,

7    you did that.  That's wrong, nein, pfui.  Move them over

8    to where the actual odor is, whether it's another room,

9    another vehicle, whatever.  As soon as their nose gets

10   on, they show the alert; they indicate.  Here comes the

11   toy, the high, happy.  It's just an explosion of just

12   euphoria for the dog and everything.

13        So that's how we reinforce the dog to understand

14   that that's unacceptable.  This is what you're supposed

15   to do.

16   Q.   These are in the training scenarios?

17   A.   Correct.

18   Q.   You know whether or not there are actual --

19   A.   Yes.

20   Q.   But in a real world situation, but the handler

21   and the dog -- does the handler know that there are, in

22   fact, drugs in a suspected location prior to presenting

23   the dog?

24   A.   No.

25   Q.   So in a situation like that, where the dog is

1    presented, or the dog sniffs, how can the handler avoid

2    the false negative -- or the false positive?  I'm sorry.

3        A.   That's an excellent question.  So when we train

4    our handlers and our dogs, the dogs have -- when they're

5    working through an odor, when call -- when a dog starts

6    to change their respiration, their body posture, we call

7    that an alert.  It's basically alerting the handler.

8    And anybody can see this.  Okay.  I mean, if we were

9    take a drug detection dog right now and put them on the

10   floor and put an odor there, you would see the dog

11   immediately change -- when they were in odor, when they

12   were in the scent cone of that odor, change their

13   respiration.  They'd start sniffing a little more

14   deeply, maybe a little faster, and their body position

15   would start changing.  They start getting a little more,

16   you know, intense as far as their sniffing and

17   everything is concerned.

18        And then that always precedes the indication.

19   That's the critical part of this.  So it's not just the

20   indication because you will see dogs -- and this is the

21   interesting thing to watch when these dogs are

22   working -- is if there's no odor there, and you got

23   these dogs that you're forcing -- like I said, we push

24   these dogs to the limit.  And you're sitting there

25   double tapping and triple tapping an area to make these

dogs indicate.  The dogs will literally sit there,
they'll kind of look at their handler sometimes, and
they'll be like, all right.  If you're making me do it,
I'll do it.  They'll sit, but they won't have that
change in respiration.  They won't have that change in
body posture.  It's very clear, clear to see that before
the indication happens, which is what we show the
handlers, so the handlers are aware of that.  So they
understand when they're doing the training on their own,
for instance, and we're constantly harping at them.  No
matter if it's the quarterlies or during the academy,
it's a reinforced lessen for the handlers all the time.

Q.  So let's define some terms here.  Two terms.
Alert and then indication.

A.  Yes, sir.

Q.  What is an alert?

A.  Yes, sir.  So an alert is a change in the dog's
respiration and body posture.  So that's what I was
describing earlier, where the dog will start intently --
they'll go from just sniffing, you know, just maybe it
might be an methodical sniff, sniff, sniff.  Once they
get an odor, they'll start sniffing a little bit faster,
a little more intense.  And you'll see their body kind
of maybe tense up a little bit.  Or start -- tail
maybe -- it's funny, because sometimes we laugh because

some dogs have a little bit of a tell at times.  Some

dogs, they'll get in the odor -- and we have one dog in

particular, the tail will start circling.  It was just

the funniest things.  But we can tell, that's when the

change in the body posture of the dog itself.  So that's

the alert behavior.

        The indication itself is a clear indication the

pinpoint of behavior that the dog is on the odor.  And

what that is for us -- there are different types.  There

could be passive indication.  There could be aggressive

indication.  So our dogs are trained to be passive

indicators, which means they'll sit and they'll stare at

the source.  That's what we've trained them to do.

        There's aggressive indicators, which obviously,

for obvious reasons we don't like to use aggressive

indicators.  But if we put them on vehicles or in houses

and things like that, they're going to start scratching

at the vehicles and things like that.  So we don't do

that.

        So that's what an indication is by our definition

and what we train the handlers and then the dogs, when

we discuss this, and explain it to them in the training.

Q.  In part of the training of the handlers, is the

handler instructed to be very careful about using either

alert or indication?

1    A.   Yes.

2    Q.   And that's because the two are two different

3 behaviors, correct?

4    A.   Yes, sir.

5    Q.   So if a handler wrote a particular dog displayed

6 alert behavior along the passenger-side bed, approaching

7 the cab of the truck, then indicated at the upper

8 portion of the tool box towards the passenger-side seam

9 at the cab, the presence of the odor of controlled

10 substances emitting from the vehicle, how would you

11 interpret that statement?

12    A.   First of all, I would say that the handler

13 obviously noticed that.  That the dog was actually

14 alerting when the dog actually was getting into odor.

15 Again -- and then at that point, when the dog went to

16 the indication, it showed -- it demonstrated to me, by

17 hearing this, that the handler, first of all, noticed

18 the alert behavior, right, which is what we trained our

19 handlers to do.  If you see that alert behavior, watch

20 that.  Because if the dog indicates, that's a clear sign

21 that that dog was on odor, so the indication is the

22 final, hey, this is where the odor is.

23         So it shows, like we've trained, that the alert

24 always precedes the indication.

25    Q.   So if a K-9, who graduated from your academy,

1    simply sits down and may be interested in some object,

2    is that enough to qualify as an indication?

3        A.   No.

4        Q.   So there has to be the change in behavior, then

5    the sign, the sitting down, the stare, correct?

6        A.   Correct.  Indication, yes.

7        Q.   Is there -- does the academy train these dogs to

8    give different indications where -- where different

9    locations, or is this just a general indication?

10       A.   Just a general indication.  That would be an

11   astronomical undertaking to try and train dogs to do

12   different things for different odors.

13       Q.   In regards to the quarterly as well as the

14   certification training, and that's where all K-9s under

15   the troopers' jurisdiction go, correct, every quarterly

16   and the annual, correct?

17       A.   Yes, sir.

18       Q.   And by the way, on the certification is it always

19   held at the same time of year, or does it vary?

20       A.   It varies.  Simply based on when the academy --

21   or I'm sorry -- the quarterly training falls, in

22   relation to when they're due for the next certification.

23   Sometimes it may be a little earlier than the end of

24   their annual, when their annual is due, or it might be a

25   little bit after.

Q.  During the year, if a dog came on, let's say, at third quarter and was certified at third quarter, would they get a pass on the next quarterly, or are they required to attend that as well?

A.  No, they'll still attend -- yeah, the training's required.  So the training they have to show up to regardless because it's training for all the dogs.

It just, depending on the timing, like I said, some dogs will actually have -- the teams -- when I say dogs, it's the teams that are getting certified.  Some teams will have to go through the certification, as well.

Q.  So there are four of you instructors currently, correct?

A.  Yes, sir.

Q.  Have there always been four instructors who run the -- is it called the academy?  Or what's the actual --

A.  It's the State Trooper K-9 Unit.

Q.  So you four are essentially the board of professors, correct?

A.  Yes, sir, so to speak.

Q.  Do you -- how often do the four of you discuss how to set up the academy?

A.  We do that every -- every time we have an

academy, we have to meet to just kind of go over the
general, how we're going to -- well, first of all,
logistically, like I said, it's very challenging to get
an academy together.  So when I say there's four
instructors, we may not have all four of us at the same
time during the academy, all four of us training or
running the academy.  We may have two of us running at
one point and then two more will come in later on.

Again, it's just to rotate so we're not all
gone -- I mean, I'm there the whole time as the lead
instructor, but the other three instructors will rotate
in and out.  But we do come up with -- so, you know, how
we going to do this.  And that's the nice thing about
having more instructors is to allow us to troubleshoot.
Because oftentimes when you're dealing with a bunch of
different dogs and a bunch of different handlers, our
job as an instructor is to kind of observe and make
corrections and help a handling team get better, to
improve their performance, and that's what we do.  After
we've conducted these academies and they've certified,
we're constantly making improvements and corrections on
their handling skills.

Q.  What type of scenarios do you use in these
quarterly and annual certification --

A.  So we'll run certifications -- I'm sorry --

training, in barnyards, out in fields.  Like I said, we
go to many people's homes.  We'll go to feed stores.  So
we'll literally have dogs search over bags of dog food.
Like a warehouse of dog food to search for the odor of
the drugs, the narcotics.

        Just -- I mean you name it, we've had them at,
gosh, fire department stations.  We've used -- I mean,
there's just many different places where we take -- a
lot of businesses offer their -- open up for us to do
some of these training searches and things like that.
So it's just a huge variety of places we've trained in.

    Q.  Do you give the attendees, the teams, a heads up
of where the test sites are going to be?

    A.  Other than the general location, we don't -- I
mean, it depends on the training.  So sometimes we'll --
so we'll do unknown and known searches during trainings.
So not everything is going to be an unknown for the
handler.  We may do known searches.  And the reason we
want known searches for the handlers is so the handler,
as they're working, can see the dog's behavior, because
it's very -- especially certification time.
Certification time we're having the dogs search ten
different areas, the teams themselves, and 14 different
finds.

        So in one day's time that's a lot to go through

1    for a handling team, so it's very stressful.  And the

2    point of that is, is we want to make sure that there

3    is -- basically we want the handler to be confident in

4    the dog's performance because the dogs don't lie.  I

5    mean, they're not capable of lying.  They are either in

6    the odor and they're going to indicate or they're not.

7            So we have to show the handlers how to properly

8    handle the dogs.  So they can see the change in behavior

9    and recognize that.  Because sometimes it's subtle.

10   Sometimes it's not as obvious, the alert behavior as

11   other times.  That's why we let the handlers know

12   sometimes where the odor is, so the handler can

13   concentrate on watching the dog and watching the dog's

14   behavior.  But that's just as important.

15       Q.  But do you also employ unknowns?

16       A.  Yes, sir.  We do unknowns as well.

17       Q.  And why do you do that?

18       A.  Because that's the situation that they're going

19   to be dealing with out in the real world.  So they're

20   not going to know where the odors are, and they've got

21   to be able to figure that out.  They're going to have to

22   troubleshoot.  They're going have to problem solve, too.

23   Because part of that -- part of the whole responsibility

24   of a handler is to do a safe and thorough search.  So

25   what that means is, they have to make sure that the area

1    that this dog is -- that they're going to be running

2    this dog through for a search, is safe for the dog.  So

3    we don't want them running them through a garage that

4    has antifreeze or mousetraps or things like that that

5    are going to hurt the dog.  That's the handler's

6    responsibility to make sure that that's safe.

7         Similarly, in the real world we do that because

8    we don't want the dog searching over needles and stuff

9    like that, that they're going to get stuck.  So we want

10   to make sure that the handlers are looking for those

11   hazards.  That's one of the things.

12        The other thing is to check the air current.  So

13   in a room -- for instance, in a room like this, it's got

14   air vents and stuff like that.  We want the handler to

15   able to look at this and figure out what's the wind

16   current, how it is going to affect scent movement in

17   this area because a dog might actually start alerting,

18   may even indicate some place on the far side of the

19   room, when the odor that actual -- the odor of the drug

20   maybe is over here.

21        Now why would that happen?  And the way you can

22   explain that, if that's in fact what's happening, is

23   maybe the air current itself is pushing the odor up,

24   over, and down to that side.  So that's what these dogs

25   are indicating on, is the presence of the odor of the

controlled substances.  So we want handlers to work
through those situations.

For the dogs, we want to push them through to see
how far we can push them and test them.  See how far
they'll work.  So the handlers know the capabilities of
their dogs as well.  So we'll run them through very,
very long searches to a very easy find, for instance.
So they may search a huge area.  Maybe like this, and
this is a big area for a dog to search.  And you have
the dog search this area, and they're getting winded.
They've gone through all this entire area to all the way
to maybe the far corner and that's when they find the
odor.  That keeps the dog engaged.  Knowing that if they
keep going, eventually they're going to find the odor.

And conversely, we'll do very hard finds, like
maybe there'll be high finds.  That seems like a very
easy thing, but maybe the scent's not -- the air current
isn't coming out, and it's more difficult for the dog to
actually indicate or find the odor.

And another important thing we talk to the
handlers about and stress, it's very important.  We do
not care -- and this may sound terrible.  We don't care
if the dog walks (phonetic) dope.  So in other words, if
they're sniffing parcels or vehicles or something like
that, and the dogs walks it, guess what?  It happens.

Why?  Because there's probably no odor escaping from that vehicle or that parcel that the dog's detecting. So we constantly reinforce with the handlers, don't push your dogs.  If the dog doesn't indicate in a real-world situation, the dog didn't indicate.  It's not a big deal.  And we've done that before where a dog's gone through a parcel, for instance, not indicated on the parcel, and they've gone through -- the detectives or the investigators have gone through the process of developing all the rest of the reasonable suspicion and the probable cause and are able to apply for and get a warrant approved and opened up the package and found drugs in it, but the dog didn't indicate on it.  That's okay, because obviously, the odor had not escaped for the dog to indicate on.

        So it's not a bad thing.  And we stress this with our handlers; it's not a bad thing if the dogs don't indicate.  It just isn't.  It just means the dogs aren't picking up on the odor.

    Q.  So you do give the handlers some -- occasionally you give the handlers some heads up as to what type of drug that may be hidden in a particular location so that they can gauge their dog's reaction; is that correct?

    A.  We don't necessarily always tell them even what drug it is.  We say, yeah, there's a substance over

here.  There's controlled substances over here.  There's

a drug over there.  We may not tell them what the

quantity is, or what it is in particular because it

doesn't really matter in that sense, as long as they're,

you know, the handler's watching the dog and watching

the behavior and is able to observe that.

    Q.  So you do, do tests where the handler is unaware

of the presence or absence of a control substance; is

that correct?

    A.  That's correct.

    Q.  And how do you test for that?

    A.  So, when we run the dogs -- or the teams

through -- some of them run through blank vehicles,

which means there has been no odor placed on the

vehicle, or rooms, no odor in the rooms.  We'll say,

okay, there's your search area.  Go ahead and do your

thing, basically.  So they'll do their ritual and get

the dog prepped for it.  And then they'll run the dog

through whether it's a -- they'll do on-lead directed,

on-lead free, off lead -- or on-lead directed, whatever.

        But they'll continue, they'll go through the

room.  And handlers will sit there, and they'll go

through -- they'll go through, and the dogs will not

indicate.  Won't show any alert behavior, and you can

tell they're getting frustrated.  And they'll get

1    back -- they'll do this for 10, 15, 20 minutes

2    sometimes.  And they'll bring the dog back outside and

3    they sit down.  They'll be scratching their head.  And

4    you just -- finally, they kind of look at you and almost

5    that light bulb clicks.  And they go, there's nothing in

6    there, is there?

7         So it's a learning lessen for them to, again,

8    watch their dog's behavior, trust their dog because if

9    the dog isn't indicating on something, then they're not

10   in the odor.  So trust that.  And it's the same for the

11   vehicles; they do the vehicles, too.  They'll run around

12   the vehicle multiple times, and they don't know if it's

13   blank or if there is something in it.

14      Q.  Are you familiar, personally familiar with the

15   K-9, Alaska State Troopers K-9 Donna?

16      A.  Yes, I am.

17      Q.  When did you meet Donna?

18      A.  Well, I went through the selection process for

19   Donna at Adlerhorst International.  So we flew down,

20   myself and Investigator Dur'an, flew down to Jurupa

21   Valley, California, and actually selection tested Donna,

22   K-9 Donna.

23      Q.  Why did you choose her over any other dog there

24   that day, if there were?

25      A.  Because K-9 Donna is a dual-purpose dog.  So

1    she's a drug detection dog and a patrol dog, so the

2    selection process is more comprehensive rather than just

3    a drug detection dog.

4         So again, when we're testing dogs for their

5    drives we look to see what drives the dogs are working

6    out of again.  And what drives are we going to

7    experience -- what kind of training issues might we

8    experience in those -- during those selection processes.

9    So in Donna's selection process, she did remarkably

10   well, quite frankly, in the selection process

11   concerning, you know, using her for drug detection work.

12   She had excellent retrieve drive.  She did great hunt

13   skills for water and food conflict and her perseverance

14   tests were really, really good.  And the patrol side she

15   was a little weaker on, but she was acceptable.  We --

16   because we tested approximately ten other dogs, and they

17   all had certain issues that we weren't willing to have

18   to deal with in training.  So that's why we selected

19   Donna.  She happened to be very strong in one area and

20   not so strong in the other area, but we were willing to

21   work with those training issues with her and that's why

22   we selected K-9 Donna.

23        Q.  At that moment in time, had she been trained in

24   the detection of controlled substances?

25        A.  No.

1    Q.  So this was a screening that was in advance of
2    subsequent training, correct?
3    A.  Yes, sir.
4    Q.  What happened after you choose Donna; did she go
5    with you?
6    A.  Yes.  So we flew down and back to Alaska, and
7    then we conducted the K-9 academy with Trooper Jason
8    Woodruff as her handler.
9    Q.  And that was in June of 2018?
10   A.  Yes, sir.  That's when the graduation was.
11   Q.  Did you actually participate in the training of
12   both Trooper Woodruff and Donna?
13   A.  Yes, sir, I did.
14   Q.  In what capacity?
15   A.  As the lead instructor for the academy.
16   Q.  What types of -- did you use the same kind of
17   testing that you generally described before we started
18   focusing on Donna?
19   A.  Yes, sir.
20   Q.  The same known/unknown?
21   A.  Yes.
22   Q.  Have you participated or observed any other
23   quarterly training or certifications of Donna since
24   2018?
25   A.  Yes, sir, I have.

1    Q.   And is she still certified?

2    A.   She is still certified.

3    Q.   How many times do you -- do you recall that you

4    individually were involved with trainings or

5    certification?

6    A.   Ever since she's -- from the very beginning.

7    I've been to every single quarterly, every -- her

8    academy obviously, and every certification I've

9    participated in.

10    Q.   In your estimation is she a reliable drug

11    detection dog?

12    A.   Yes, sir, she is.

13    Q.   And why is that?

14    A.   I've witnessed her during the certifications

15    during all the other trainings she's never -- so the

16    only issues that I've ever seen with K-9 Donna is, as I

17    described before, for an indication we want those dogs

18    to be staring at source and sitting.  And that's a

19    perfect indication.  K-9 Donna doesn't give the perfect

20    indication.  And what I mean by that is, she'll bark.

21    She'll look at Trooper Woodruff, her handler, at times

22    once she's done her indication.  Sometimes she'll

23    scratch the source.  All those things that basically

24    take that perfect indication and make it less than

25    perfect.  But it still passes.  Okay.  It's still an

1    indication.  It's still very clear.  So I've seen that

2    in Donna, and she just -- that's sometimes what she

3    does.

4         We have some dogs that will look back at the

5    handler for the toy reward.  And that's what she's

6    doing, quite frankly, is she's looking back for the toy

7    because she knows where the toys come from.  She's

8    not -- these dogs aren't dumb; I mean, they are very

9    smart animals and they figure it out fairly quickly no

10   matter how hard we try to train them.  There's some dogs

11   that they just haven't quite got it, and they just --

12   they'll do that perfect indication.  There's some that

13   pick it up pretty quick.  So that's the variation that I

14   mean when I say it's not perfect.

15   Q.  Well, then how come you rely upon it -- her

16   indications?

17   A.  Because when she does that, she always is in

18   odor, has found the controlled substance.

19   Q.  So this is not just a plop down, look back, give

20   me the rewards?

21   A.  No, sir.  There's the alert before this, before

22   the indication.

23   Q.  Is there an efficiency percentage that a dog has

24   to meet to be considered reliable in scent detection?

25   A.  It's not a percentage in reference to the

certification itself.  There's -- ultimately, for the
certification we want the dogs to, number 1, we want to
make sure that the dogs recognize the odors that we've
imprinted on them that we've trained them on.  In this
instance, it's the methamphetamine, cocaine, and heroin.
And secondly, we want to make sure that they are going
to exhibit the behavior that we've trained into them,
when they are in those odors and find those odors.  So
again, that's that indication.  So for the dog that's
what we're looking for.

When I talk about the variations of the score --
when we talk about the scores themselves, the
percentage, the only percentage we have are scores.  So
one being basically perfect, the best score.  Six being
unacceptable, you fail.  And the middle of that, the
average is like a 2.5 to like a 3.24, I think is the
average -- or 3.49.  I can't remember offhand at the
moment.  It's an average.  And then there's minimal
acceptable and then there's insufficient and basically a
failure, insufficient.

So, and again, those -- that score's affected by
how the dog is searching, the intensity of the search
because we're looking at the indication, the search, and
the handler's score.  Those are the three factors when
we're actually grading a dog -- a team, for

certification. So the handler's score is scored based
on, is the handler looking for the hazards? Is the
handler using the dog appropriately? Is the handler
controlling the dog, like we say? Like for instance,
maybe we don't want the dog to go jumping on a car.
Because why, we don't want the dog necessarily to be in
a real-world situation, jumping on someone's car and
scratching their car. So that shows us that, hey, you
got to control your dog. Make sure your dog is not
going to be doing that, as best as you possibly can.
And when that does happen, that lowers the handler's
score a little bit.

        The same thing, like, if they're not presenting
the entire area for the dog. Because if we let a dog
just randomly search this room with no direction
whatsoever, especially a lot of these dogs, they'll
literally search ad nauseam one particular area and
never get to another area on their own. Which is why
it's a team, the handler team. The handler's got to
say, okay, my dog searched this area really well. Now
we're going to move the dog onto another area -- that's
part of the teamwork of the handler team. We joke, but
the handler is supposed to be the brains of the team and
help the dog, you know, do an effective search, make
sure it covers the entire area. So when the handler

doesn't do that, that's going to lower the handler
score, when the handler's not using the dog efficiency.
Those are the things that affect the handler's score.

The dog's score is affected by, is the dog --
after the ritual is performed, is the dog down on the
ritual, if the dog's creeping.  That lowers the score a
little bit, believe it or not, because we want to make
sure, when the dog's down, the dog's down during the
ritual.  While the handler's in the room doing their
thing, if the dog's creeping a little bit, whining that
will lower the score a little bit.  If the dog scratches
at source on the indication, that's going to lower the
dog's score.  If the dog's barking at source, that's
going to lower the dog's score.  So all those things are
a factor in lowering the dog's score.  Are they
indicating?  Did they find the odor?  And did they
indicate?  That's ultimately what we're looking for.

The scores are basically to what degree are they
effective in this, are they successful at this.

Q.  So there's a human element in the score --

A.  Certainly, absolutely.

Q.  And the focus -- is the score a consensus by
other instructors or the individual instructor on that
particular test?

A.  On that particular one.  So whoever's observing

that particular -- because obviously, we can't have an

instructor doing the entire thing typically with all the

teams to go through.  So I might be basically observing

three or four different areas.  Another instructor may

be observing another two or three areas, and so on.  So

it's not the same instructor for the entire

certification.

Q.  In regards to Donna's --

THE COURT:  Mr. Collins, I apologize for

interrupting.  I do see we've been going for the better

part of two hours, and I think it's time for our

afternoon break.

MR. COLLINS:  I appreciate that.

MR. EILERS:  Thank you.

THE COURT:  So we will break now, and we will

come back in 15 minutes.

DEPUTY CLERK:  All rise.  This matter is now in

recess for 15 minutes.

(Recess taken from 3:02 p.m. to 3:23 p.m.)

DEPUTY CLERK:  All rise.  His Honor, the Court,

the United States District Court is again session.

Please be seated.

THE COURT:  Mr. Collins, please continue.

MR. COLLINS:  Thank you.

BY MR. COLLINS:

Q. Sergeant Zeisel, in regards to the training of both the handlers and the K-9s, what measures does the state troopers program take to address the possible influence that may occur between the handler and the K-9 when dog is in a dog sniff situation?

A. So we'll make comments -- so we're looking -- when we're actually -- during training especially, we're watching what the handler does, when they're actually working with the dog. And we'll point out if they're cueing the dog or not. They may subconsciously not realize what they're doing. And that's part of our job as instructors is to point those things out, make those corrections, and just kind of help them see what they're doing.

Because if you're a handler, and you're -- you don't see the overall picture as an instructor can from the room. So we're watching the handler, watching how they present the area. We're watching how the dog's behaving, as far as are they picking up on the dog's alert behavior because sometimes they won't; sometimes they'll be presenting an area, that they're so close to the dog. We kind of say they're too close to the dog to see the alert behavior, and so they don't trust the dog sometimes when the dog does indicate, even though the

dog's right. That's because they didn't observe the

alert behavior, so they'll second guess themselves. And

that's part of, you know, we're dealing with a living,

breathing, animal. The handler's got to work through

those issues with the dog so that they understand how

the dog functions and can better work the dog.

Q. Do you do any particular types of testing to

address those concerns?

A. Just our continual training. It's a constant

process. So we tell our handlers to make sure they have

thick skin. And the reason is, is they're -- you won't

get more constructive criticism, I guess, in any other

field than being a dog handler, because you're

performing in front of the instructors; you're

performing in front of your peers. And it's kind of a

thing, you want to make sure that your dog -- make sure

your dog is doing what the dog's supposed to do, and you

want to be the best handler you can possibly be. That's

why we pick these handlers, because even for the

handlers there's a selection process; we board for our

handlers.

Q. In that regard, based upon your experience of

being an instructor, during the training and

certification process of Donna, have you ever had any

concerns that Trooper Woodruff is not meeting the

criteria that the program requires of a dog handler?

A.   No.   He's absolutely meeting the criteria.   In
fact, most of the issues that we have with Trooper
Woodruff is we were constantly telling him trust your
dog.

Q.   And by that, what do you mean?

A.   Because he constantly -- Donna will indicate,
will show alert behavior and indication.   And he'll do
what we recall a reassessing.   He'll bring her back
around again, and after like the second or third or
fourth time, we're like, come on, man, you know, your
dog is indicating.   He gets probably a little nervous
during the certifications and trainings and stuff like
that.   But the dog's spot on.   Trooper Woodruff is a
very, very good handler.   That's what I mean by trusting
the dog.   It's just the dog will indicate, and he'll
just want to reconfirm, I guess.

Q.   In regards to -- are you familiar with the
program's record keeping process?

A.   Yes.

Q.   And what's your estimation of the current record
keeping process?

A.   So about, let's say a little over a year, year
and a half ago, two years ago, maybe two years ago --
excuse me -- we switched from a lot our applications and

1  things like that.  We're doing them electronically, as

2  with most other forms and reports and things like that.

3  So now we're switching to a more electronic format

4  because, quite frankly, as I said, early '90s is when

5  the K-9 program started.  We had, you know, just file

6  cabinets full of K-9 records.  They are all paper, which

7  is very difficult to -- I mean, that's just a lot of

8  paperwork for K-9 reports and things like that.

9       So this electronic version kind of makes it a

10  little more efficient, a little more easier for the

11  handlers to update their records, and things like that.

12  Q.  Is it perfect?

13  A.  No.  Nope.  With the onset of this electronic

14  formatting some of the things that we've noticed, or

15  sometimes there are issues, it will show the number of

16  indications that are -- that the handlers put in.  And

17  at times it's not breaking the report down into -- we

18  have this many indications and yet, sometimes it'll

19  show -- it doesn't show -- it doesn't break down how

20  many applications the dog used into like -- we may have

21  like several different more finds of methamphetamine

22  maybe, than applications.  And it doesn't make sense,

23  but we have to go back through and figure out, well, how

24  did that happen.  The weights are correct, of the odor

25  that's discovered, you know, that's located.  But maybe

1  there's, for some reason, it wasn't updating in the
2  electronic version the number of actual uses of dog, the
3  number of indications or the number of times the dog was
4  used and didn't indicate.
5      So it's a system we're trying to work through to
6  make it a little more user friendly, I guess.
7      Q.  Are you familiar with the Supreme Court decision
8  of *Florida vs. Harris*?
9      A.  Yes, I am.
10     Q.  And how did that affect the way that the trooper
11  program, K-9 program records?
12     A.  Yes, sir.  So we would keep track of all of our
13  real-world searches, and we still do.  It's not that we
14  don't.  But in our affidavits, the K-9 affidavits that
15  we use in support of the actual search warrant
16  applications, we show how many times the dog's been
17  used, for instance, during training and how many
18  indications that dog has made during training.  And then
19  how many times the dog has been used on different
20  applications, on real-world situations.  How many times
21  the dog indicated during those real-world uses.  How
22  many times were those -- did the dog not indicate in
23  those real-world searches.  Were they verified or not.
24  So it also show, well, it wasn't verified.
25          So we were like, how do we verify this, because

1  we're relying on -- sometimes on people that don't want

2  to necessarily tell us the truth.  If the dog indicates,

3  how are we supposed to verify if the dog's indication

4  was an indication on the controlled substances or not

5  because if we ask the individual, the subject, they

6  aren't necessarily going to be honest with us.  So it

7  was very hard for us to verify that.

8        Which is why this *Harris V Florida* ruling, which

9  depends on the certification and the training.  We know

10  then in our training that this dog is reliable because

11  we -- the certification shows that the dog's reliable.

12  The dog passed the certification.  And in training, it's

13  showing that the dog's reliable in the certification --

14  or in its training records.

15  Q.  So to clarify, prior to this new system, when a

16  dog would not indicate you couldn't be sure that there

17  was no controlled substance if there was no subsequent

18  search warrant; is that --

19  A.  Correct.

20  Q.  So sometimes you might have an indication but no

21  follow up to indicate -- to confirm the indication,

22  correct?

23  A.  Yes, sir.  Yes.

24  Q.  So the current system is based upon the

25  trainings, the quarterlies, as well as the certification

177

1   process?

2       A.  Yes, sir.

3       Q.  Correct?

4       A.  Yes, sir.

5       Q.  And so is it fair to say that the training record

6   of a scent detection K-9 team is a form that all the K-9

7   handlers use.  It's pretty much the same except for the

8   specifics of a particular case.

9       A.  Yes, sir.

10          MR. COLLINS:  At this time I haven't any other

11  questions, Your Honor.

12          THE COURT:  Thank you, Mr. Collins.

13          Mr. Eilers, cross?

14                      CROSS-EXAMINATION

15  BY MR. EILERS:

16      Q.  Good afternoon.

17      A.  Good afternoon, sir.

18      Q.  On direct examination the prosecutor asked you

19  some questions about a hypothetical scenario involving

20  Donna.  I think what he did was, he read a sentence that

21  was written by Trooper Woodruff about a search that was

22  done with Donna.  Do you remember that?

23      A.  Yes.

24      Q.  All right.  So I just want to go back through

25  that with you really quick.  So I'm going to read you

Case 3:20-cr-00002-JMK-MMS   Document 101   Filed 04/06/22   Page 177 of 229

the sentence again, and I want to try to break it down.

So during the on-lead directed sniff of the exterior of the vehicle, K-9 Donna displayed alert behavior along the passenger side of the bed, approaching the cab of the truck. K-9 Donna then indicated at the upper portion of the tool box, or the passenger side seat of the cab, for the presence of the odor of controlled substances.

All right. Does that sentence -- is there a description of what I just told you about constitutes indication behavior in K-9 Donna? What does K-9 Donna do when she indicates?

A.   Sits and stares.

Q.   Okay.

A.   Like I said, as far as training is concerned, you know, like I said, sometimes she'll bark at it, and sometimes she'll stare back at Trooper Woodruff for the toy. That kind of thing, so...

Q.   Is there a specific -- you said that the final indication is critical; that's what you said on direct examination, right?

A.   Uh-huh.

Q.   That's when a dog confirms that it's reached the source of the scent that it's alerted to, right?

A.   Yes, sir.

1      Q.   Okay.  Now is there a -- is a K-9 detector dog,

2  are they supposed to have a single alert type of trained

3  behavior that they have?

4      A.   Yes.

5      Q.   Okay.  What is K-9 specific alert trained

6  behavior?

7      A.   It's the sitting and staring at source.

8      Q.   Okay.  That's the communication, right?

9      A.   Yes.

10     Q.   Okay.  So it's not an indication if K-9 Donna

11  scratches at something, right?

12     A.   No.  If she's just standing and scratching, no.

13     Q.   Okay.  And it's not an indication if Donna lies

14  down, right?

15     A.   No, that would be okay.

16     Q.   That would be okay?

17     A.   Yes, sir.

18     Q.   So it's more than one thing --

19     A.   Sure.  And I apologize if I wasn't very clear.

20  So the sitting indication is -- I guess I should be more

21  specific.  If it's nose level or something like that,

22  the dog will sit and indicate.  If it's a low find, for

23  instance, if it was the bottom of the baseboard or

24  something like that, the dog is going to down because

25  that's the closest it can get to the source.

1    Q.   Uh-huh.

2    A.   So it'll down.  Or if it's way up high the, dog

3    will maybe just stand and lock itself in.  Just stare up

4    at the source, and that's acceptable.  So yeah, I

5    apologize for not clarifying that.

6    Q.   Okay.  Now any one of those things could be an

7    indication for K-9 Donna; is that your testimony?

8    A.   Yes, sir.

9    Q.   Okay.  Now that sentence I just read you, it

10   doesn't explain which type of indication behavior Donna

11   exhibited, right?

12   A.   No.  No, I don't know.

13   Q.   Now you weren't there on June 14th, when this

14   sniff and search happened in the field, right?

15   A.   Yes, sir.  Right.

16   Q.   Okay.  And I think on direct you testified

17   that -- let's talk about cueing a little bit.  I think

18   at one point, and correct me if I'm wrong, you said

19   something about a video recording?  Have you ever video

20   recorded a handler -- to and -- then instruct them on

21   how they might be cueing their dog?

22   A.   Yeah, we have at times.

23   Q.   Okay.  Have you ever video recorded a dog handler

24   conducting a search in the field -- or I'm sorry -- in

25   training?

1    A.    In training?

2    Q.    Yes.

3    A.    Out in the field?

4    Q.    In training, sorry, not in the field.

5    A.    Yes.  In training, yes.

6    Q.    Okay.  Now that video footage is helpful for you

7    to evaluate how the handler and the dog are behaving

8    during a particular search unit, right?

9    A.    That's correct, yes, sir.

10    Q.    Okay.  Now wouldn't it be helpful if the Alaska

11    State Troopers had recorded dash cams so that we could

12    see a particular search in the field?

13    A.    For sure, yeah.

14    Q.    Do the Alaska State Troopers have dash cams?

15    A.    Not on all the vehicles, but I know that we're

16    getting some.  We've had it at times and sometimes we

17    don't have them.  I mean, I know we're just now getting

18    Watch Guard up in Fairbanks.  So I'm not sure how many

19    vehicles, or how many units have the Watch Guard -- the

20    dash cams you're speaking of.

21    Q.    All right.  Now there's no video that you're

22    aware of relating to this particular search in this

23    case, right?

24    A.    I'm not aware of it, no.

25    Q.    But that would certainly be helpful for you to

1    have to form an opinion about whether that particular
2    search was reliable, right?
3        A.   Sure, yes.
4        Q.   Okay.  Now when you do -- well, let's talk about
5    certification a little bit.  So you -- what other law
6    enforcement agencies are you aware of in terms of their
7    certification requirements and how they go about doing
8    it?
9        A.   There's a couple.  And NAPWDA is one of them,
10   Northern Pacific Working Dog Association; and then NPCA,
11   I think is another one.
12       Q.   Okay.  So in -- when you do a certification
13   through the state troopers -- so first of all, the state
14   troopers have their own K-9 training school, right?
15       A.   Yes, sir.
16       Q.   And that's run by state troopers, right?
17       A.   Yes, sir.
18       Q.   Okay.  Now the state troopers themselves, and you
19   in particular with respect to Donna, actually will go
20   and fly to locations to select dogs, right?
21       A.   Yes, sir.
22       Q.   And then select the dog and bring it back to the
23   academy, right?
24       A.   Yes, sir.
25       Q.   And those dogs are expensive, right?

1     A.   Yes, sir.

2     Q.   And then you invest significant time into

3   training that dog?

4     A.   Yes, sir.

5     Q.   And then get that dog certified?

6     A.   Uh-huh, yes, sir.

7     Q.   And then into the field, right?

8     A.   Yes, sir.

9     Q.   How many times have you done that with dogs as a

10  state trooper, or in your capacity?

11    A.   Five academies now.

12    Q.   Okay.  How many dogs have you gone and selected

13  and then taken them through that whole process and then

14  certified, personally?

15    A.   I think ten dogs now.

16    Q.   Okay.  Out of those ten dogs that you went and

17  got, certified, went to the handler, have you

18  subsequently failed on certification?

19    A.   Oh, we've retired one dog.

20    Q.   Okay.  Did you retire that dog, was that one of

21  the ten?

22    A.   Yes.

23    Q.   Okay.  Okay.  Now let's talk about what happens

24  during the certification.  So the standard for a

25  certification for the PSV 2, is ten search areas, 14

1    finds, right?

2        A.  Yes, sir.

3        Q.  All right.  And for each of those finds there's a

4    scoring system, right?

5        A.  Yes, sir.

6        Q.  And it's one would be perfect, six would be fail?

7        A.  Yes, sir.

8        Q.  Is there any kind of written policy about what

9    behavior during a particular event during certification

10   would constitute any one of those numbers?

11       A.  From one to six, it would be very subjective.  So

12   no.  Like I said, the standard was -- I think I

13   explained before, hopefully; maybe I wasn't clear.  The

14   only thing is if the a dog indicated in a location where

15   there was no odor, that would be a failure.  So that

16   would be the six.

17           If a handler, for instance, didn't remove a

18   hazard from an area before presenting that to the dog to

19   search, that would be a six; that would be a failure.

20           Like I said, those other scores in between, are

21   degrees of successful or issues that we are talking

22   about.  So that's where that scale -- it's a more

23   subjective scale until we get to the point where if the

24   dog does not indicate on the odor and does a false

25   indication during a certification, that is a six for

1    that dog.

2       Q.   Okay.  But otherwise there's no written standard?

3    It's kind of a go-with-your-gut as to your overall

4    impression one through six?

5       A.   Very much so.  It's very subjective when they are

6    humans involved in that process, yes.

7       Q.   Okay.  And then there's more than one instructor

8    that you guys have as part of this academy, right?

9       A.   Yes, that's correct.

10      Q.   Is there written curriculum for this academy?

11      A.   There is.

12      Q.   Is that written curriculum kept in the Alaska

13   State Troopers records?

14      A.   It's -- I have that written curriculum.  Yes.  We

15   have -- the K-9 coordinator has it.  It's on file.  We

16   have the training slides for that.

17      Q.   Is there a written curriculum for certification

18   testing?

19      A.   Yes.  For the patrol side, and for the detector.

20      Q.   For the detector, there's a written sort of set

21   of criteria about how a search, they're supposed to take

22   place?

23      A.   Just the outline you see in the certification.

24   So for instance, the different areas to search -- and

25   yes, that's it.

1    Q.  So just ten search areas 14 finds?

2    A.  Yes.

3    Q.  That's the only written standard for how those

4    certifications are conducted, right?

5    A.  Correct, yes.

6    Q.  And then each instructor on a particular occasion

7    when they're going to certify a dog, that's just the

8    general outline, and then they just take it from there

9    and will do those certifications --

10   A.  Yeah.

11   Q.  -- based on that alone?

12   A.  We do confer, as instructors, to make sure that

13   we're on the same sheet of music.  So if an instructor

14   was like way off, for instance, and that's during our

15   recurring training.  So we're not very far off on our

16   subjective judgments.  In other words, so like I said,

17   if a dog does fail because they indicate in an area

18   where there's no drugs, that's a failure.  I mean, we

19   can't -- that's pretty obvious.

20        Other than that, if the dog's not searching very

21   aggressive -- you know, not searching very effectively

22   or scratches, or barks at the source, or maybe they do

23   a -- maybe they indicate but they're in fringe.  So

24   they're not exactly at source because we want them to

25   get more pinpointed, that lowers their scores a little

1  bit.  So that's the only difference in that, as far as

2  the scale or the grading of the dogs.

3      Q.  All right.  Now each time a dog is certified

4  there's just one instructor there making those number

5  determinations, right?

6      A.  For each location.  So like I said before, maybe

7  I'm, you know, observing three or four areas and another

8  instructor is observing a couple other areas and so on.

9      Q.  Okay.  Now if a dog handler combination failed a

10  certification, would you then at that point conclude

11  that that dog's not reliable at that point in time?

12      A.  That's -- we would say that dog did not -- that

13  team did not pass.  So we give them another opportunity.

14  Usually the next day.

15      Q.  Okay.

16      A.  Because usually -- I'll be honest with you.  The

17  issues we have with dog teams is usually the handlers.

18  The handlers make mistakes.

19      Q.  Okay.

20      A.  The dogs will indicate where they're supposed to

21  indicate if the handler does what they're supposed to

22  do.

23      Q.  If a dog handler team fails certification, can't

24  pass, they would be removed from the field until --

25      A.  Yes, sir.

1    Q.   -- that issue is corrected?

2    A.   Absolutely, yes, sir.

3    Q.   Okay.  Now let's just break down what that

4  certification actually establishes.  What a

5  certification establishes is that on that particular day

6  that dog was certified and passed all the tests that it

7  was presented with satisfactory, right?

8    A.   Yes, sir.

9    Q.   Okay.  Now the dog can pass the certification

10 and, you know, given a particular day or particular

11 circumstances of a search, could have reliability

12 issues, right?

13       Let me put it this way, if a dog passes

14 certification in your mind, does that mean that that

15 dog's automatically reliable for the following year when

16 it gets another certification?

17   A.   That's where the maintenance training kicks in.

18   Q.   Okay.  Maintenance training is important, right?

19   A.   Yes.

20   Q.   Okay.  Maintenance training, and you also do

21 quarterly training, right?

22   A.   Yes, sir.

23   Q.   Okay.  Now maintenance training is important

24 because if a dog's certified, then through maintenance

25 training a handler may realize that they've got problems

1  with their dog, right?

2     A.  Yes, sir.

3     Q.  And under that dog's standard manual the troopers

4  have, that handler would then have an affirmative duty

5  to come forward to an instructor such as you, and say,

6  hey, there's an issue with my dog; we're having problems

7  with her, right?

8     A.  That's correct, yes, sir.

9     Q.  Okay.  Now when a K-9 handler does maintenance

10  training is that just kind of up to them to figure out

11  how much maintenance training they want to do?

12     A.  No.  They do -- in the OPM, in our operations

13  procedures manual, they should do about two and a half

14  hours a week.

15     Q.  It's actually at a minimum of two and a half

16  hours --

17     A.  Correct, yep.

18     Q.  So if a handler's not doing two and a half hours

19  a week of required maintenance training that's going to

20  create some concerns from your standpoint, right?

21     A.  Yes.

22     Q.  Yeah.  Because that handler's not following the

23  rules of the manual, right?

24     A.  Right.

25     Q.  The manual that the state troopers themselves

1   created, right?

2       A.  Yep.  Yes, sir.

3       Q.  All right.  I want to talk about record keeping

4   for a record.  We talked about *Florida V. Harris,* and

5   how that changed things for the troopers.

6           You said one to two years ago the Alaska State

7   Troopers made a transition from paper format records to

8   electronic application, right?

9       A.  Yes, sir.

10      Q.  What happened to all the paper records for K-9s?

11      A.  They still exist.

12      Q.  They do?

13      A.  Yeah.

14      Q.  Where are they?

15      A.  They're at the AST headquarters.

16      Q.  Okay.  Are you sure of that?

17      A.  Yes, sir.

18          THE COURT:  Mr. Eilers.

19          MR. EILERS:  Your Honor, I think we have an

20  issue that needs to be addressed.

21          THE COURT:  Do we want to -- is it going to

22  alter the course of your cross-examination if we wait to

23  address the legal issues until the conclusion of this

24  evidentiary hearing or?

25          MR. EILERS:  I just want to make sure I don't

1    waive the issue.

2              THE COURT:  No.  I recognize the ultimate point

3    here.  But I'm also cognizant of the clock.

4              MR. EILERS:  Right.

5              THE COURT:  Obviously, given the testimony, I

6    recognize there's some things there you're going to want

7    to talk about, and I'm interested to talk about them as

8    well.

9              I'm going to suggest you conclude your cross

10   examination.  I recognize the point here -- the

11   contention that you have, and we will address it before

12   we go off record today.

13             MR. EILERS:  So to complete my cross

14   examination based on records that have available to me,

15   right?

16             THE COURT:  Yes.

17             MR. EILERS:  Okay.

18   BY MR. EILERS:

19      Q.  When a dog handler does maintenance training

20   they're required to keep a record of it, right?

21      A.  Yes, sir.

22      Q.  Okay.  If a dog handler's doing one hour of scent

23   work as maintenance training every ten days, that

24   wouldn't meet the maintenance training requirement,

25   right?

A.  Well, you have to be more specific, in the sense
that this is a dual-purpose dog.

Q.  Uh-huh.

A.  It's not pigeon-holed into one discipline.

Q.  Okay.

A.  So in other words, this two and a half hours is
not just for specifically one discipline.

Q.  Okay.

A.  So in this case with K-9 Donna, it's a
dual-purpose dog.  So I would -- it's not just two and a
half hours of scent work and two and a half hours of
patrol work.  That's combined.

Q.  Well, let's talk about the dual purpose.  What
kind of maintenance training is involved with a tracking
and apprehension dog, which Donna is?

A.  Sure.  As far as maintenance training?

Q.  Yes.

A.  That would be building searches, detaining
drills, things like that, to detain on passive subjects.
That's part of the things that we do train for a patrol
dog.

Q.  And the state troopers keep records of that
training, right?

A.  Yes.

Q.  Are you familiar with a -- let me make sure I'm

1  phrasing this right.  Are you familiar with the term a

2  K-9 application form?

3      A.  Yes.

4      Q.  Okay.  What is that?

5      A.  It shows when the dog's been used, what it was

6  used for, and the results.  So typically for the

7  detector side, it will kind of give a brief synopsis of

8  the situation.  The date that it was used, what case

9  number it's referenced to, and how the dog was used and

10  what were the results, if possible.

11      Sometimes, you know, handlers are doing it for

12  other agencies, so sometimes they don't necessarily get

13  immediately results until after a search warrant

14  services are completed.  Those kinds of things.  But

15  that's generally what the application is.

16      Q.  And pursuant to Alaska State Troopers' standards,

17  every time a drug detection dog is employed with a

18  search in the field, that handler is required to

19  complete a K-9 application form, right?

20      A.  They should do it, yes.

21      Q.  It's required, right?

22      A.  Yes.  They need to do it.

23      Q.  Okay.  There's a binder in front of you.  There's

24  a tab, tab D-11.

25      A.  Yes, sir.

1    Q.  All right.  Go ahead and just turn to the second

2    page there.  And down on the bottom right corner, just

3    so that we know we're on the same page, there's the

4    number 2272, at the very bottom.

5    A.  2272?

6    Q.  Yes.  Very bottom corner of the piece of paper

7    there.

8    A.  Yes, sir.  I got it.

9    Q.  Now this is a score sheet from a dog

10   certification, right?

11   A.  Yes, sir.

12   Q.  Okay.  And this tells us who the handler is and

13   who the dog is, right?

14   A.  Yes, sir.  That's correct.

15   Q.  And this is for Donna, Trooper Woodruff, and it's

16   dated May 19th, right?

17   A.  Yes, sir.

18   Q.  Of 2019?

19   A.  Yep.  Yes, sir.

20   Q.  Okay.  And on the top right corner it's got three

21   different evaluators who could have done this

22   evaluation, right?

23   A.  Yes, sir.

24   Q.  Okay.  Down at the bottom of that form, bottom

25   right corner is a place for the evaluator to put their

1   initials, right?

2       A.  Yes, sir.

3       Q.  This hasn't been initialled, right?

4       A.  No, sir.

5       Q.  Okay.  Now, above that there's three different

6   sections where it tells us who the evaluator is.

7   There's blank sections there, right?

8       A.  Yes, sir.

9       Q.  That's not filled out, right?

10      A.  No, sir.

11      Q.  What should be there?

12      A.  Well, it would just be the three names at the

13  top.  So that's why -- it's kind of redundant.  So there

14  is really no reason to do it.

15      Q.  Okay.  So we don't know which -- do we know which

16  instructor did --

17      A.  Which section?

18      Q.  Yes.

19      A.  No, no.  No, sir.

20      Q.  Okay.  Let's break this down a little bit.  So a

21  one is excellent, right?

22      A.  Yes, sir.

23      Q.  And a 5.01 through a six is unsatisfactory,

24  right?

25      A.  Yes, sir.

1    Q.  Now 4.01 to a five is insufficient, right?

2    A.  Yes, sir.

3    Q.  That means that if the dog or handler or both,

4  were consistently scoring fives, that that dog and

5  handler would not pass that certification, right?

6    A.  That's correct, yes, sir.

7    Q.  Okay.  Let's go up to the first search exercise

8  that happened here.  That's the resident's bedroom.

9    A.  Yes, sir.

10   Q.  We don't know which instructor determined the

11  scores for this, right?

12   A.  No, I can't recall.

13   Q.  All right.  Now down at handler, there's a five

14  there, right?

15   A.  Yes, sir.

16   Q.  That's a problematic score, right?

17   A.  Yes, sir.

18   Q.  Now off to the right there's a place for remarks,

19  right?

20   A.  Yes, sir.

21   Q.  Now what it says there is the handler allowed the

22  dog to jump on the bed, right?

23   A.  Yes, sir.

24   Q.  Okay.  Now that's a place where an instructor

25  would probably point out why a dog or handler scored

1    insufficient on that particular search, right?

2        A.   Yes.

3        Q.   Okay.  Now if a handler scored fives consistently

4    in other applications, that handler would fail the

5    certification, right?

6        A.   Right.

7        Q.   Okay.  Now a bed, like a vehicle, can have drugs

8    concealed inside of it, right?

9        A.   Right.

10       Q.   Okay.  Now let's go down to the vehicle -- the

11   first vehicle search here.  It says, vehicle interior.

12   It says:  Handler allowed dog to jump on vehicle, right?

13       A.   Yes, sir.

14       Q.   Now the handler scored a three there, right?

15       A.   Yes, sir.

16       Q.   How do you explain that distinction?

17       A.   Like I said, it's subjective in that sense.  So

18   it could have been -- I don't know.  It could have been

19   the dog jumped on the vehicle a couple different times.

20   I don't know.  I don't know.

21       Q.   Okay.

22       A.   That's the score that's there.

23       Q.   So we don't know, right?

24       A.   Well, we have the explanation why it's there.

25       Q.   Right.  Because the handler allowed the dog to

1    jump on the vehicle, right, or in the bed?

2        A.   Yes, right.

3        Q.   And that's unacceptable, right?

4        A.   It's not acceptable in the sense that obviously,

5    we don't want the dog scratching the vehicles.

6        Q.   Okay.

7        A.   So, as I said before, you know, getting back also

8    to the bed situation.  We're at people's homes, and

9    again, we're trying to make sure that the handlers -- we

10   are trying to respect people's homes when we're using

11   someone's residence.  So we don't want the dogs to be

12   tearing up somebody's residence.  So we tell the

13   handlers, look, keep them off the bed.  We don't want

14   them jumping on the bed and getting dirt and everything

15   on someone's bed.  All right.  That's just common

16   courtesy.  We're using someone who's opening up their

17   home to us.

18            Same thing with the vehicle.  So the point is, we

19   were very specific about it.  The dog got up there maybe

20   because the handler, instead of doing an on-lead

21   directed, which would have been a smarter thing to do, a

22   more appropriate thing to do, he potentially could have

23   done an off-lead free.  Which dog would have naturally,

24   because they're dogs, will jump on on the bed.  So

25   that's a poor decision by the handler.

1          Whereas opposed, with the vehicle, which would

2     explain maybe why the score's not as low.  Maybe the

3     handler had the dog on a lead doing an on-lead directed.

4     And I know we don't have that for sure, but I'm just

5     explaining why some of those scores could have varied.

6     Maybe the dog was on the lead and the dog jumped up and

7     the handler had the lead.  Could have made sure the dog

8     didn't do that.

9          So that's -- it's not exactly, in that sense,

10    it's not perfect but it's the certification that we

11    have.  As long as they're meeting those specific

12    standards I mentioned earlier.

13    Q.  So you agree with me then that you're speculating

14    on the distinction?

15    A.  Yes, sir.  Absolutely.

16    Q.  And again, that scoring is entirely subjective?

17    A.  Yes, sir.  Up to the point of, either the dog

18    indicates in a place that there's no odor, or the

19    handler is -- obviously, misses a danger for the dog

20    itself.

21    Q.  Okay.  Now even though a dog passes a particular

22    certification, there can be circumstances about a

23    particular search that raises concerns, right?

24    A.  In what way?  I'm not sure if I understand your

25    question.

1    Q.  Like there could be circumstances about the way a

2 particular search was conducted in the field that could

3 make that search unreliable, even though the dog's

4 certified?

5    A.  I'm not sure if I understand what you're trying

6 to -- I just don't understand.

7    Q.  So let me give you an example.  You're aware of

8 what cueing is, right?

9    A.  Yes.

10   Q.  Okay.  Cueing is where a handler engages in

11 behavior that the dog picks up on and then responds in a

12 way it shouldn't, right?

13   A.  Sure, yes.

14   Q.  And cueing could be done subconsciously, right?

15   A.  Yes, sir.

16   Q.  Yeah.  And earlier you testified that dogs can

17 even detect seizures before they happen, right?

18   A.  Yes.

19   Q.  Cardiac detection dog?

20   A.  Yes, sir.

21   Q.  Yeah.  So when a handler goes to begin a search

22 they go through a ritual, right?

23   A.  Yes, sir.

24   Q.  And that handler -- or the dog they believe

25 they're getting to work, and they're getting excited,

1    right?

2        A.   Yes, sir.

3        Q.   And when they get excited they change their

4    breathing rate, right?

5        A.   Sure, yes.  I think so.

6        Q.   Okay.  And that's one of the things that would

7    happen if the dog alerted, right?  If it started

8    honing in --

9        A.   There's a distinction between the two.  When the

10   dog's excited, it's a little different than when they're

11   actually searching, and that behavior changes.  When

12   that behavior changes, that's different.

13       Q.   Okay.  Now again, a K-9 can pick up -- you know,

14   their sense of smell is so powerful, and maybe even

15   their hearing, it's not entirely understood.  That they

16   can even detect, you know, changes in heart beats and

17   things like that; is that right?

18       A.   I would assume so.  Like I said, I brought that

19   up.  They can obvious detect when people are having

20   seizures.  I'm not sure as far as that goes.

21       Q.   Now if a handler gets excited, the dog's going to

22   pick up on that, right?

23       A.   Sure.  Yes, sir.

24       Q.   Okay.  If the handler is told that, you know, is

25   provided limited information that leads them to believe

1    that there may be controlled substances in a vehicle,

2    and the handler believes that and goes to employ that

3    dog in the field, it's possible that a handler could cue

4    that dog, right?

5        A.   It's possible, yes, sir.

6        Q.   And for that reason, a search in the field could

7    be unreliable, even though that dog's certified?

8        A.   Okay.   Sure.   I could see that.

9        Q.   Okay.   Now a dog's sense of smell is extremely

10   sensitive, right?

11       A.   Yes, sir.

12       Q.   A drug detection dog they can alert to even drug

13   paraphernalia, right?

14       A.   Yes, sir.

15       Q.   From how far away?

16       A.   It depends on wind current.

17       Q.   Okay.   But it could be a minuscule amount of the

18   controlled substances that could get that dog to, you

19   know, work towards that scent and then alert and

20   indicate, right?

21       A.   Yes, sir.   It's possible.

22       Q.   Okay.   Now let's assume that a handler goes to

23   conduct a search of a vehicle in the field.   And

24   underneath that vehicle, or near that vehicle is a used

25   bag that has drugs in it, a trained substance.   Would

1  that have an impact potentially on the reliability of

2  the dog searching in that circumstance?

3      A.  I'm trying to understand.  I guess it would if

4  the dog -- I mean, are we saying that the dog didn't

5  indicate on the bag and indicated on the vehicle, or

6  visa versa?

7      Q.  It indicated on the vehicle.

8      A.  Okay.

9      Q.  Right.

10     A.  So it depends on if the dog was indicating on the

11  vehicle and staring at the vehicle.  I wouldn't think

12  that the bag would have -- especially -- are you talking

13  about a loose bag outside the vehicle, on the ground?

14     Q.  Yep.  Underneath it.

15     A.  The way we train our dogs, I think the dog would

16  be more inclined to try to get closer to that bag and

17  actually indicate on the bag, rather than the vehicle.

18  Because of the way --

19     Q.  What if there is also controlled substances in

20  the vehicle?

21     A.  Well, then the dog would indicate on the vehicle,

22  right.  I mean, it's kind of like six of one, half a

23  dozen in the other.  It just depends on which substance

24  the dog ends up alerting to and then moving towards

25  closer to.

Q. Is a -- is an Alaska State Troopers dog handler
supposed to have a concrete understanding of what it
means for their dog to indicate? Like what the
indication behavior is?

A. Yes, they're trained. They're taught how to know
what indication is, yes.

Q. Okay. If a trainer -- or excuse me. If a
handler took the position that their K-9, that laying
down, sitting down and staring, scratching and barking,
and jumping up on the hind legs, that all of those
constitute indications, would that be a problem?

A. Yes. If it's just those -- if you have to --
like I said, especially during the certifications and
the training -- again, I wasn't very clear, and I
apologize for that -- the dog indicates and then starts
barking and scratching at source. That's -- we want the
dog not to do that. We prefer the dog not to do that,
but that doesn't mean that's not an indication.

Like I said, the perfect score is sitting and
staring at the source. That's the perfect -- that's
what we want the dog to do perfectly. It's kind of like
our firearms training. The perfect score is 240 for us,
but a 192 still passes. So in that reference that's
what we're looking for with these dogs. And so if a dog
is standing up and locked in its source, because it's so

1    high, that's acceptable.

2         But if -- I guess in that context, I'm just

3    trying to understand, if you mean that if the handler

4    says that my dog was just standing there staring and

5    barking at what the dog believed was where the odor is.

6    I would say that's problematic, yes.  Because we want

7    the dog to be at least sitting and staring at the

8    source.  Again, if there's a variation of the barking,

9    that's not what we would like to see, but it's not a

10   failure either.

11       Q.  So in that sentence I read to you at the

12   beginning of this discussion, it didn't tell us what the

13   indication was, right?  It just said indication, right?

14       A.  Yes.

15       Q.  Okay.  Now it would be helpful if there was an

16   explanation of what that indication behavior was, right?

17   That would be helpful for us to know here, right?

18       A.  Well, yes.  And I can tell you that when we do

19   reports, it's not -- I mean, if we wrote exactly every

20   single thing that happened, we'd write novels, right?

21   It's a synopsis for the trooper, for the officer to

22   refer back to when making testimony.

23        I mean, I know I've done reports before, where I

24   put indication, my dog indicated on this.  And then I

25   can be asked, well, what does that mean afterwards.  So

1    I mean, it just lets me know that this is what happened,

2    and then I can explain it.

3        Q.   Okay.  I want to talk with you about negative

4    reinforcement.

5             Actually before I do that.  Is it problematic --

6    is it inconsistent with a handler's training to have

7    their dog jump up on a vehicle during a search?

8        A.   No.

9        Q.   It's consistent with that -- the training?

10       A.   Well, if the dog jumps in the back -- if you want

11   the dog to jump in the back bed of a truck, I guess.

12   I'm not sure exactly how you mean that.

13       Q.   Well, say that a handler's taking their dog

14   around the truck, and it's an exterior search.  And the

15   dog jumps up on the -- on his hind legs up on the tool

16   box.  Is that something that would be inconsistent with

17   the way in which these dogs are trained?

18            The way in which they're supposed to conduct

19   themselves when performing the search?

20       A.   For the dog, no.  Because they're dogs.  Dogs are

21   going to try to get closer to the source, and that's

22   what they do.  They're trying to get closer to something

23   they're sniffing.  We're just trying to avoid, as part

24   of our training, for handles to control their dog, to

25   hopefully keep the dogs off of the cars.

1           They do it frequently.  Quite frankly, we're
2      trying to avoid that from happening because we don't
3      want people's cars scratched, so we're not training the
4      dogs to jump up on cars.  But when they're searching
5      that doesn't mean it's never going to happen.  So I
6      guess we're doing it as a precautionary measure to avoid
7      having to pay for people's cars getting scratched and
8      things like that during searches.  That's the
9      precautionary measures we're trying to take.
10     Q.  So that would indicate to you maybe a problem
11     with a handler, right, not the dog?
12     A.  Potentially, or the dog, whatever reason the
13     handler didn't make sure the dog didn't jump up.
14     Q.  Right.  Okay.  And you testified that dogs don't
15     lie, right?
16     A.  Yes, sir.
17     Q.  But a handler can make a dog lie essentially,
18     right?
19     A.  Sure.  A handler can make -- like I mentioned
20     before, we go through drills that we're forcing the
21     handler to do something to make the dog indicate.  We're
22     pushing them to the limit.
23     Q.  Okay.  So the if the handler's not following
24     through with their training that could happen, right?
25     A.  Potentially yes.

1    Q.   Where you put a dog into false indication, right?

2    A.   It's possible, yes.

3    Q.   Right.  And as we see in the certification

4    process, a handler allowing a dog to jump up on the bed,

5    for example, could result in a score as low as five

6    during a particular certification test, right?

7    A.   Yes, sir.

8    Q.   Okay.  Let's talk about negative reinforcement.

9    So what do you mean when you say that you do negative

10   reinforcement as part of the training?

11   A.   So for -- well, negative reinforcement would be

12   like a correction.  Like a low, gruff voice, like if

13   you're correcting a dog.  They get the same enjoyment as

14   a reward, if you have the high praise tones.  Dogs get

15   excited.

16        Same thing, if the handler's, you know, not happy

17   with what the dog did, then the dog's going -- excuse

18   me -- the handler is going to give them a nein or a pfui

19   in a low, gruff voice, going to probably take the lead

20   and correct the dog.  So that's the negative

21   reinforcement that we're talking about.

22   Q.   I think I used the wrong terminology there.  Let

23   me try to rephrase this.  You talked about some training

24   that troopers do where they try to get the dog to

25   indicate where it shouldn't?

1     A.  Yes.

2     Q.  Okay.  And can you talk about -- can you walk us

3 back through what was done there?

4     A.  Yes.  So that's where I mentioned, as far as the

5 negative reinforcement's concerned.  When we see that,

6 we don't want the dog to think that that was okay.  So

7 we incorporate that in our training, so that once that

8 dog does that we immediately give them a corrective,

9 nein, pfui.  We move them over to a spot where there is

10 the odor and immediately once they get alert, they

11 indicate, and then it's a lot of praise.  They get a

12 toy.  A lot of happy -- it reinforces.

13     It's kind of like Pavlov's Theory in that sense.

14 Where, you know, the dog was getting the treat when the

15 dog would press the button.  That's what it is.  That's

16 the kind of behavioral training we're providing for

17 these dogs.  So that's a negative reinforcement.  That's

18 not going to get you the toy by doing something like

19 that.  What's going to get you the toy is when you

20 indicate on the odor of the substance that you're

21 trained on.

22     Q.  Now these certifications, again, there's sort of

23 a general standard of ten searches and 14 finds, right?

24     A.  I'm sorry?

25     Q.  The certification test, where you --

1    A.    Yes.

2    Q.    Ten search areas and 14 finds?

3    A.    Yes, sir.

4    Q.    Okay.  And again, there's no really further

5    criteria for how that all takes place, right?

6    A.    Yeah.  It's not specific in that sense, yes.

7    Q.    Okay.  So there's no requirement in the

8    certification process that there be blanks, a blank

9    search?

10    A.    Well, there is a blank search with the third

11    vehicle.  So there are three vehicles that are used.

12    One of the vehicles has no drugs on it.

13    Q.    Can you walk us through how that search is done?

14    A.    Yes, sir.  So there's three vehicles that are

15    lined up.  Depending on what we get, sometimes they're a

16    few feet apart, sometimes they're more than that.  So

17    three separate vehicles.  One of the vehicle is an

18    interior hide, the other vehicle is an exterior hide,

19    and the other vehicle there's nothing on it at all.

20    Q.    Okay.

21    A.    And they got to work through those three

22    vehicles.

23    Q.    Okay.  Let's go back to that certification sheet

24    at 2272 again.  I don't know if you're -- is that still

25    in front of you?

1    A.  Yes, sir, it is.

2    Q.  Okay.  Where on that certification sheet does it

3  indicate how the dog did on that blank, on that blank

4  find?

5    A.  It doesn't indicate anything on there.

6    Q.  Okay.  And you didn't do the certification,

7  right?

8    A.  I didn't do the whole certification.  I did some

9  of it.

10    Q.  Okay.  And there's four different instructors,

11  right?

12    A.  Yes, sir.

13    Q.  So we don't know who did this, the blank -- who

14  was grader for the blank search, right?

15    A.  Yes, sir.

16    Q.  And we don't what that grade was by looking at

17  the certification?

18    A.  I can tell you, if the dog indicated on a blank

19  vehicle, one of those two, whether it's the interior or

20  exterior search, it would be a fail score.

21    Q.  Okay.

22    A.  Because one of the vehicles the dog indicated on

23  didn't have anything in it.

24    Q.  Yeah.  I mean so -- it's ten searches, 14 -- or

25  ten search areas and 14 finds, right?

1    A.   Correct.

2    Q.   But it's 15 searches?

3    A.   No.

4    Q.   Fourteen searches?

5    A.   Finds, 14 finds.

6    Q.   Right.  So how many search are done?

7    A.   Ten search areas.

8    Q.   Okay.

9    A.   So if you count down the list of how many areas

10   there are, there are ten areas:  Resident's bedroom,

11   kitchen, living room, interior, exterior,

12   (indiscernible) back room.  See, if you count them

13   altogether.

14   Q.   Right.

15   A.   Ten.  Now within those searches -- those search

16   areas -- excuse me -- if you notice the factory stock

17   room has two finds in that one, right, the barn stall

18   also has two finds.

19   Q.   Uh-huh.

20   A.   Finds indicates there's actual odor, the drugs.

21   Q.   Okay.

22   A.   Those are the finds.

23   Q.   So --

24   A.   And the clothing is another one, and the dark

25   place is another of two each.

1    Q.   Okay.

2    A.   Which comes up with the 14.

3    Q.   So there's two areas for a vehicle, right,

4    interior and exterior, that are listed here, right?

5    A.   Yes, sir.

6    Q.   And next to each one of those, one's cocaine and

7    one's heroin, right?

8    A.   Yes, sir.

9    Q.   But there's nothing in here, in this document

10   about a third search involving vehicles, right?

11   A.   That's correct.

12   Q.   And there's no written policy, other than ten

13   searches and 14 finds, which is how they certificate --

14   A.   It is in the training material.

15   Q.   It is?

16   A.   Yeah, in the training material.  I apologize.

17   It's in the training material when we discuss how many

18   vehicles that they're searching over.

19   Q.   There's a written document about that?

20   A.   In the training material, yes.

21   Q.   Where's that training material?

22   A.   Like I said, we have those available.  We have

23   the training material, the slide shows, and that kind of

24   thing.

25   Q.   All right.  In your preparation for your

1   testimony today, are you aware of a subpoena that was
2   issued in this case?
3       A.   Yes.
4       Q.   Did you respond to that subpoena?
5       A.   I got it yesterday, and I just read where the
6   address was.
7       Q.   Okay.
8           THE COURT:  It's coming up on 4:15, I'm asking
9   the witness to stay seated.
10          Let's have a little talk.  So Mr. Eilers remind
11  me because my recollection is far from pristine.  It
12  seems to me that many months ago we discussed the motion
13  to suppress, and we discussed the lack of documentation
14  related to the K-9 itself, the K-9 team here.  I think
15  it was Docket 40-some-odd, that we talked about issuance
16  of the subpoena for these materials.
17          If I recall correctly, Mr. Collins, at that time
18  you had suggested that you were going to endeavor to
19  track down these materials.  It also seems to me at a
20  subsequent status hearing, the suggestion was made that
21  either the documentation wasn't maintained or that it
22  was destroyed, or for whatever reason it was not going
23  to materialize.  Is my recollection correct?
24          MR. EILERS:  So far.
25          MR. COLLINS:  I think it's a fair recollection.

214

1   testimony today, are you aware of a subpoena that was
2   issued in this case?
3       A.   Yes.
4       Q.   Did you respond to that subpoena?
5       A.   I got it yesterday, and I just read where the
6   address was.
7       Q.   Okay.
8           THE COURT:  It's coming up on 4:15, I'm asking
9   the witness to stay seated.
10          Let's have a little talk.  So Mr. Eilers remind
11  me because my recollection is far from pristine.  It
12  seems to me that many months ago we discussed the motion
13  to suppress, and we discussed the lack of documentation
14  related to the K-9 itself, the K-9 team here.  I think
15  it was Docket 40-some-odd, that we talked about issuance
16  of the subpoena for these materials.
17          If I recall correctly, Mr. Collins, at that time
18  you had suggested that you were going to endeavor to
19  track down these materials.  It also seems to me at a
20  subsequent status hearing, the suggestion was made that
21  either the documentation wasn't maintained or that it
22  was destroyed, or for whatever reason it was not going
23  to materialize.  Is my recollection correct?
24          MR. EILERS:  So far.
25          MR. COLLINS:  I think it's a fair recollection.

           THE COURT:  Okay.  So I think the question here
is -- and I guess I'm showing my cards here a little
bit.  But based on the materials that have been
submitted, either in the original motion or in the
defense exhibits, it seems clear to me that the
documentation related to K-9 Donna and Trooper Woodruff
is insufficient.  It is wanting.

           Now if in reality this documentation exists
somewhere, as we sit here, is it equitable, or is it
fair to Mr. Eilers and Mr. Conner that we delay this
hearing until such time that it can be found?  Or
through the legal prism here, is it more fair for me to
suggest whether they were failed to be produced or
destroyed, it is of no distinction to this Court in
analyzing the defense motion?

           In other words, the fact that they have yet to
be -- if they existed and they just were failed --
whoever party is responsible, failed to produce them.
Shouldn't this Court just at this point in time treat
them as non-existent?

           MR. COLLINS:  The records, you're referring to?

           THE COURT:  The records related to K-9 Donna
and Trooper Woodruff.

           MR. COLLINS:  Well, not having possession or
control of these documents, and also having made a

request to the agency informally.  And I believe
Mr. Eilers served the subpoena upon them, the party he
wished to serve upon, I can't speak to why the those
documents, if they do exist, were not produced.

THE COURT:  No.  And this is isn't --

MR. COLLINS:  And I'm not interpreting the
Court's suggestion that I'm failing with my duties to
the Court or Mr. Conner, but I can't speak to that.

That's the State of Alaska who, as we all are
aware, is a completely separate entity.

THE COURT:  And I recognize that, and I
recognize that you are not under the obligation to
provide this discovery.

Nevertheless, it does seem to me that when the
efficacy or the quality of a K-9 unit is challenged, the
only way in which that can be sufficiently and fairly
litigated is if the defense has access to the underlying
documentation, which they do not have here.

So I guess my question is more procedural.  At
this point, it isn't due to lack of effort for us to
have acquired this documentation.  I think, and correct
me if I'm wrong, Mr. Eilers, we have been operating
under the assumption that either the documentation was
never made or it was not maintained.  Now we have
testimony that suggestions that perhaps these -- this

document does still exist.  What's vexing to me is that
this isn't something that was a surprise.  Everyone knew
we were looking for this documentation.

So as I sit here now, is there any reason for
me to not simply say, I don't care if this exists at
this point in time.  We're here.  We're litigating the
motion to suppress.  I find the documentation to be
woefully lacking.  Why should we now stop and pause and
give the government an opportunity to remedy this lack
of documentation?

Do you see what I'm saying?  I'm not being
particularly artful.

MR. COLLINS:  And I am vexing myself too.  But
again, Sergeant Zeisel testified generally.  I don't
think he testified specifically as to --

THE COURT:  Right.

MR. COLLINS -- Donna records.  I don't know if
he rifled through the filing system and whatnot.  So I
can't speak for him.  And I didn't intend to call him to
put him on the spot to have him speak to that particular
question because I think he just learned of the subpoena
yesterday.  Which...

MR. EILERS:  Your Honor.

THE COURT:  Mr. Eilers.

MR. EILERS:  First of all, this isn't to impune

Mr. Collins.  Ultimately, this is a case that does -- of
course their prosecution relies upon the Alaska State
Troopers.  The Court did issue a subpoena.  It was clear
what was requested.

Exhibit D-17 is an email of -- from the
sergeant, Andy Cooper, I think, who's the state-wide
drug enforcement coordinator, and what she said is that
after *Florida V Harris,* they started only pulling
records from certification year to certification year.
And that they only pulled records from certification to
certification.

So what they do now is they destroy prior
records, according to this sergeant.  And what the Court
in *Harris* says, as the Court knows, is that a
certificate -- a dog that's properly trained and
certified may be, that can be essentially prima facia
evidence of the dog's reliability.  But the defense has
an absolute right to challenge that certification by
examination of its records.

We don't have those.  What we have is a Court
ordered subpoena, the troopers failed to comply with.
We've got conflicting information about whether these
records exist.  From the defense standpoint, the request
is that the Court strike from the record any testimony
of the K-9 related to this case.  That it be stricken

from the record, and that we move forward as though

there was no dog sniff in this case.

THE COURT:  Mr. Collins?

MR. COLLINS:  Well, as Mr. Eilers alluded, I

think it's D-17, in which it shows that Mr. Eilers sent

me an email requesting the details.  And it shows that I

forwarded this to the case agent to pass along to the

officers.  And which apparently it was because there was

subsequently a response by the trooper that the --

Darren Cooper, that reflects what -- well, it reads for

itself.  I'm not going to reread it into the record

here.

The evidence before the Court is the testimony

of the witnesses.  The -- in order to prove prejudice,

Mr. Eilers would have to prove that there's something

that is contradictory of the testimony.  I'm not saying

that that means that it should be presumed to be

credible.  That's ultimately for the Court.  At this

juncture I can only rely upon what the State of Alaska

relayed to me, that they -- in regards to Trooper

Woodruff and Donna that they did not have those

particular records.

The testimony of Sergeant Zeisel today was, he

believes that they are maintained.  That I cannot -- I

cannot speak to whether or not Sergeant Zeisel's

1   recollection applies to Woodruff and Donna, or if the
2   State of Alaska has mislead me, as well as Mr. Eilers,
3   in regards to that request.
4           THE COURT:  Mr. Eilers, if you could help me
5   recall with specificity what the subpoena -- I don't
6   have a copy in front of me, and I apologize.  But was
7   part of that request the actual training documentation
8   of the slides that the witness has referred to, things
9   of that nature.
10          MR. EILERS:  Yes.  So if you turn to page 2 of
11  that email of D-17.  What you can do there is you can
12  read the email I sent to Mr. Collins back on June 30th.
13          (Pause.)
14          MR. EILERS:  And then just for the Court's
15  edification, there's substantial briefing in the motion
16  to suppress talking about the defendant's right to this.
17          THE COURT:  No, and I note that.
18          MR. EILERS:  And I just have a couple more
19  comments before the Court issues a ruling.
20          THE COURT:  Please.  Please proceed.
21          MR. EILERS:  Okay.  So the Court actually has
22  advisory authority to dismiss a case where there's a
23  violation of due process.  We would make that request,
24  as well.  And as the alternative, we would ask that the
25  testimony be stricken.

1          This case has been pending for a long time.

2     Mr. Conner has been in custody throughout this case, and

3     then also dealing with the pandemic.  A lot of the delay

4     up to this point has also had to do with our ability to

5     get an expert.  We got an out-of-state expert here.

6     He's been listening to this testimony.  We had to pay to

7     get him out here.  And so, at this point, you know,

8     delaying the case for us to get what we're

9     constitutionally entitled to, I think that would be a

10    constitutional violation for Mr. Conner.  And I think

11    the most appropriate -- you know, we would ask that the

12    Court exercises its advisory and dismiss the case or

13    suppress the evidence.

14          But in the alternative, I think the only other

15    fair way to deal with this would be to strike the

16    testimony having to do with the dog in this case.

17          THE COURT:  Mr. Collins, any other argument?

18          MR. COLLINS:  Well, the email upon which

19    Mr. Eilers relies, that contains the response from the

20    state, indicates that despite -- well, it says:  Without

21    seeing the original order my response might not cover

22    what it needs to, and then it proceeds to talk about the

23    *Florida V Harris*.

24          So it appears that Sergeant Cooper, who's not

25    the witness on the stand, nor anyone who has testified

 1  during the course of this matter, had seen the subpoena.
 2  So I can't say as to what the subpoena contained
 3  verbatim.  All we have is the description of what's in
 4  the email.
 5        THE COURT:  But it's fair to say that somebody
 6  at the Alaska State Troopers received the subpoena?
 7        MR. COLLINS:  I never received a copy of the
 8  service, so I could assume that Mr. Eilers did serve
 9  it --
10        THE COURT:  Mr. Eilers.
11        MR. EILERS:  I recall Mr. Johnson served it.
12        MR. COLLINS:  I'm going to assume that he did.
13        THE COURT:  So this is where I'm at.  At this
14  point in time, I think the only equitable remedy here
15  is -- I can't, given where we're at from a failure to
16  provide these records standpoint, and, you know, quite
17  frankly, from Trooper Woodruff's testimony and the
18  documents we actually do have in possession, I think I'm
19  left with only one recourse.  Which is to, I think --
20  I'm trying to think of the right verb here, but to
21  disqualify the sniff test here, the alert from Donna.
22  And then I think, once I excise that, I have to review
23  the sufficiency in both the search warrant, which is
24  separate from the actual traffic stop.
25        I'm not going to dismiss this case, but I am

1    going to, in my analysis of the motion to suppress,

2    assume that -- it was as if the alert did not exist, and

3    review the affidavit for the search warrant accordingly

4    and make a determination.

5            I will highlight what I think is going to be

6    problematic for the government.  But I am not in a

7    position right now, given the sort of hard right turn

8    we've taken late in the testimony, to make that decision

9    off the cuff.  I want some more time to think about it.

10           Mr. Eilers.

11           MR. EILERS:  Your Honor, could we just have a

12   quick minute with Mr. Collins outside, off the record?

13           THE COURT:  Please do.  But Mr. Conner needs to

14   go downstairs here in about five minutes.

15           MR. EILERS:  Sixty seconds, Your Honor.

16           DEPUTY CLERK:  Your Honor, are we in recess?

17           THE COURT:  Sure.

18           DEPUTY CLERK:  This matter is in a brief

19   recess.

20           (Recess taken from 4:26 p.m. to 4:27 p.m.)

21           DEPUTY CLERK:  We are now back on record.

22           THE COURT:  Mr. Eilers.

23           MR. EILERS:  I mean, at this point, Your Honor,

24   it's the defense's position that this witness' testimony

25   is irrelevant.  So I have no further questions.

```
 1          THE COURT:  Well, I did find the witness'
 2   testimony to be enlightening and interesting, but I
 3   think given the deficiency or absence of records in this
 4   case, ultimately the testimony is mooted out by the fact
 5   that I don't find that the defense here had a fair
 6   opportunity to confront and challenge the K-9 search
 7   here.  I do think the case law is fairly clear on this.
 8   I recognize that there is a nuance here, given the fact
 9   that this is a Federal case, and this is a state agency.
10          Nevertheless, I do find that Mr. Eilers has
11   made every effort to acquire these documents that either
12   exist or have been destroyed.  Mr. Collins has, as well.
13   I don't find fault of the parties, nor necessarily any
14   of the witnesses who have testified.  But nevertheless,
15   that is where we find ourselves.
16          Which begs the question, where do we go from
17   here?  Obviously, I'm comfortable issuing an order on
18   the motion to suppress, based on the testimony we
19   received from Officer Miller.  We have not taken
20   testimony from Mr. Conner.  I don't know how crucial,
21   Mr. Eilers, you believe that testimony would be.  I do
22   have the affidavit that is attached to the original
23   motion to suppress.
24          MR. EILERS:  If the Court's willing to waive
25   the affidavit that's submitted in support of the motion
```

1  to suppress, we would be willing to submit on that.

2          Alternatively, you know, we can present

3  Mr. Conner to testify about that discreet issue.  I can

4  tell the Court that the content of his testimony would

5  certainly not be outside the scope of that affidavit,

6  but...

7          THE COURT:  Mr. Collins, your thoughts.

8          MR. COLLINS:  I want to be clear, you're saying

9  that you are not going to consider the affidavit?  I

10  mean --

11          THE COURT:  I would be willing to consider the

12  affidavit in lieu of Mr. Conner testifying.  If the

13  parties are adamant that Mr. Conner testify, I would

14  appreciate that.  I don't know when we would be able to

15  accommodate that request, which should not in any way

16  color your analysis here.  But nevertheless, that's

17  where we find ourselves.

18          MR. COLLINS:  I request that the Court not

19  consider the declaration.  It's an untested one.  And

20  Mr. Conner's subject to cross examination on various

21  matters, including bias and creditability.

22          That said, I understand the Court's position.

23  I ask the Court to allow an opportunity to reconsider.

24  If it turns out, in fact, that there are no records, I'm

25  prepared to call someone to -- who is actually familiar

with the service of the subpoena and the efforts to

obtain. Sergeant Zeisel was not the one served with the

subpoena to follow up on it. So his testimony --

        THE COURT: And I in no way hold Sergeant

Zeisel responsible for any of this. Nevertheless, I

have very little sympathy for the troopers who should

have complied with this in a more vigorous and thorough

manner.

        I'm not interested at this point in time, nor

should -- do I think I should keep Mr. Conner waiting

for these documentations any further. If they exist, if

they don't exist. At this point in time, I made my

ruling as to the relevance or the admissibility of the

K-9 search itself.

        So what we're left with is Mr. Eilers' motion

related to, was this is an impermissible traffic stop.

And once I excise the sniff test and Trooper Woodruff's

affidavit, was the search warrant -- was there probable

cause sufficient to issue the search warrant? That's

where I'm at. I appreciate that you do not want me to

rely on the affidavit. I will not. What this means is

we have to find a time for Mr. Conner to testify.

        I've spoke with Madam Clerk; there is not a

courtroom available for the rest of this week. If it's

just going to be a half hour, maybe we can find

1 something next week.  We can also try to do it
2 virtually.  Although, I recognize nobody's thrilled with
3 taking testimony virtually.
4        Mr. Eilers, I see you shaking your head.
5        MR. EILERS:  Your Honor, could I put him on for
6 five minutes?
7        THE COURT:  We are already past the time in
8 which marshals need to move.  And again, this isn't me
9 displaying anger, but last week we had a status hearing.
10 There was a belief that we were going to finish this
11 evidentiary hearing in an afternoon.  And now we've gone
12 from four hours to nine hours.  I'm not asking the
13 marshals, nor the Madam Clerk, to stay late to
14 accommodate this.
15        What we will do is, we will endeavor to either
16 find a brief window of time where we can get a courtroom
17 early next week.  I know you have paternity leave.  When
18 does that begin?
19        MR. EILERS:  Your Honor, we're going to rest on
20 the case as presented, and ask that the Court issue a
21 ruling at the Court's earliest convenience.
22        THE COURT:  Very well.  That is what the Court
23 will do.  To the extent that we had some -- something
24 unexpected occur today, I will allow, I guess, through
25 close of business on Monday, if either party wants to

file any supplemental briefing related to this point

regarding the missing records, or why that may be

grounds for just an outright dismissal, why I'm wrong

for making the ruling that I have, I will entertain it.

But my endeavor will be to move to issue an order as

soon as possible.

Mr. Collins, anything else from the government?

MR. COLLINS:  No, Your Honor, thank you.

THE COURT:  Mr. Eilers.

MR. EILERS:  Thank you, Your Honor.

THE COURT:  Sergeant Zeisel, I appreciate your

patience and your testimony today, but you are excused.

Madam Clerk, we may go off record.

DEPUTY CLERK:  This matter is adjourned.  This

Court now stands adjourned subject to call.

(Proceedings concluded at 4:33 p.m.)

1                        --o0o--

2                      CERTIFICATE

3       I, Stacy M. Baldwin, Federal Official Court Reporter
     in and for the United States District Court of the
4    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
5    digital recording in the above-entitled matter and that
     the transcript page format is in conformance with the
6    regulations of the Judicial Conference of the United
     States.

7
        Dated April 6, 2022.

8

9
                          /s/ Stacy M. Baldwin
10                        STACY M. BALDWIN, RMR
                          FEDERAL OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25